1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3
      * * * * * * * * * * * *    13CV10974-ADB
4     MEGAN IRWIN and           *
      THOMAS IRWIN              *
5                               *    SEPTEMBER 30, 2015
      VS.                       *    10:50 A.M.-12:54 P.M.
6                               *
      ECLECTIC DINING, INC.     *
7     * * * * * * * * * * * *    *    BOSTON, MA

8

9        BEFORE THE HONORABLE ALLISON D. BURROUGHS

10                   DISTRICT JUDGE

11                    (Jury Trial)

12                    **VOLUME III**

13                **EXCERPT TRANSCRIPT**

14
      **APPEARANCES**:
15

16    FOR THE PLAINTIFFS:    SCOTT E. CHARNAS, ESQ.
                             Charnas Law Firm, P.C.
17                           66 Long Wharf
                             Boston, MA 02110
18
      FOR THE DEFENDANT:     JOHN F.X. LAWLER, ESQ.
19                           HEATHER M. GAMACHE, ESQ.
                             Prince Lobel Tye LLP
20                           Suite 3700
                             One International Place
21                           Boston, MA 02110

22    Court Reporter:        Debra D. Lajoie, RPR-FCRR-CRI-RMR
                             One Courthouse Way
23                           Boston, MA  02210

24

25            Proceeding reported and produced
               by computer-aided stenography

<u>**I N D E X**</u>

**PLAINTIFF WITNESS**                                    <u>**PAGE**</u>

<u>Dr. Mary Hibbard</u>
Direct Examination by Mr. Charnas                          5

1          30 SEPTEMBER 2015 -- 12:50 A.M.

2          (The jury is not present for the following)

3          THE COURT:  Is there anything we need to do this

4     morning?

5          MR. LAWLER:  The only thing that I wanted to

6     address was I did reach my expert late last night, and

7     I've communicated with him, and he basically says that

8     his opinions are going to stay the same.  He will

9     comment, I would assume, like the other experts, that

10    the records show that, since the taxi accident, or

11    following the taxi accident, she reported her headaches

12    were more severe.

13         THE COURT:  Fair game.

14         MR. CHARNAS:  No problem.

15         THE COURT:  All right.  I'm not concerned about

16    him standing on an opinion that he already has; I'm

17    concerned about an opinion that is sufficiently

18    different that the person that is prepared for the

19    cross-examination is disadvantaged.  We'll give you the

20    same -- I'm concerned about it on both your behalfs.

21         MR. LAWLER:  I would never do that.

22         THE COURT:  Okay.  So, an opinion that's in the

23    same ballpark is going to be fine, but a sea change

24    we'll talk about.

25         MR. LAWLER:  All right.  And I would expect that

1    rule would apply to both sides, Your Honor.

2         THE COURT:  I was supposed to speak on this WBA

3    panel last night -- this is off the record.

4         (Discussion off the record)

5         (The jury is present for the following)

6         THE COURT:  Good morning, everyone.  Obviously,

7    we're getting started a little late.  I know the

8    weather was difficult today, and I'm sure there were

9    travel challenges, but I'm going to really grovel this

10   afternoon and beg you all to be here on time tomorrow,

11   but I will save the groveling for 4:00 instead of at

12   11:00.

13        What I will say is that the timing is a little

14   bit challenging.  Mr. Charnas has witnesses for today

15   and tomorrow that had some scheduling challenges, and

16   we need to complete their testimony by the end of day

17   tomorrow, so we need to try and make up the time today

18   because he already had them tightly scheduled.

19        So, what we're going to do is skip the morning

20   break, and we're going to cut the lunch break to half

21   an hour, but we ordered you lunch that you'll have in

22   the jury room.  Hopefully, we've gotten something that

23   everybody likes, but if not, you'll have a half an hour

24   to run downstairs or do whatever it is you want to do,

25   but we're cutting the lunch break, and we're providing

1    lunch.  I'm sorry for the inconvenience.  I'm sorry for

2    the lack of break time, but it's just these two days,

3    we just don't have any flexibility in the schedule at

4    all.

5            So, I'm not going to waste any more time.

6    Mr. Charnas, call your witness.

7            MR. CHARNAS:  Thank you, Your Honor.

8    Dr. Mary Hibbard.

9            (The Witness Was Sworn)

10           THE CLERK:  You may be seated.  Can you please

11   state your name and spell your last name for the

12   record.

13           THE WITNESS:  Mary -- I can't see you.

14   Mary Hibbard, H -- Mary, M-a-r-y, Hibbard, H-i-b, as in

15   boy, b as in boy, a-r-d, as in David, 733 Forest

16   Avenue, Larchmont, New York.

17           MR. CHARNAS:  May I proceed?

18           THE COURT:  Yes.

19           MR. CHARNAS:  Thank you, Your Honor.

20           **DIRECT EXAMINATION BY MR. CHARNAS**

21   **Q.**   Dr. Hibbard, tell the jury, what is your

22   occupation?

23   **A.**   I'm a licensed psychologist in New York State.

24   **Q.**   And are you a neurorehabilitation psychologist?

25   **A.**   That's the specialty of psychology I have focused

1    on, yes.

2    **Q.**    Tell the jury, what is a neurorehabilitation

3    psychologist?

4    **A.**    There are many -- there are many types of

5    psychologists.  There are behavioral psychologists,

6    there are industrial psychologists.  I'm in the world

7    of rehabilitation.  I have worked in rehabilitation

8    settings for the last 30-odd years.

9            THE COURT:  Dr. Hibbard, can I ask you to keep

10    your voice up just a little bit?

11            MR. CHARNAS:  I don't think the microphone is in

12    the right position for her, Judge.

13            THE WITNESS:  It may not be.  I usually have to

14    swallow it.  Is that better?

15            THE JUROR:  Yes.

16    **A.**    Okay.  The world of rehabilitation is aimed at

17    working with individuals who have had some sort of

18    life-threatening disability or illness and to maximize

19    their functioning.

20            In order to do that, as a psychologist, part of

21    my seeing individuals is to do what they call

22    neurocognitive testing, which is assessment of thinking

23    skills as well as mood and symptom complaints.  That's

24    part of my position is to do the assessment.

25            The other half of rehabilitation is to take that

1    information and to work with the individual and to work

2    with a team of rehab professionals in order to maximize

3    the person's recovery.

4    **Q.**    Do you deal with people who have traumatic brain

5    injury in your work?

6    **A.**    Yes, I do.

7    **Q.**    I'm going to ask you to explain for us, what is

8    traumatic brain injury?  And I have a chart which might

9    be of some help to you.

10         Why don't you tell us, Doctor, first of all,

11   what is traumatic brain injury?

12         MR. LAWLER:  Objection, Your Honor.  Sidebar,

13   please?

14         (Discussion at sidebar)

15         THE COURT:  Do you have a qualifier for this?

16         MR. LAWLER:  It's lack of foundation.

17         THE COURT:  Do you have a qualifier for this?

18         MR. CHARNAS:  Well, should I ask her more about

19   what she does about traumatic brain injury?

20         THE COURT:  She's a psychologist.  I mean,

21   she --

22         MR. CHARNAS:  I'll ask her about what she does

23   with the brain.  I mean, her whole thing is related to

24   the brain.

25         THE COURT:  But that doesn't mean she's the one

1    that diagnoses them or --

2         MR. CHARNAS:  No.  The physiatrist is going to

3    diagnose mild traumatic brain injury.  Her job is to --

4    she determines what impairments are attributable to the

5    brain injury, so part of her job is she knows about how

6    the brain functions and how the impairments relate to

7    that brain function.

8         THE COURT:  You need to make that clear.  You

9    need to make it clear that she's not the one that's

10   diagnosing this plan.

11        MR. LAWLER:  It's still -- Judge, so far, we're

12   three questions in basically.  Psychologist is my

13   subspecialty, and what is mild traumatic brain injury?

14   It's like them asking one of us that particular

15   question.  There's been no qualifications whatsoever.

16        MR. CHARNAS:  Obviously, I'm trying to speed

17   things up maybe a little too fast.

18        THE COURT:  You have to beef it up a little bit.

19        (End of discussion at sidebar)

20   **Q.**   Dr. Hibbard, please summarize your education for

21   us after high school.

22   **A.**   Immediately after high school, I went to a

23   three-year nursing school, which was the mode when I

24   went in the 1960s.  I completed my nursing degree and

25   then worked as a nurse in leadership positions for six

1    or seven years.

2           At that time, I decided I would change careers

3    and went back to school to complete a Bachelors Degree

4    in psychology at Mary Mount College in New York City.

5    Post completing that, I went on for a dual Masters

6    Degree at Columbia University, a Masters in education

7    and a Masters in vocational counseling.  It's under the

8    Educational Psychology Division of the school.

9           I then went on for a Doctorate, and over a

10   period of close to ten years, I finished my Doctorate

11   in psychology, in counseling psychology at New York

12   University.

13   **Q.**   And please summarize your training and experience

14   in the field of neuropsychology and neurorehabilitation

15   psychology.

16   **A.**   My psychology experience is very much in-the-field

17   experience with attending numerous on-going seminars

18   and conferences as well as on-going team work and grand

19   rounds, things like that, within a hospital setting

20   because I work in a hospital setting.

21          I had extensive course work as a psychologist in

22   a range of clinical testing materials, and I also had a

23   range of counseling and clinical intervention

24   experiences both in clinical internships and in

25   externships during my years in my post -- in my

1    Doctoral program.

2    **Q.**    Summarize your employment history for us, Doctor.

3    **A.**    My employment history, I'm doing to skip from

4    nursing and on to psychology because I think that's

5    time-sensitive.  I began my career as a psychologist

6    shortly after I finished my dual Masters Degree, and I

7    joined New York University Medical Center and its Rusk

8    Institute, which was a world-renowned rehabilitation

9    center in New York City.

10          I worked there for 11 years as a staff

11   psychologist.  I worked with a variety of individuals

12   doing research on cancer and adjustment to new

13   diagnosis of cancer for the first maybe three years of

14   my experience there as part of an NIH study, National

15   Institute of Health study.

16          I then went on to do subsequent work for another

17   branch of the Government, it was a grant from NIDRR,

18   which was the National Institute of Disability

19   Rehabilitation Research, and that focused on

20   individuals with stroke, and I worked with individuals

21   with left-sided strokes as well as right-sided strokes.

22          I then began to be interested in the world of

23   traumatic brain injury.  It was intriguing to me.  It

24   was much -- it presented as a very large challenge.

25   Everybody was very different, where there was a lot of

3-11

1   commonality with the individuals with strokes, so I

2   began to focus on traumatic brain injury.  I stayed

3   with traumatic brain injury and began to do research in

4   the area of traumatic brain injury while I was at NYU

5   for my initial stay there.  I subsequently come back

6   later on.

7        In that capacity, I again worked with a

8   colleague on early work on what happens to individuals

9   living in the community after traumatic brain injury

10  since, at that point in time, it was the low -- you

11  know, early '80s, and most people only knew about what

12  happened to individuals when they were hospitalized.

13  But in traumatic brain injury, a majority of

14  individuals are never hospitalized.

15        MR. LAWLER:  Objection.  Non-responsive.  There

16  has to be a question at some particular point.

17        THE COURT:  The question is your employment

18  history, so just --

19        THE WITNESS:  Okay, fine.  Thank you.

20  **A.**   I then went on to -- I, along with a team,

21  transferred up to Mt. Sinai Medical Center, which is

22  another large hospital in New York City.  It too had a

23  Department of Rehabilitation, and our job was to grow

24  that Department.  It was very small, and my major role

25  there was to expand the Department of Psychology within

1    the larger Department of Rehabilitation as well as

2    continue on my work with research.

3        My research continued to focus on -- almost

4    exclusively on traumatic brain injury, with the

5    exception of many articles I've written about training,

6    training both interns and post-Doctoral Fellows,

7    specifically in the world of traumatic brain injury.

8        I stayed at Mt. Sinai for 25 years and then was

9    recruited back to become the Director of the Psychology

10   Department for the Psychology Department I worked for

11   when I was a newbie and just new in my field, and it's

12   within the Rusk Institute.  I stayed there for five

13   years, completed what I needed to do in that -- no,

14   four years -- completed what I needed to do at that

15   point in time and then have subsequently moved in to a

16   very small private practice.

17   **Q.**   Do you have experience in evaluating patients with

18   traumatic brain injury?

19   **A.**   I have extensive experience.  I've been evaluating

20   traumatic brain injury -- individuals with traumatic

21   brain injury for the last 35 years or more.

22   **Q.**   And, generally speaking, how do you evaluate

23   people with traumatic brain injury, in general?

24   **A.**   In general?  The assessment will consist of a

25   review of the person's medical chart to see what

1   diagnoses -- were there diagnoses of traumatic brain

2   injury that are available from the medical chart about

3   the individual and what the symptoms were that the

4   person conveys, and do they match the typical cluster

5   of what a traumatic brain injury is?

6          I will then bring the patient in for an in-depth

7   clinical interview.  The clinical interview is designed

8   to find out who this person was before the injury, at

9   what level were they intellectually functioning, what

10  were their strengths and weaknesses prior, did they

11  have any medical situations I needed to know about or

12  psycho-social situations?  And then I needed to ask

13  about, What changed, what happened during the accident

14  or the injury itself that created the traumatic brain

15  injury for the individual, and then, What are the

16  changes they experienced since that period of time?

17  **Q.**   Okay.

18  **A.**   That --

19  **Q.**   Go ahead.  Sorry.

20  **A.**   Okay.  That typically will be an hour to an hour

21  and a half, sometimes longer, to understand the

22  person's perspective of what has happened to them and

23  what has changed.  I will often bring in a family

24  member.  Sometimes I will have the family member with

25  the person, sometimes I'll have them separately.

1          I will then proceed with doing an extensive

2      battery of testing.  The testing is directed at areas

3      of functioning that are typically impaired in

4      individuals with brain injury.

5          I will start with an estimate of what their

6      pre-injury intellectual functioning might have been

7      like, then I will do an actual IQ test, which will look

8      at strengths and weaknesses in the person's verbal and

9      visual or perceptual abilities.  I will then use the

10     gauge of who this person was pre-morbidly and go

11     through a series of tests to look at areas of

12     attention, both visual and auditory attention, simple

13     and complicated attention.

14         I will look at processing speed, how quickly

15     somebody can do tasks, how quickly they can read

16     things, how quickly they can do visual tasks, how

17     fine -- their fine motor skills, see if they're

18     impacted.  I will then go in to the verbal domain

19     because often there are problems with -- not overt

20     problems with speaking but problems with naming things

21     that they know very well, so I will look at naming

22     problems, I will look at ability to define abstract

23     thinking concepts and the like.  So, now I've gone

24     through attention, processing speed and verbal.  And

25     fluency is the other area I would look at.

1          The next area I would look at is visual
2     perceptual abilities, the ability to see things in
3     space and manipulate them and make them whole.  There
4     are several tests that are done to look at that area.
5          I then move on to memory.  Memory is a
6     complicated area because I would be looking at memory
7     for things you hear and memory for things you see, for
8     memory for things you just heard and for memory for
9     what you -- for 30 minute later, what do you remember,
10    that's long-term memory.  I will see if prompting helps
11    the person because that's an important clinical tool to
12    know about.  If somehow we can create artificial
13    prompts, we may be able to help that person function.
14         And the last area I will look at is the area of
15    executive function.  Executive functions are
16    frontal-lobe functions, and they are multiple in
17    nature.  They work very closely hand in hand, and if
18    one or two of those functions isn't working, everything
19    else doesn't work very smoothly.  These skills are
20    skills such as problem-solving, flexible
21    decision-making, ability to inhibit responses --
22    flexible problem-solving, verbal -- those major areas.
23    There are several areas there.
24    **Q.**   Dr. Hibbard, how do we know that these tests are
25    accurate in measuring impairments with brain function?

1    **A.**    Each of the tests that are selected -- or that I

2    select have been well-normed, standardized on

3    individuals at different age cohorts, so there could be

4    20- to 30-year-olds and 30- to 40-year-olds and males

5    and females by different education levels.  So, the

6    tests are found to be reliable, predictable and

7    consistent.

8         There are manuals to score all of these tasks.

9    You follow them very closely when you score each of

10   these, but you have the information for you about the

11   person based on their performance on a test, and then

12   you will look at a norm -- a normative manual to find

13   out what percentage of their -- of the person's age

14   group, education group and often -- and gender group,

15   what's the expectation for that person for that

16   performance.

17   **Q.**    Dr. Hibbard, have you taught or trained others in

18   the field of neurorehabilitation psychology?

19   **A.**    Yes, I have.

20   **Q.**    Tell us a little bit about that.

21   **A.**    For probably 20 -- I would say 20 years of my 25

22   at Mt. Sinai where I worked in the Department of

23   Rehabilitation in the Psychology Department, I

24   developed a pre-Doctoral internship program to train

25   psychologists in their last year of their Doctoral

1    studies where they come for clinical practice for a

2    year, and these individuals specifically had sought out

3    learning about rehabilitation and assessment and

4    treatment of individuals with acquired disabilities

5    primarily within the area of brain injury.

6    **Q.**    As part of your training and experience, have you

7    had to learn about what traumatic brain injury is?

8    **A.**    Yeah, it becomes key because you're the teacher of

9    it to all of the students.

10   **Q.**    So, tell us about that.  How did you learn about

11   that?

12   **A.**    Well, before I -- I just want to come back.

13   **Q.**    Sure.

14   **A.**    I not only did the internship, but I developed a

15   post-Doctoral fellowship, which was a two-year

16   specialized program in the area specific to traumatic

17   brain injury, diagnosis and treatment.  I then

18   maintained my involvement in the clinical internship

19   and the post-Doctoral program when I went back to NYU,

20   so I've been involved with training.

21        I was an active lecturer for many of the

22   courses.  I routinely saw patients with the students

23   under my supervision and modeled and educated about

24   brain injury and what tests were the most selective for

25   that individual.

1    **Q.**   Okay.  Have you ever given lectures to medical

2    professionals in regard to --

3    **A.**   Yes, I have.

4    **Q.**   -- traumatic brain injury?

5    **A.**   Yes, I have.

6    **Q.**   Please tell us about that.

7    **A.**   I have done numerous, numerous lectures,

8    probably -- I don't -- I can look.  It's over a hundred

9    lectures nationally.  Internationally and regionally,

10   I've done many, many more.  The majority of lectures

11   are related to topics specific to traumatic brain

12   injury and individuals coping with same.

13   **Q.**   In the last ten years, have you been affiliated

14   with any hospitals?

15   **A.**   In the last ten years?  The last ten years, I've

16   been affiliated with Mt. Sinai Medical Center where I

17   was a full Professor of Rehabilitation Medicine and so

18   as part of their academic faculty.  I was -- when I

19   transferred back to NYU, I was again given a full title

20   of Rehabilitation Professor, and I have maintained that

21   title even in retirement -- or semi-retirement.

22   **Q.**   What type of patients did you see at NYU, with

23   what kind of problems?

24   **A.**   At NYU, I was the oversight person for all

25   individuals coming to the Psychology Department, but my

1    personal work was entirely with individuals with

2    traumatic brain injury.

3    **Q.**    Now, can you break that down further in to

4    patients you see -- you saw then in terms of the

5    different types of brain injuries you dealt with?

6    **A.**    Just at NYU or in general?

7    **Q.**    In general.

8    **A.**    In general?  Okay.

9         I saw many, many individuals who've had both

10   left- and right-hemisphere strokes because that was

11   part of my earlier research, and earlier research

12   always involved assessment of these individuals as well

13   as creation of novel interventions.

14        For individuals with traumatic brain injury,

15   traumatic brain injury is more common in its

16   presentation clusters, meaning individuals are

17   struggling with specific physical problems, cognitive

18   problems and emotional problems.  Having said that,

19   each person I see is a snow flake.  Everyone is

20   different.  They have different residual skills and

21   different residual deficits that are really tripping

22   them up in their everyday functioning.  So, it's very

23   hard to categorize other than the commonality is the

24   diagnosis of traumatic brain injury.

25        Having said that, I've seen people who were

1    barely post-coma or in coma emergence to try to do an

2    evaluation at bedside, I've seen people in nursing

3    homes, I've seen people who have come to the Outpatient

4    Department.  My predominant focus has been not

5    inpatient work but outpatient work, so my vast

6    experience is with individuals who present with mild to

7    the most severe injuries.

8    Q.   Generally speaking, what does it mean to be

9    Board-certified in a medical field?

10   A.   To be Board-certified is to procure an advanced

11   specialty recognition by your field.  It will be

12   different for medicine and psychology.  In the medical

13   world, it's a standardized test.  In psychology, it's a

14   standardized test that is used.

15   Q.   Is there a Board certification given in the field

16   of neurorehabilitation psychology?

17   A.   The area is more broad.  It's in rehabilitation

18   psychology with many people having specialties

19   underneath it, but there is, and I have a Diplomate.  I

20   procured it in late 197 -- 1990s.

21        And I had served on the Board of the Psychology

22   Diplomate for many, many years, have recently stepped

23   down the last two years but continue on mentoring

24   psychologists who are preparing to go through that

25   process so that they hopefully succeed.

1    **Q.**    Dr. Hibbard, have you won any awards or honors in

2    your field?

3    **A.**    Yes, I have.

4    **Q.**    Could you tell us about just a few of those?

5    **A.**    Okay.  Well, I'll just pick a few.  The first one

6    that was noteworthy for me was that, in 1986, myself

7    and colleagues had won a Sidney Licht Award for

8    scientific writing by the American Congress of

9    Rehabilitative Medicine, and this one was on a study

10   involving stroke patients.

11        I've gotten both -- the Ted Weiss Consumer

12   Advocacy Award from the Brain Injury Association of New

13   York State.  I've also gotten the Champion of Hope

14   Award from the same organization.

15   **Q.**    You can just stop there, Doctor, in the interest

16   of time.

17        Have you published any peer-reviewed articles in

18   the field of brain injury?

19   **A.**    Yes, I have.

20   **Q.**    And can you just tell us a few of those?

21   **A.**    Okay.  All right.

22   **Q.**    You're looking at your curriculum vitae, I take

23   it?

24   **A.**    Yes, I am.  Yes.

25        Here's one I've just picked out of the random

1     group of 42 that I've published with myself as primary

2     or one of the peer reviewers.  O'Neill, Hibbard, et al,

3     "Personal and Social Costs and Benefits of Working

4     After Traumatic Brain injury" in the "Journal of Head

5     Trauma Rehab" in 1998.

6         I have one in a -- on primary Hibbard, Uysal

7     Kepler, Bogdany and Silver, John Silver who's a

8     psychiatrist, "Axis I Psychopathology in Individuals

9     with Traumatic Brain Injury."

10    **Q.**   Let me stop you there.  Have you written any books

11    or chapters in books having to do with traumatic --

12    with the evaluation or treatment of traumatic brain

13    injury?

14    **A.**   I've written chapters but not books.

15    **Q.**   Chapters in books; right?

16    **A.**   I know better than to do a book.

17    **Q.**   Okay.

18    **A.**   All right.

19    **Q.**   Can you give us one or two of those?

20    **A.**   Sure.  Let me get one to match.  Okay.  There's a

21    lead chapter by Gordon and myself in 2005 called,

22    "Cognitive Rehabilitation" and it's in John Silver's

23    book -- John Silver, McAllister and Yudofsky, "Textbook

24    of Traumatic Brain Injury."

25    **Q.**   Now, just so it's clear, the Gordon that you wrote

1    that with is not the Dr. Barry Gordon that's the

2    defense expert in this case?

3    **A.**    No.    This is Dr. Wayne Gordon.

4    **Q.**    Thank you.    Doctor, you've mentioned traumatic

5    brain injury several times.    Can you tell us what

6    traumatic brain injury is?

7        MR. CHARNAS:    And, Your Honor, if I could have

8    the chart now?

9        THE COURT:    Yes.

10        MR. CHARNAS:    Thank you.

11        MR. LAWLER:    Same objection, Your Honor.

12        THE COURT:    Overruled.

13        MR. LAWLER:    Thank you.

14    **Q.**    Doctor, tell us, what are we looking at here?

15    **A.**    What are we looking at here?

16    **Q.**    Yeah.

17    **A.**    We're looking at the brain, the inside of -- on

18    the inside of our skull.    The outside covering is the

19    skull.    The brain itself is divided -- well, I'll first

20    say this brain here that looks kind of firm is kind of

21    Jell-O consistency, it's very fluid.    But within it,

22    there are areas of specialization, and over time we

23    continue to find new areas of specialization in

24    understanding the brain.    It's a very complex organ.

25    The primary divisions of the brain are the frontal

1    lobe -- does this circle?  No?

2    **Q.**   No.

3    **A.**   It doesn't, okay.  All right.  The frontal lobe is

4    blue; the temporal lobe, which is over your ears here,

5    are a dark blue; at the back is your occipital lobe;

6    and behind the frontal lobe on top is the parietal

7    lobe; you also have a cerebellum, which is down

8    underneath; and a brain stem.  That's the global

9    outside view of a brain.

10   **Q.**   Can you tell us, what is traumatic brain injury?

11   **A.**   Traumatic brain injury is when the brain

12   experiences a significant force that causes damage to

13   it.  The damage can be transitional and short-lived, or

14   it can be permanent.  The most typical traumatic brain

15   injury --

16          MR. LAWLER:  Objection.

17          THE COURT:  Sustained.

18          MR. LAWLER:  Non-responsive.

19          THE COURT:  Sustained.

20   **Q.**   Are there different kinds of brain injury,

21   traumatic brain injury?

22   **A.**   Yes.

23   **Q.**   What's the most typical?

24   **A.**   The most typical traumatic brain injury is a

25   frontal-impact injury.  For example, if someone in a

1    car gets stopped short and doesn't have a seatbelt on

2    and crashes through the windshield, frontal injury,

3    okay?

4          That will impact this lighter blue area of the

5    visual, mostly on the front part of the brain -- front

6    part of the frontal lobe and as it goes underneath

7    because that frontal lobe really wraps the front of the

8    brain itself.  It is -- the damage as a result of a

9    traumatic brain injury is that whatever the functions

10   are in the areas of that anterior frontal lobe, as well

11   as the front part or the anterior part of the temporal

12   lobe, which is underneath it sitting over our ears,

13   those are the areas that are primarily impacted in a

14   frontal injury.

15         The impact itself is because the brain is a

16   fluid mass.  It has cerebral spinal fluid floating

17   around it, which keeps it kind of protected, but it's a

18   very fragile thing.  And if you hit a fragile mass,

19   you're going to cause a lot of pressure on that brain

20   itself.  That pressure compacts the brain and makes it

21   literally move back and forth in the skull, and it also

22   causes it sometimes to rotate.

23         It's connected, remember, to the brain stem.

24   So, you have a brain stem, and you have this brain, and

25   the brain starts to rotate and go back and forth.

1    Well, if you take a brain that's the consistency of

2    Jell-O and you start doing that to it, you're starting

3    to change the structure of the Jell-O or the brain.

4    The problems will go through the entire --

5            MR. LAWLER:  Objection.

6            THE COURT:  Okay.  He's asking a question, and

7    you're answering more broadly than the question he's

8    asking.

9            THE WITNESS:  Okay.  Sorry.

10           THE COURT:  So, if you could try and listen to

11   his question and answer it.  He's very good.  He will

12   certainly ask you the next question.

13           THE WITNESS:  Okay.

14           MR. LAWLER:  Thank you, Your Honor.

15   **Q.**   Which is, what is mild traumatic brain injury?

16   **A.**    Mild traumatic brain injury is a terminology, one

17   of several.  You could have a mild, a moderate or a

18   severe traumatic brain injury.  The initial definition

19   of mild is based on EMS, Emergency Medical System, and

20   ER interventions with how impaired the person is and

21   what they are presenting as symptoms.  There is a

22   measure called the Glasgow Coma Scale --

23           MR. LAWLER:  Objection, Your Honor.  Request

24   sidebar at this point.

25           (Discussion at sidebar)

1          MR. LAWLER:  It's well-established that jurors

2     get aggravated at counsel when they have to object

3     constantly.  I have to object constantly now because

4     Mr. Charnas is trying to put Dr. Hibbard on autopilot.

5          THE COURT:  I don't actually think he's trying

6     to do that.  I think the witness is on self-autopilot,

7     but you've got to --

8          MR. CHARNAS:  I know.  I'm trying to speed

9     things up, Judge, and --

10          THE COURT:  I know, but --

11          MR. CHARNAS:  And she's on autopilot too.

12          THE COURT:  She's on autopilot, but you've got

13     to -- she's going well beyond the questions that you're

14     asking.  I'll instruct her again.

15          MR. CHARNAS:  That's not necessary.

16          MR. LAWLER:  Thank you.  Well, I would like an

17     instruction again.

18          (End of discussion at sidebar)

19     **Q.**   Dr. Hibbard, what's the difference between mild,

20     moderate and severe traumatic brain injury?

21     **A.**   The difference is in the degree of altered mental

22     state or consciousness immediately post the injury, how

23     long a period the person has a period of total loss of

24     memory after the event, and the last criteria is did

25     they have a loss of consciousness or not.

1  **Q.**   Can someone who sustains mild traumatic brain

2  injury have serious consequences?

3       MR. LAWLER:  Objection.  Leading.

4       THE COURT:  Overruled.

5  **A.**   The literature would suggest that 20 to 30 percent

6  of individuals with mild injury are likely to remain

7  with permanent, ongoing problems for the rest of their

8  life.

9  **Q.**   And would those problems be serious even though

10  the brain injury is called mild?

11  **A.**   Mild is a euphemism for living with a mild brain

12  injury with persistent symptoms.

13  **Q.**   Now, Doctor, in your work as a neurorehabilitation

14  psychologist, from time to time, do medical doctors ask

15  you to perform neuropsychological evaluations on their

16  patients?

17  **A.**   Yes, they do, routinely.

18  **Q.**   And what types of doctors, what specialties

19  generally tend to ask you to do these evaluations?

20  **A.**   Neurologists traditionally are the individuals who

21  will ask you to see a patient because the person has

22  had a significant blow to the head, and they're worried

23  about them.

24       The area of rehabilitation medicine has

25  physicians who are specifically trained in

1    rehabilitation medicine, and they're called

2    physiatrists.  Physiatrists are not psychiatrists;

3    they're physiatrists, and those individuals will

4    routinely recommend evaluation.

5    **Q.**   When you're asked to do these evaluations, what

6    type of evaluations do they ask you to perform?

7    **A.**   They will ask me to do a neuropsychological

8    evaluation.  They do not ask for, Do this test or that

9    test.  That's within the realm of the psychologists to

10   choose.

11   **Q.**   So, generally speaking, what are you testing for?

12   **A.**   I'm testing for the area -- I'm testing, A, based

13   on the person's self-complaints, to be sure I'm testing

14   areas that would reflect the intactness or lack of

15   intactness of those areas, that's the first and

16   foremost.

17          And then I would go through the areas of

18   cognitive impairments that are most typically shown in

19   individuals with brain injury.  I would look at areas

20   of attention, memory, processing speed, visual

21   perceptual functioning, executive functioning.  I would

22   also evaluate how the person's mood is and their

23   anxiety levels.

24   **Q.**   Is that called affective functioning?

25   **A.**   Yes, affective functioning.

1    **Q.**   When a doctor asks you to do a neuropsychological

2    evaluation, do you yourself do the tests, or do you

3    have someone else do the tests for you?

4    **A.**   I always do the tests myself.

5    **Q.**   And is that important?

6    **A.**   It's extremely important.

7    **Q.**   Why is that?

8    **A.**   Because you get to see the person, first of all,

9    How is their stamina over a period of an hour?  Do they

10   begin to get flustered as the hour went on?  So, you're

11   looking at clinical information there.  You can see

12   when the person gets overwhelmed.  You can see when

13   they break down and cry because they're so frustrated.

14   You don't get to see that if somebody else is doing the

15   testing and all you have is data to look at.

16   **Q.**   Doctor, at some point, did I ask you to do a

17   neuropsychological evaluation of Megan Irwin?

18   **A.**   Yes, you did.

19   **Q.**   And do you remember approximately when that was?

20   **A.**   I can give you the exact dates.  It was 3/20/14,

21   3/26/14 and 4/01/14.

22   **Q.**   That's when you performed the evaluation?

23   **A.**   That's correct.

24   **Q.**   And what did you do in order to perform this

25   neuropsychological evaluation of Megan Irwin?

1    **A.**   My initial steps in meeting -- before I met Megan,

2    was to do a medical chart review.  Mr. Charnas had

3    provided medical chart information for me to review.

4          What I found in the medical review was multiple

5    areas of consistency across physicians, both --

6          MR. LAWLER:  Objection.

7          THE COURT:  Is that the same objection we talked

8    about?

9          MR. LAWLER:  Yes, Your Honor.

10         THE COURT:  Dr. Hibbard, you have to just answer

11   the question that's asked.  I know you may be able to

12   surmise what his next question is going to be, but you

13   have to wait for him to ask it.

14         THE WITNESS:  Okay, thank you.

15   **Q.**   So, Doctor, when I asked you to do a

16   neuropsychological evaluation of Megan Irwin, what did

17   you do?

18   **A.**   I did a medical chart review to look at symptoms,

19   diagnosis of traumatic brain injury and consistency

20   across the chart.  I then brought Megan in for a

21   clinical interview where I focused on her -- who she

22   was before, her pre-morbid abilities, her education,

23   her family background, her academics, medical problems

24   she had --

25         MR. LAWLER:  Objection.  The question was:  What

1    did she do, Your Honor.

2        MR. CHARNAS:  And she's telling us, Judge.

3        THE COURT:  Yeah, she's -- I'm going to overrule

4    that objection.

5        MR. LAWLER:  Thank you.

6    **A.**    Let me get grounded again.

7        The -- I'll ask who she was -- who Megan was

8    before this event happened, this accident happened, and

9    then I will ask changes subsequent to that in her

10   functioning, what she tells me spontaneously.  I will

11   also review symptoms that she's reported on checklists

12   and things like that I then reviewed within session.

13       I, in this case, interviewed the husband on the

14   telephone.  I then proceeded to begin testing.  I went

15   through all of the areas I've talked about that are

16   typical in traumatic brain injury.  The one additional

17   area that you need to look at is an area of effort on

18   testing to be sure that the person is trying their best

19   and personality considerations.

20   **Q.**    And did you arrive at certain opinions concerning

21   Megan Irwin's cognitive and affective functioning?

22   **A.**    Yes, I did.

23   **Q.**    And do you hold those opinions to a reasonable

24   degree of certainty?

25   **A.**    I do.

1    **Q.**    And what is your opinion?

2            MR. LAWLER:  Objection.  Foundation.

3            THE COURT:  I'm not sure I understand the

4    objection.  Do you want to talk about it at sidebar?

5            MR. LAWLER:  Yes, Your Honor.

6            (Discussion at sidebar)

7            MR. LAWLER:  Again, the objection is lack of

8    foundation.

9            THE COURT:  To make an opinion in general or on

10   that particular question, an overall lack of

11   foundation?

12           THE COURT:  Overall lack of foundation.

13           THE COURT:  Okay.  That's overruled.

14           MR. LAWLER:  Your Honor, she basically is saying

15   I'm giving her these tests --

16           THE COURT:  Yeah.

17           MR. LAWLER:  -- and do you have an opinion based

18   on these tests, and yes, she's going to basically say,

19   I do have an opinion, and now what is that opinion?  So

20   now it's time for me to object.  She hasn't established

21   what tests were given to Ms. Irwin, what the interview

22   consisted of.  I mean, she's produced, I don't know, a

23   30- to 40-page report in this particular case that

24   talks about all these different elements of it, and now

25   basically because he wants her to cut to the chase,

1    none of this is brought forward.

2         THE COURT:  Well --

3         MR. LAWLER:  First you want him to go through

4    every test that she did.  This goes to the weight of

5    the evidence.  She's qualified for her expert opinion.

6    He's asked her for her opinion.

7         MR. CHARNAS:  Your Honor, the law is clear.  I'm

8    entitled to get her opinion and then ask for a basis

9    for it.  And I'm beginning to think that these multiple

10   objections are designed to make it take longer and

11   longer for this witness.  He knows I'm under time

12   pressure, and he's making these multiple objections.

13        THE COURT:  I'm going to overrule that

14   objection.  You can get to it on cross.

15        MR. LAWLER:  I will, thank you.

16        (End of discussion at sidebar)

17        THE COURT:  That objection is overruled.

18   **Q.**   Did you arrive, once again, at certain opinions

19   concerning Megan Irwin's cognitive and affective

20   functioning?

21   **A.**   Yes, I did.

22   **Q.**   Do you hold those opinions to a reasonable degree

23   of certainty?

24   **A.**   Yes, I do.

25   **Q.**   Tell us, what is your opinion?

1    **A.**   My opinion is -- my psychological diagnoses were

2    cognitive disorder, a thinking disorder secondary to

3    traumatic brain injury, a mood disorder secondary to

4    the injury, an adjustment disorder secondary to the

5    injury, and a post-traumatic stress disorder secondary

6    to the injury and the accident itself.

7    **Q.**   When you say the injury, we're talking about the

8    injury of August 5th --

9    **A.**   The traumatic brain injury.

10   **Q.**   -- 2012, okay.

11        Now, earlier you said that one of the things you

12   did was you looked at the effort that Mrs. Irwin was

13   giving?

14   **A.**   Correct.

15   **Q.**   Why is that important?

16   **A.**   Because of the potential of secondary gain,

17   someone is feigning potentially or making believe

18   they're doing worse than they really could do on

19   testing.  So, in order to counter that, there have been

20   a whole range of measures used to look at effort and

21   the adequacy of effort.  Some of the tests are tests

22   all by themselves, and some are embedded measures.

23   **Q.**   And did you prepare a chart for us of a summary of

24   these tests that you did to test her effort?

25   **A.**   Yes, I did.

1     MR. CHARNAS:  And Your Honor, I'd like to show

2     this chart to the jury.

3     THE COURT:  Go ahead.

4     **Q.**   So, if you would, tell us, what are we looking at

5     here on this chart?

6     **A.**   Okay.  We're looking at four different components

7     of measures of effort that I used in this evaluation.

8     They were sampled throughout the testing, so the person

9     had no idea when I was using these particular tests.

10          The first one was a component of a verbal

11    learning test.  It was a list of words that Megan had

12    to remember after being repeated multiple times, and

13    then I asked her in a half an hour to remember those

14    words again, and the California Verbal Learning Test at

15    the very end has a fairly simple, Which of these words

16    did you hear in the list that I kept reading?  Is this

17    this or this?  And the person has to choose which of

18    those answers are correct.  Megan correctly identified

19    16 of the 16 words that were on that list in that

20    format.  That's an embedded measure of effort.

21          The second test I used is a stand-alone test of

22    effort.  This is a series of simple pictures called the

23    Test of Memory and Malingering.  The person is shown 60

24    simple visual pictures, like a picture of a birdhouse

25    or a whistle -- okay? -- and then is asked to choose

1    from two items, Which has she seen before?  So, in this

2    case, if there was a whistle and an alarm clock, the

3    answer would have been whistle.  You will do these 50

4    items and then the choice of 50, 50 from choice of two

5    items, and then depending on a cut score on how well

6    she does on that test, you may have to do it again.

7        In Megan's case, the first time she saw these

8    50 items, she picked 34 out of the 50 when given a

9    multiple choice between two items.  That was low.  It

10   was not passing score.  A passing score needs to be 45

11   or higher.  So, I needed to re-administer the test

12   again.  I re-administered the test in the same way,

13   showing her the 50 pictures and then asking her to

14   choose from an array of two.

15       And this time she did pass, and she got 48 out

16   of 50.  There was one more option if I needed to, to

17   test the limits, but I didn't need to here.  She passed

18   the test, and her effort was deemed appropriate and

19   reliable.

20       The third measure on this list is a sub -- is a

21   different way of scoring one of the components of

22   attention that I measure, and it's call the Digit-Span

23   Test where numbers are read in increasing array of

24   length forward, and then the person has to repeat them

25   and then backward and the person has to repeat them.

1    For this purpose, a minimum number of digits remembered

2    forward and backward is the essential measure of

3    effort.  Someone needs to remember at least four

4    numbers going forward in the right order and four

5    numbers in reverse order.

6         In Megan's case, she had a total of four numbers

7    she remembered forward, four number back.  The cut

8    score for this measure is seven, so she is deemed to

9    have adequate effort.

10        The Rey 15 item is a simple effort measure.

11   It's 15 very easy items to remember.  You pre-cue the

12   person, I want you to remember these because I'm going

13   to give you a blank piece of paper and you'll have to

14   draw them for me, and they're things like a 1, a 2, a

15   3, a circle, a diamond -- a triangle and a square, very

16   simple, easy things.

17        For this test, when Megan drew them, she drew 15

18   out of 15, she got -- 12 out 15, rather.  So, she

19   remembered the majority of them.  This score is higher

20   than nine, which is the cut-off for this measure, so

21   across the board she presented adequate effort.

22   Q.   After you determined that she was giving an honest

23   effort, what did you do next in terms of your analysis

24   or testing?

25   A.   My next task was to assess her pre-accident

1    intellectual abilities.

2    **Q.**    Why is that important?

3    **A.**    It's essential because not everybody coming in to

4    the office comes in with the same basic intellectual

5    ability.  Some people are average, some people are very

6    superior, some people are borderline to begin with.

7    So, we need to get an estimate for her so that we can

8    see what the changes are for Megan relative to who she

9    was before.

10          There are measures that I will use from her

11    history, what her college GPA was, what kind of scores

12    did she have, did she ever fail any tests.  I will look

13    at her academic his -- her work history to see what

14    kind of work she did, how complex was it and was she

15    successful in the work or not.  Those are indicators of

16    who this person was pre-accident.  I'll also ask about

17    a family history and how far people went in school.

18          For testing itself, I will use a measure which

19    is a reading measure, and the words get increasingly

20    esoteric and hard to pronounce.  It's important to

21    pronounce them correctly.  It is in association with

22    people with more education will have a broader array of

23    vocational skills and agility.

24          This test is called a test of pre-morbid

25    functioning, and for Megan, she scored in the average

1    range on that measure.  So, her -- the pre-morbid

2    estimate for testing for Megan is that's her benchmark,

3    she was average.  The average is the range that I will

4    then use to say that this score at average is intact.

5    **Q.**    Just so it's clear, was it just that test that you

6    used to determine what her pre-morbid or pre-accident

7    condition was or functioning was?

8    **A.**    No.  To repeat again, that is one component.

9    That's a standardized measure of pre-morbid estimate,

10   all right?  I would -- as I said, went back to her

11   history, which often tells you additional information

12   about the individual that may suggest that whatever

13   you're going to get on one test may be -- may suggest

14   her IQ might be a little higher than that.

15   **Q.**    Was there anything specifically about her work

16   history that you thought was significant when you were

17   evaluating her pre-morbid functioning?

18   **A.**    Yes, there was.

19   **Q.**    And what was that?

20   **A.**    The -- her ability to take on positions and

21   rapidly be identified as a superior excellent worker in

22   the field.  Megan worked in -- her first position was

23   in Yellow Book, which was an advertising group for I

24   think Yellow Pages or something like that.  And she was

25   quickly identified as Rookie of the Year the first --

1    within the first year she had taken that job.  She,

2    obviously, had done very well in sales.

3          She then went on to Shire Pharmaceutical where

4    she rapidly -- where her job was to sell medical

5    products to physicians in their private offices in

6    Manhattan.  Her job was to really go in and sell

7    medication to physicians, so intuitively, you know,

8    that would need a great deal of ability to be able to

9    understand medications that she might be recommending,

10   what potential side effects there might be, things like

11   that.

12         She, again, showed incredible ability to excel

13   at sales in this position.  She was there for eight

14   years.  She was senior salesperson up until the time

15   she had her accident, and she had just been awarded an

16   achievement award for high sales for the company

17   several months before her accident.  So, it does talk

18   about some other strengths that she was obviously

19   showing in her work experience.

20   Q.   Dr. Hibbard, what did you do next in terms of your

21   analysis?

22   A.   The -- for testing?

23   Q.   Yes.

24   A.   Then I would proceed with testing.  Testing

25   usually takes six to eight hours, depending on the

1    individual, and I will not do an area of attention, for

2    example, only and then move only to memory; I will mix

3    tests, so that the person has no idea what it is I'm

4    going to be asking them to do next.

5    **Q.**    Doctor, did you prepare a chart for us, a two-page

6    chart, summarizing your test findings?

7    **A.**    Yes, I did.

8          MR. CHARNAS:  Can everybody read that?

9    **Q.**    Can you read that?

10   **A.**    I can read that.

11   **Q.**    Okay.  Well, if you can read it, I can.  Okay.

12   **A.**    Right.  Let me give you -- this is a lot of

13   information here, but let me --

14   **Q.**    Let's -- what I'm going to ask you to do is go

15   through the chart line by line and tell us the

16   significance of each of these things.

17   **A.**    Okay.  All right.  The first grid is current IQ.

18   This was her current IQ post-injury, all right?  If you

19   see the second column -- let me just give you the grids

20   first; okay?

21         The first column is where Megan's performance is

22   in the high average or above range.  Just because

23   predicted IQ is average, one could expect that there's

24   going to be some high intellectual abilities

25   potentially still intact.  Second is average skills.

1    Third is low average.  And the last area is impairment,

2    which falls in the borderline-to-impaired range.

3    Q.    So, please go through these columns for us.

4    A.    Okay.  The first -- the current IQ is a composite.

5    There's a full IQ score, and a full IQ score is in the

6    second column here, and it says it's 93, which is

7    exactly the same as the test of pre-morbid functioning

8    predicted, interestingly.  Rarely do we find that, and

9    it's at -- so, she stands at the 37th percentile for

10    her age group.

11          But within the IQ score, and you will often see

12    this in IQ scores, there are four sub-indexes:  There's

13    a verbal comprehension index for verbal strengths;

14    there's a perceptual reasoning index for visual

15    perceptual skills; there is a working memory index,

16    holding information in short-term attention; and then

17    there is a processing-speed index.  All four combine to

18    make the IQ.

19          What you will see typically and you see in

20    Megan's case is that, after the injury, certain

21    cognitive skills that make up the IQ test are pulling

22    down some of these scores and keeping others relatively

23    preserved.  In Megan's case, the first column, which

24    says, "Processing-speed index," was still -- was in the

25    82nd percentile.  That's high average, and clearly this

1   reflects how she used to be able to mutli-task at home,

2   how quick she could do work and go to school and take

3   care of the kids and --

4           MR. LAWLER:  Objection, Your Honor.

5   A.    -- and still be a super-achiever.

6           MR. LAWLER:  This is the same objection that I

7   made before.  I mean, this is a non-responsive answer

8   that's running on to seven minutes now.

9           THE COURT:  Dr. Hibbard, he's again objecting to

10  the fact that you're going beyond the scope of the

11  question.

12          THE WITNESS:  Okay.  I will try not to digress.

13  I apologize.

14  A.    Okay.  The -- but it is important to know the

15  difference in the IQ indexes.  Her processing speed was

16  her relative strength in IQ --

17          MR. LAWLER:  Objection, Your Honor.  There is no

18  question.

19          MR. CHARNAS:  Let me try it, Judge; okay?

20          THE COURT:  What he's asked her to do is to

21  explain the columns, so why don't you try and do that a

22  little bit more succinctly.

23          THE WITNESS:  Okay.

24          THE COURT:  Okay?

25          THE WITNESS:  Fine.

1    **Q.**    So, we have the processing speed as a cognitive

2    strength of hers you've told us?

3    **A.**    Correct.

4    **Q.**    And then you've told us that her full IQ is 93,

5    which -- but her verbal IQ or her verbal index is

6    58 percent?

7    **A.**    Correct.

8    **Q.**    What is the significance of that, that difference?

9    **A.**    There is no -- there's no significant difference

10    between the full IQ and the verbal IQ.  They're both in

11    the average range; okay?

12    The significant difference is she's got a

13    strength in speed of processing.  And if you look at

14    the other columns, she's got weaknesses in two areas,

15    and the weaknesses are in her perceptual reasoning --

16    **Q.**    That's the next column; correct?

17    **A.**    Yes.  -- and working memory.  And of those two,

18    working memory is at the ninth percentile based on a

19    hundred, so 91 percent of people do better than she at

20    her age group.

21    **Q.**    Now, this last column, "Functional Implication,"

22    what are you trying to tell us in that column?

23    **A.**    That any of these tasks that are administered

24    require some component of working memory, meaning

25    holding on to the information long enough so you can

1    get to the answer, even if you're thinking about, How I

2    do I define a word?  Well, I won't go further than

3    that.

4    **Q.**    That's okay.

5         So, basically the first column across, you've

6    told us she has certain weaknesses; correct?

7    **A.**    Correct.

8    **Q.**    And then those weaknesses reflect in certain

9    actual functioning problems she's having, as explained

10   in the last column?

11   **A.**    Correct, and to elaborate later on down here.

12   **Q.**    Right.  And so, working memory, so it actually

13   affects her working memory.  Tell us what working

14   memory is.

15   **A.**    Working memory is to hear new information and be

16   able to hold on to it and manipulate it in your head so

17   that you can retain it.

18   **Q.**    Now, the next column down, you're talking about

19   cognitive functioning by domains.  What's a domain?

20   **A.**    A domain is an area of cognitive abilities.

21   **Q.**    So, the column below that, the horizontal column,

22   it says, "Attention Skills."  What are attention

23   skills?

24   **A.**    Attention skills include attention for things you

25   see, both simple and complex information; and attention

1    for things you hear, or auditory attention, and those

2    can be simple or complex information; and your ability

3    to sustain your attention over a period of time.

4    **Q.**    So, the next column over to the right, one of her

5    cognitive strengths was simple visual attention?

6    **A.**    Correct.

7    **Q.**    What's that?

8    **A.**    Simple visual attention is looking -- an example

9    would be seeing symbols on a page, seeing one symbol or

10   two symbols, you're told you have to remember the

11   symbol and which one appeared first and second, and

12   then you're given a choice of four different symbols,

13   pick out the one that came first and came second.

14   That's holding on to the information visually so that

15   you can identify it correctly.

16   **Q.**    That was a strength of hers?

17   **A.**    That was a strength.

18   **Q.**    Now, moving to the right, you found cognitive

19   weaknesses, and again, these are things you found

20   through your testing; correct?

21   **A.**    Correct.

22   **Q.**    So, tell us what, in a nutshell, what these things

23   are, simple auditory attention, et cetera.

24   **A.**    Simple auditory attention, the task used for that

25   is remembering digits going forward and backward.  I

1    already told you about that as a sub-measure of

2    attention, but -- a sub-measure of effort, rather, but

3    her overall score here was at the ninth percentile.

4    **Q.**   And the complex auditory attention?

5    **A.**   Complex auditory attention was measured by giving

6    Megan a series of increasingly complicated math

7    problems that she had to hold in her head and do, not

8    use paper and pencil, but to hold in her head, work out

9    the information and then respond.

10   **Q.**   And that was a weakness?

11   **A.**   And that was weakness.

12   **Q.**   And how about complex visual attention?  What's

13   that?

14   **A.**   Complex visual attention is when she has to hold

15   on to a complex visual figure in this case.  It was the

16   Rey Complex -- Rey is an example of a complicated

17   visual design.  She needed to hold on to that to be

18   able to then remember it at a later point in time.

19   **Q.**   Now, a cognitive impairment you found in the

20   domain of attention skills is in the next column --

21   **A.**   Right.

22   **Q.**   -- and that's sustained attention, et cetera.

23   Could you explain each one of these, what they are?

24   **A.**   Sure.  This is a -- this is called a Connors

25   Continuous Performance Test.  It is a 15-minute task

1    where the person has to sit in front of a computer and

2    look at a screen and respond as quickly as they can to

3    a letter flashing on the screen, except for when they

4    see the letter X.  So, any other letter counts but not

5    X.

6          Her overall score was at a 50th percentile,

7    which put her at an equal chance of having an attention

8    problem or not, but when you looked at the

9    sub-components of the test measures themselves, what

10   you see is that she has problems with decreasing her --

11   her performance decreases over time or her accuracy

12   decreased over time of a 15-minute span of testing,

13   that she was often impulsive, meaning every time that X

14   came on, she'd touch the space bar and do what she

15   wasn't supposed to do; and she had poor vigilance, she

16   just couldn't keep up the focus on what she needed to

17   do.

18   Q.   So, Doctor, let's talk about the next column to

19   the right.  How did the weaknesses and impairments in

20   the attention skills, how did they manifest themselves

21   in terms of how they affect her life?

22   A.   One of the things I did was go back to the

23   self-report measures that she completed prior to coming

24   in to see me in the office.  One of them was called the

25   Brain Injury Questionnaire.  It includes 100 items

1  typically problematic after a brain injury, and what I

2  looked at were her reports of symptoms on a scale of

3  "never a problem" to "often" and "always a problem"

4  that reflected attention problems in everyday life.

5  **Q.**   Oh, can I stop you there for a second?  Doctor,

6  how do you know that she just didn't put down anything

7  she wanted to put down?

8  **A.**   You can look at the variability in her testing.

9  She didn't -- she didn't identify all things as

10  problematic.  She was very selective on which things

11  were always a problem or often a problem.  She -- there

12  is a measure of sensitivity and specificity of the

13  items on this test specifically for traumatic -- mild

14  traumatic brain injury, of which I'm co-author, and so

15  there are ways to assess whether there is a reliable

16  measure.

17  **Q.**   Did the things that she complained of on that

18  form, did they match up to your test results?

19  **A.**   They certainly did.

20  **Q.**   And I'm sorry.  I interrupted you.  You were

21  telling us about the functional implications.

22  **A.**   The functional implications which she endorsed

23  were that she sometimes becomes confused in familiar

24  places, and that could be her local neighborhood.  She

25  admitted to being often easily distracted.  She often

1    had difficulty concentrating and reading.  She knew she

2    had problems here.  She sometimes loses her train of

3    thought.  There are examples within testing where that

4    happened.

5           She frequently can't do two things at once.  My

6    analogy is the person can walk or chew gum; they can't

7    walk and chew gum together and do it well.  She was

8    restricting her driving due to mistakes in her judgment

9    and will always get easily disoriented.  She gets lost

10   in her own neighborhood.  She has trouble following

11   conversation when there's more than one person talking.

12   Those are all attention working memory issues.

13   **Q.**   All confirmed by your tests?

14   **A.**   Correct.

15   **Q.**   Now, let's go to the next column down, "Visual

16   Perceptual Skills."  What's that, in a nutshell?

17   **A.**   Visual perceptual skills are seeing the world and

18   its component parts and being able to make a whole out

19   of it, so that it's not fragments of life that we see

20   but a whole picture.

21   **Q.**   And you found that she had some intact skills,

22   cognitive skills, in that area; correct?

23   **A.**   Correct.

24   **Q.**   And then you found that she had certain cognitive

25   weaknesses in that area; correct?

1   **A.**   That's correct.

2   **Q.**   Could you go through these cognitive weaknesses in

3   that box there and tell us what each one is?

4   **A.**   Okay.  Her -- the intact skill in the average

5   range was non-motoric visual perceptual integration.

6   This task is seeing a picture of, say, a boat that's

7   been cut up in different pieces and put unusually

8   around on a piece -- on a page, and the person has to

9   use their visual perceptual abilities to be able to see

10  what -- how, if you put those pieces together, would

11  the puzzle come together and what would it be.  So, the

12  person has to then guess a boat, it's a boat that

13  they're seeing.  She did well on that.  She was in the

14  average range.

15      She also was very good at copying, as long as

16  visual designs were simple.  That requires visual

17  perceptual integration, How am I going to do this?

18  What do I need to do first?  What do I need to do

19  second to make this image the same as the thing that

20  you're showing me at this point?  There, on a copy task

21  within a memory component, her performance was

22  unimpaired, it was greater than 75th percentile.

23  **Q.**   What about the next column, "Cognitive

24  Weaknesses" --

25  **A.**   Okay.

1    **Q.**    -- in this visual perceptual skills domain?

2    **A.**    All right.

3    **Q.**    What are these things that you have in the box

4    and --

5    **A.**    Okay.  Visual abstraction, being able to see an

6    array of five items and something's missing, and you

7    have to figure out, what's the pattern in those five

8    items to figure out what the sixth one should be and

9    then choose it from an array of four or five items.

10   Megan had problems with this area and ended up in the

11   low average range.

12        The visual motor perceptual task, it's different

13   from the non-motor, which she could do in her head, and

14   that was at the -- that she did fairly well on that.

15   That was in the average range.  This visual motor, she

16   actually had to take blocks, two-tone blocks and

17   manipulate them to match a design.

18        She did very well as long as she had only four

19   blocks to work with.  The minute the design changed in

20   rotation or changed in number, more blocks were needed

21   to complete a design, she became overwhelmed.

22   **Q.**    Let's talk about the cognitive impairments in the

23   visual perceptual skills domain.

24   **A.**    All right.

25   **Q.**    What is this copy of complex visual design?

1    **A.**    We have a -- I think a visual would help on that

2    one.

3    **Q.**    And what tests are you talking about, Doctor?

4    **A.**    The Rey Complex Figure Test.

5    **Q.**    Now, what are we looking at here, Doctor, on the

6    left and the right?

7    **A.**    I'm sorry.  I didn't hear you.

8    **Q.**    Can you see on the screen?

9    **A.**    Yes.

10    **Q.**    Okay.  So, tell us what is on the left and what's

11    on the right.

12    **A.**    Okay.  Up in the far corner of the left side of

13    the screen here is an examiner's version of what is a

14    complex visual design.  The numbers on it ignore for

15    the moment.  The person is presented a piece of paper

16    with this large figure drawn on a page without the

17    numbers, remember; okay?  And the instruction is, I'm

18    going to give you a piece of paper, and I want you to

19    draw this exactly as you see it.

20          So, the person has no memory involved, she can

21    just see the design and then copy it herself.  This

22    requires complex visual perceptual skills.  You need to

23    know, How am I going to organize this complicated

24    picture to do this?

25    **Q.**    Is this a timed test?

1    **A.**   This is un-timed.

2    **Q.**   Is the person given an eraser?

3    **A.**   The patient -- the person is given an eraser, yes.

4    **Q.**   Go ahead.

5    **A.**   All right?

6         This was Megan's actual copy of the task.  It

7    doesn't look exactly right.  Her performance is in the

8    impaired range because the assumption is that most

9    people will be able to draw this without a problem

10   since it's un-timed and it requires no memory.  The

11   person's only -- it's a pure visual perceptual task.

12   **Q.**   Can you point out for us some of the errors that

13   she made when she tried to copy from the left to the

14   right?

15   **A.**   Okay.  There are several areas.  The first -- this

16   is awfully tight.

17   **Q.**   It's hard to see, I know.  You might want to look

18   at your own copy.

19   **A.**   Yeah, that would help.  Okay.

20        All right.  The first thing you can see is --

21   can people -- they can't see what I'm doing.  The

22   vertical cross on the far left of the figure --

23        MR. CHARNAS:  Excuse me, Doctor.  Is there some

24   way she can move her finger and make highlights?

25        THE CLERK:  Yes, she can touch the screen.

1          THE WITNESS:  Oh, there it is.  Oh, my goodness

2     gracious.  How do you move it?  Sorry.  I just messed

3     it up.

4          MR. CHARNAS:  I can clear it for you.

5          THE WITNESS:  Okay, thanks.

6     **A.**   That design is mostly right, but if you look at

7     the master design, it's missing the tail of it.  So,

8     she doesn't get full credit for it.

9          The large rectangle, which you can see here, is

10    made up of component parts.  It's not a rectangle; it's

11    four little boxes, and they're slightly different

12    shaped, and it's not a rectangle.  The top part up here

13    is not straight.  The six -- what is it? -- four

14    parallel -- four parallel lines, which is right there,

15    these four par -- there are five, one's partially

16    erased, and they're not straight and -- because

17    accuracy and placement is essential, and the placement

18    is off.

19         The -- there was this small horizontal line

20    above -- oh, I just made it again.  Take it back.

21    That's it.  Right there.  That line is crooked, it's

22    not straight.  All of those lose partial credit, all

23    right?

24         The five parallel lines, horizontal cross.

25    Okay.  And the horizontal cross is cockeye -- no, not

1    the horizontal cross.  The horizontal cross here is

2    moving up, not straight.

3    Q.    Where is that one?  I'm sorry.

4    A.    Down the bottom here.

5    Q.    Can you press on it?  Oh, there it is, okay.

6    A.    There it is.  This one here.  She doesn't have it

7    long enough, it's truncated, it's not in proportion to

8    what the original design was.

9    Q.    Is this test particularly sensitive to brain

10    damage?

11    A.    Yes, it is.  It's extremely sensitive to brain

12    damage.

13    Q.    Explain that to the jury.  Why is this test

14    especially sensitive to brain damage?

15    A.    It's one of the measures that looks at not only

16    complex visual perception but underlying executive

17    functioning, How does the person go about doing this

18    task?  Do they do it in a logical cohesive manner, or

19    do they do it in a piecemeal and unusual truncated

20    manner, looking at little segments rather than the

21    whole picture?

22    Q.    And a normal person wouldn't tend to do that?

23    A.    No.

24         MR. CHARNAS:  Can we go back to the camera?

25    Thank you.

1    Q.    So, let's look at that functional implication

2    column of these visual perceptual skills on the right.

3    How did that manifest itself, this testing that she did

4    and her performance on the testing in regard to visual

5    perceptual skills?

6    A.    The major problem for Megan was that she was

7    always in front of a computer researching things,

8    getting ready for the next meeting, doing her sales

9    reports, and she was presenting problems with looking

10   at the computer due to visual disturbances.

11         She had difficulty driving, turning her head in

12   a car without dizziness and visual distortion.  She was

13   having real trouble keeping the world in its logical

14   place.  She -- the visual world was easily distorted

15   and disturbed.

16   Q.    Okay.  Doctor, let's look at the next column on

17   the left, you have, "Processing speed, fine motor

18   skills."  What's that?

19   A.    Processing speed is how quickly one can do a task

20   relative to your age group, your education group and

21   your gender.  And usually the assessment is done of

22   fine -- gross -- fine motor skills, both for left and

23   right hand, with a series of pegs that people have to

24   put in a board or, relative to age group, Did the

25   person complete a verbal task or a visual task within

1    an average period of time, a very fast period of time,

2    very slow period of time?

3    **Q.**    And some of her skills in that area were intact;

4    correct?

5    **A.**    Yes.

6    **Q.**    And then move to the next column, some of those

7    skills were in the weakness -- cognitive weakness

8    column?

9    **A.**    Correct.

10   **Q.**    Explain, what are these fine motor abilities,

11   right hand?  What are you talking about there?

12   **A.**    They're from the grooved peg board.  It's a board

13   where you have little key holes, and you've got pegs

14   sitting in a pot, and the instruction is pick up one

15   peg and put it -- one in each of the holes in a

16   systematic way.  The key holes are turned periodically

17   on this display.  The person is instructed to use your

18   right hand only.  If you drop it, leave it, I'll pick

19   it up, but do it as rapidly as you can and complete all

20   the pegs in the hole, and it's a board about yea by

21   yea.

22           And they reverse, you'll do it with both the

23   dominant and non-dominant hand.  Megan's left-hand

24   performance was in the average range.  Megan's

25   right-hand performance was in the low average range.

1    **Q.**    So, how -- moving off to the right, how did that

2    manifest itself in terms of functional problems she

3    has?

4    **A.**    Processing speed translates to it takes longer to

5    do most anything.  She complained of often was slow

6    when completing reading tasks, when completing writing

7    tasks.  When she tries to speak, she finds she's

8    slower.  When she tries to think, it's slower.  When

9    she tries to learn, it's slower.  So, the operating

10    word is slower in activities normally involved with

11    cognition.  She also said she's moving slower, she

12    lacks energy, and she's inactive.

13    **Q.**    Let's get to the second page of your work, "Memory

14    Abilities," basically that's remembering things?

15    **A.**    That's remembering things --

16    **Q.**    All right.

17    **A.**    -- and it's remembering things that you hear

18    verbally and remembering things that you hear

19    visually -- that you see visually, Is one area stronger

20    than the other?  And does complexity make a difference?

21    If it's simple information, Do you remember it better,

22    or if it's complex, do you remember it better?

23    **Q.**    And she's retained some real strengths in that

24    area; correct?

25    **A.**    Yes, she has.

1    **Q.**    Tell us about the strengths.

2    **A.**    One strength was in the California Verbal Learning

3    Test, which is that it's a mixed-up laundry list of

4    items that are 16 items long, it's got names of

5    transportation and foods and various different

6    categories, but you wouldn't know it when you heard it.

7    It's a mix -- it's all mixed up together.

8         The first time she heard that list, she

9    remembered a strength at 84th percentile for her age

10    group.  She could hold on to that information the first

11    time she heard it.  That would be called learning, you

12    know, short-term memory for unstructured information.

13    **Q.**    And she had other skills in that area that she was

14    average at -- correct? -- in the next column?

15    **A.**    That's correct.

16    **Q.**    And let's talk about the cognitive weaknesses in

17    the memory abilities in the next box over.

18    **A.**    Okay.

19    **Q.**    What is this "LTM unstructured but repeated verbal

20    information"?  What does that mean?

21    **A.**    All right.  The short-term memory, which is STM --

22    that's a shorthand just to fit it on the chart here --

23    for simple visual information, she was shown simple

24    visual designs like the figure X with little flags on

25    each of the ends of the Xs -- on each of the ends of

1    the X, and she was shown the design, the design was

2    removed, and she needed to copy it on to a page.  She

3    did very well the first time she saw that design for --

4    the first time she did it.

5        The -- structured verbal -- the -- all right.

6    Let me backtrack.  The verbal learning list that I

7    talked about that she did so well the first time she

8    heard it gets repeated five different times for her,

9    and each time she needed to repeat back the information

10   to me.  Her short-term memory for that information that

11   was repeated declined to the average range but still

12   was intact for her.  She had some loss of the

13   information, but it didn't -- it was certainly in the

14   average range.

15       She did better, however, when things were

16   structured in the verbal world.  Her short-term and

17   long-term memory for a story -- there were two stories

18   read, but the stories had a beginning, a middle and an

19   end to them, and that structure helped her remember

20   that information both the first time she heard it and

21   the second time she heard it, with her performance in

22   the average range.  So, here we have some positive

23   strengths in verbal memory skills.

24       There are some losses, however, and --

25   **Q.**    Tell us about that.

1    **A.**    Shall I go on?

2    **Q.**    Yes.

3    **A.**    The information, that verbal list that she learned

4    so many times, in the long term, her performance

5    dropped to the low average range, which, even with

6    repetition, she was unable to hold on to it after a

7    30-minute delay where some other task was done.

8            And more alarmingly, when she took that simple

9    information that she had remembered in the average

10   range the first time she saw it, there were five

11   different designs, she was down to the second

12   percentile, which is in the impaired range at 30-minute

13   delay.  So, she lost the majority of that information.

14   There were five pictures.  She remembered the first one

15   accurately, which was the simplest.  She reversed the

16   information on the second one, and she couldn't

17   remember any of the last three designs.

18            The Rey Complex Figure, which we had up a little

19   while ago, is not only a visual perceptual task, but

20   it's a memory task because we have Megan draw the

21   picture, and we saw how she did the drawing and how

22   disorganized it was, and then unexpectedly I then say,

23   Draw the figure for me from your memory.  The first

24   time she saw it and 30 minutes later, she had impaired

25   performance on this complex visual memory measure.

1    **Q.**   Dr. Hibbard, apart from the test of her efforts

2    that you talked about before, did you have an

3    opportunity to observe her working on these tests?

4    **A.**   Yes, I did.

5    **Q.**   And did you make any observations about her

6    efforts on these tests?

7    **A.**   She was trying the hardest she could.  She was

8    extremely frustrated when she realized she couldn't do

9    something or she had forgotten something.  In one task,

10   she lost the set of what she was doing and started

11   doing her own version of the test and then realized

12   halfway through it, This is not what I'm supposed to be

13   doing.  So, she was an acute observer of her behaviors

14   and most distressed at them.

15   **Q.**   So, let's move off to the right column now, and

16   tell us about how -- the functional implications of

17   these memory issues you were telling us about.

18   **A.**   She had many.  She often forgets what she just

19   said, she forgets what happened yesterday, she often

20   loses her train of thought, which is the example I just

21   gave you in the testing, she often forgets to turn off

22   appliances.  That's a safety issue.

23        She sometimes gets lost in the community.

24   That's not only attention, but it's memory, Where was I

25   going?  She forgets to do chores, and she learns

1    slowly.  All of those are illustrations of functional

2    problems with memory.

3    Q.    Doctor, the last column here, "Executive

4    Functioning Skills," tell us, what are exec -- I think

5    you touched on it before, but tell us, what are

6    executive functioning skills?

7    A.    Executive functioning skills include things such

8    as problem-solving, flexible thinking, organization,

9    ability to inhibit responses, ability to monitor what

10   you're saying.

11   Q.    And did she have any -- she had no cognitive

12   strengths high average or above in that area?

13   A.    That's correct.

14   Q.    In terms of average, she had some average skills

15   in that area; correct?

16   A.    That's correct.

17   Q.    Tell us about that in that column.

18   A.    Verbal abstract thinking, the person -- she would

19   be presented with two items that don't, on surface,

20   seem to be related, like music and tides and asked, How

21   are music and tides alike?  What do they have in

22   common?  That level of abstract thinking requires you

23   to think flexibly about two things that don't normally

24   go together.  And on that particular task, she was in

25   the average range.

1          Her rapid shifting of moving on -- from one

2     thing to another on visual tasks was also in the

3     average range.  Somehow moving from thing to thing to

4     thing was discombobulating for her.  And you can see

5     that on a Picov's Trails Test.

6     **Q.**   Now, what about the next column over?  What were

7     her cognitive weaknesses in these executive functioning

8     skills?

9     **A.**   She was having trouble inhibiting.  Remember the

10    task of sustained attention where she needed to look at

11    things flashing on a computer and not touch the space

12    bar when she saw the letter X.  She couldn't inhibit

13    that response.  There were other tasks that looked at

14    inhibition, and she had trouble managing those tasks.

15         Her simple mental set-shifting is just going

16    from one task to another, her ability to do that was

17    very compromised.  She did better if she stayed on one

18    task without changing back and forth.  And her visual

19    abstract thinking was in -- is a weakness, and it was

20    and was previously described.

21    **Q.**   Let's talk about cognitive impairments in the

22    executive functioning skills.

23    **A.**   There she had a significant array, unfortunately.

24    Her complex mental set-sifting, she could do shifting

25    simply from one task or one component thing to another;

1    but when things became more complex, her performance

2    declined dramatically and were in the borderline or

3    impaired range.

4            Her flexible problem-solving was in the impaired

5    range, and this task was called the Wisconsin Card-Sort

6    Test, and it was a test -- it was kind of like a

7    computer game.  The person saw four cards on a visual

8    computer and a deck of cards, and the person had to,

9    based on feedback from the computer, figure out what

10   placement one of these four cards should they stack the

11   new card on to.  It was a sorting task.

12           Unbeknownst to the person, the task kept

13   changing.  Sometimes you had to match the card to the

14   color of the stimulus cards, there were different

15   colors, yellow and red and green and blue.  Other times

16   it was the shape of the card, there were hearts and

17   diamonds and clubs.  And other times it was the number

18   of items, there were three hearts or two clubs or

19   things like that.

20           Her ability to take feedback and be able to

21   shift on spot and problem-solve another way of tackling

22   the problem was extremely limited.  She was very

23   frustrated at this task, and her performance was

24   clearly in the impaired range for her IQ.  Her ability

25   to inhibit responses, that's also part of this, I

1    mentioned already.

2    **Q.**   What does that mean?

3    **A.**   Inhibiting responses, not responding when you

4    wanted to.  There was one task where she was asked to

5    read words, and the words were the words "blue, red" or

6    "green" as rapidly as she could.  She did fine on that.

7    It's a speeded task.

8         Then she was asked to have -- there was a page

9    with just Xs on it, and the Xs were in red, blue or

10   green, and she needed to tell you the color of the Xs,

11   and she would say, Red, green, blue, green, whatever

12   color.

13        The third part, and this is a Stroop -- a

14   Stroop-like test, it's part of the B Test battery.  The

15   third test was what they call an interference test

16   where she had to ignore the word but tell you the color

17   of the ink it was printed in.  So, you'd see the word

18   "red" but it would be in blue ink, and the answer would

19   be blue.  And then you'd see the word "green," but the

20   word "green" would be printed in red ink, and the

21   answer would be red because the instruction was to tell

22   the color of the ink.  She struggled with that task.

23   **Q.**   What does that tell you?

24   **A.**   It is your ability to in -- you can inhibit

25   distraction and still maintain your focus on what the

1    task is that you need to do.

2    **Q.**    Can you give an example of how that would manifest

3    itself in life?

4    **A.**    Well, it manifests itself as impulsivity, the

5    person just does; they don't stop and think.  Even if

6    the feedback is telling them maybe this is not what

7    they should do, they still do it.

8    **Q.**    Go ahead.  I didn't mean to interrupt you.

9    **A.**    Her verbal output, her monitoring of verbal

10   output, she had no idea, on the California Verbal

11   Learning Test, that she had said the word five times

12   before or not.  She just repeated it as if it was a

13   novel bit of information that she was telling you.

14        Her conceptual thinking skills, or her overall

15   executive level of functioning, and those also were in

16   the impaired range, and that was based on that

17   card-sorting task.  And it was unstructured, which

18   is -- was her nemesis, so those are the impaired ones.

19   **Q.**    Doctor, this is the last box on the cognitive

20   function.  The functional implications of these

21   executive functioning skills difficulties, tell us

22   about those.

23   **A.**    These are ones that she reported at -- when I

24   first interviewed her, and she had also endorsed them

25   on the checklist before I interviewed her.  She often

1    had difficulty making decisions, she often had

2    difficulty solving problems, she often couldn't plan

3    future events or set priorities.

4          She had difficulty following instructions, she

5    had difficulty learning from new -- learning from

6    experiences, she had difficulty coping with unexpected

7    change, she frequently mixed up the sequence of events,

8    she rarely thought before acting.  That's that

9    impulsive component, she frequently shows poor

10   judgment, she frequently reports she's disorganized,

11   and she's rarely able to plan ahead.

12   **Q.**   Now, Doctor, I think you mentioned that you also

13   checked -- tested for affective functioning?

14   **A.**   That's correct.

15   **Q.**   Let's take a look at that.

16         THE COURT:  Before you change exhibits, we're

17   still about half an hour from lunch, but why doesn't

18   everybody stand up and stretch a little bit and move

19   around.  We'll have a long stretch here.

20         THE WITNESS:  That's a good idea.

21         (Pause)

22         THE COURT:  Mr. Charnas, when you're ready.

23   **Q.**   Ready, Doctor?

24   **A.**   Yes.

25   **Q.**   Thank you.  Tell us now, in terms of these

1    affective dysfunction that you tested for, mood

2    disorders, what's that?

3    **A.**    A mood disorder is the psychological and

4    psychiatric terminology for a depression.  There can be

5    different levels of depression, there can be, you know,

6    mild depression, major depression, and there can be

7    major depression associated with medical conditions,

8    for example, different kinds of medical conditions.

9         It, in this case, does not focus or include

10    things such as mania or bipolar disorder or things like

11    that.  The focus of my assessment was to look at, Is

12    Megan depressed, and if so, how depressed?  And,

13    secondly, is she potentially suicidal?  Those are the

14    three concerns I have, given the literature on

15    traumatic brain injury.

16    **Q.**    And what did you find?

17    **A.**    That Megan met criteria for a moderate depression

18    based on her self-report.  There was a 21-item measure

19    called the Beck Depression Inventory, and it

20    specifically asks her about her mood, her overall

21    energy, whether she's pessimistic or not, whether she's

22    guilty or feeling punished, question about suicide

23    issues or intent as well as things like crying,

24    agitation, loss of interest, difficulty making

25    decisions, concentration, sleep and fatigue, loss of

1    sexual interest.

2         Her report there was in the moderate depressed

3    range, and it certainly was congruent with my

4    observations of Megan.  She was in tears many, many

5    times during the interview.

6    Q.   Couldn't she just make up any answer she wanted

7    for that Beck Depression Test you mentioned?

8    A.   I think that's possible, but what I have is

9    clinical observation of the person as well as going

10   through each of these items and asking her more about

11   them, so I had a better read of why she rated herself

12   as she did.

13        Megan was not suicidal at this point, so I was

14   relieved at that.  But I do, do a screen of the items,

15   look at her self-report and her clinical behaviors over

16   eight hours to have a sense of what her mood is like.

17   Q.   And the final column, "Anxiety Disorders," what

18   are anxiety disorders?

19   A.   Anxiety disorders are a mixture of different

20   sub-types of anxiety disorders.  They can be all the

21   way to phobias to post-traumatic stress disorder.

22   People can have generalized anxiety or specific anxiety

23   to an item or a cluster of things.

24   Q.   You found she had mild anxiety?

25   A.   She had mild anxiety.  I used the Beck Anxiety

1    Inventory, and it questioned things like, Are you

2    unable to relax, which she said she had a mild problem

3    with, dizziness or lightheaded; your heart pounding for

4    no reason, she said, I don't know; feeling terrified,

5    she said that was a mild problem; feeling nervous she

6    said was mild; she felt shaky, she felt losing control

7    at times, fear of dying and feeling scared.  Those were

8    all mild problems for her.

9    **Q.**   Then you have, in this column to the right of

10    that, "Mild Traumatic Stress Disorder."  What's that?

11    I'm sorry.  "Post-traumatic stress disorder."  My

12    apologies.

13    **A.**   I was going to say I think I did that one.

14          She alluded to, on the clinical interview -- on

15    this depression -- brain injury screening

16    questionnaire -- pardon me -- that she was having

17    flashbacks.  It's one of the items within the cognitive

18    domain that's asked of the hundred items.

19          She also was talking about having problems with

20    anger control, and I routinely now give a

21    post-traumatic stress disorder checklist as a screen to

22    see if this is a potential problem because current

23    literature is pointing to an increased frequency of

24    post-traumatic stress disorder after a traumatic brain

25    injury.

1    **Q.**   Isn't post-traumatic stress disorder what

2    people come -- soldiers come back with from Iraq and

3    Afghanistan?

4    **A.**   They also come back with traumatic brain injuries.

5    But yes, that is true.  It is a very common sequelae of

6    a horrific or near life-threatening event.  That's the

7    first criteria for post-traumatic stress disorder.

8         I think in Megan's case, having a 100-pound

9    umbrella flying towards her face is a pretty traumatic

10   event with child in hand.  She did have flashbacks of

11   this accident.  I did explore them in greater detail.

12   She could see the umbrella or she'd be dreaming this,

13   she'd wake up shaking at night with the dream.  So, she

14   has the life-threatening event.

15        She also has problems with avoidant behavior,

16   which is another criteria for post-traumatic stress

17   disorder.  She -- for example, this -- on this

18   checklist, she avoids thinking about or talking about

19   past stressful experiences in her life.  That's an

20   avoidance issue.  She avoids situations because they

21   remind her of a stressful event.  She has trouble

22   remembering important parts of the stressful event.

23   And she's begun to lose interest in things that she

24   used to enjoy.  Those are beginning to look at

25   avoidance kinds of issues.

1     She also has -- the last criteria, which is

2  arousal issues, she's got heightened arousal or

3  hypervigilance, always watching, being careful.  On her

4  clinical interview, she reported in detail her fear

5  that, if she was with the kids, she would -- her

6  children, she would be afraid she couldn't protect them

7  enough, and if she was away from her kids, something

8  awful was going to happen to her -- to them.  That's a

9  very classic hypervigilance kind of reaction.

10  Q.   So, do you have an opinion as to whether she

11  suffers from post-traumatic stress disorder as a result

12  of this incident?

13  A.   Well, she certainly meets all four criteria for

14  the diagnosis, yes, she does.  And some of the items

15  that I picked from the checklist that she filled out

16  were that she did have flashbacks of the accident, she

17  often had difficulty dealing with people, she felt

18  uncomfortable around other people, and she had

19  difficulty being in crowds.  Those are very traditional

20  of military who've had post-traumatic stress disorder,

21  but for Megan, this was obviously new since the

22  accident and the injury.

23  Q.   Now, earlier when you testified, you mentioned

24  that other physicians had diagnosed Megan with mild

25  traumatic brain injury; do you remember that?

1    A.    That's correct.

2    Q.    Which physicians; do you recall?

3          MR. LAWLER:  Objection.

4          THE COURT:  She can answer that question.

5    A.    There were a series.  In the emergency room -- no.

6    In the -- yeah, EMS reports, Emergency Medical Services

7    report, she had a -- the diagnose of head trauma was

8    not used specifically, but head swelling was, with

9    confusion and --

10         MR. LAWLER:  Objection, Your Honor.

11         THE COURT:  Sustained.

12   Q.    Let me try this differently.

13   A.    Okay.

14   Q.    In reading the records, were there physicians who

15   treated Megan Irwin who specifically diagnosed mild

16   traumatic brain injury?

17   A.    Yes, there were.

18   Q.    Can you tell us which physicians?

19   A.    I don't have the specific name of the physician in

20   the emergency room, but head trauma with concussion was

21   the diagnosis.

22         MR. LAWLER:  Objection.

23         THE COURT:  Sustained.

24   A.    A general practitioner two days after the injury;

25   a neurologist five weeks after the injury, Dr. Sun; a

1   neurologist/psychologist, Dr. Brown, who did some

2   testing on Megan; Dr. Stone with a concussion center in

3   Pittsburgh about a year after her injury; a follow-up

4   with Dr. Stone with the continued diagnosis; and two

5   MRIs.

6   **Q.**    What about doctors at Rusk in New York?

7   **A.**    I have looked at new medical records on Megan to

8   see what was happening with her, and she is being seen

9   by a physiatrist who is the specialist in

10  rehabilitation medicine and diagnosed there.

11  **Q.**    Is that Dr. Im?

12  **A.**    That's Dr. Im, yes.

13  **Q.**    Oh, I'm sorry.

14  **A.**    And a neurologist, Dr. Halpern, who is attempting

15  to address Megan's diagnosis of TBI and migraines.

16  **Q.**    Doctor -- there may be more, but you can stop

17  there -- is it your opinion that these symptoms, these

18  weaknesses and impairments in cognitive and affective

19  functioning are consistent with mild traumatic brain

20  injury?

21  **A.**    In my opinion, yes.

22  **Q.**    Now, Doctor, you've touched on this a moment ago.

23  You saw her back in the spring of 2014.  Have you in

24  fact read medical records of her treatment since that

25  time up to -- through 2015?

1    **A.**    Yes.

2    **Q.**    And you had said in your report that Megan should

3    engage in certain rehabilitation measures or treatment

4    measures; do you remember that?

5    **A.**    Treatment recommendations.

6    **Q.**    Treatment recommendations, thank you.

7         Would you tell us what they were back in the

8    spring of 2014?

9    **A.**    Yeah.  One second.

10        My first recommendation was that Megan should

11   see a physiatrist within rehabilitation medicine who

12   was focused on treatment of individuals with traumatic

13   brain injury, and then I suggested several things that

14   should be considered when seen by this physiatrist.

15   I'll skip those for now and move on.

16   **Q.**    Yes.

17   **A.**    The second recommendation was that, given that

18   traumatic brain injury is a chronic medical disability,

19   that she's going to need lifelong follow-up by a

20   physiatrist.  This cannot be short-term but ongoing and

21   what recommendations would be needed as Megan ages with

22   her traumatic brain injury.

23        I recommended that Megan be seen for intensive

24   psychological services by a rehabilitation

25   psychologist, someone in the field of rehabilitation

1    who's familiar with treating the combined emotional

2    problems of individuals with brain injury, in Megan's

3    case, depression and anxiety and PTSD.

4         The -- she would also require intensive

5    cognitive remediation.  Cognitive remediation can be

6    provided by several professionals in the field and

7    often do collaborate on these, but clearly she needed

8    to be educated about her brain injury and then begin to

9    address some of these impairments and weaknesses

10   identified.

11        After completing psychotherapy and remediation,

12   it's anticipated that, much like the patient would need

13   ongoing medical oversight, most likely she will need

14   ongoing psychological oversight in less intensity and

15   that, that will be ongoing, in all probability, for the

16   rest of her life.  This is to deal with any unexpected

17   events in her life as well as changes in her

18   functioning.

19        I recommended that the Irwins be seen in family

20   therapy because there was a lot to understand about

21   changes in Megan since the injury, and it needed to be

22   psycho-educational and supportive in nature.  I reco --

23   **Q.**  Go ahead.  I'm sorry.

24   **A.**  I recommended that she been seen for vocational

25   counseling but only after she had done fairly intensive

1    treatment at the front end here before she actually

2    even considered trying to return to work because she

3    needed to take her new self and recognize her strengths

4    and weaknesses before she went back to any work trial

5    if she could.

6        I recommended that she not drive at this point

7    and that she should undergo a driver evaluation before

8    she tries to get back to that.

9        She was in vestibular therapy, which was a

10    treatment for ongoing dizziness and nausea that she had

11    as a result -- and visual problems that she had

12    secondary to a traumatic brain injury.  I recommend

13    that she continue doing that.

14        I also felt she needed more childcare help at

15    home because she couldn't manage the three children as

16    she had done pre-injury.  And in order to have her come

17    for intensive treatment, that's very time-consuming, so

18    she would need extra help at home to manage and

19    oversight the kids.

20        I recommended that she undergo

21    neuropsychological evaluation every five years, and the

22    purpose of the evaluation was to see if things had

23    gotten worse or better over time and if there were

24    changes that were needed in her treatment regime.

25        I encouraged to continue her medical follow-up

1    with her general practitioner but that her physician

2    needed to work collaboratively with the rehab team.

3    Same -- she was seeing an otolaryngologist because of

4    problems that she was having related to the injury and

5    that, that person needed to be linked in to the team.

6         I recommended independent couples therapy for

7    Mr. and Mrs. Irwin once she finished rehabilitation

8    services.  The first part was just to learn about brain

9    injury and how to cope with it.  This now is working on

10   family issues that typically arise or get worse after

11   an injury of this nature and that copies of this report

12   should be shared with the patient, the family and all

13   treating personnel.

14   Q.   Dr. Hibbard, you've read those newer records since

15   spring of 2014.  Did you note any significant

16   improvement in any of Megan's symptoms?

17   A.   No, I did not.

18   Q.   Doctor, do you have an opinion as to what type of

19   environment would be conducive to --

20   A.   I take that back.  There is one.

21   Q.   Oh, I'm sorry.

22   A.   She's learning, learning with accommodations how

23   to present herself in a more organized fashion.  That

24   seems to have gotten slightly better.  Her vestibular

25   problems, her vision problems, her other cognitive

1    problems are still causing functional difficulties.

2    **Q.**    Dr. Hibbard, what type of environment would be

3    conducive to Mrs. Irwin's maximal functioning?

4    **A.**    A low-stimulation environment for sure, one where

5    she can stay focused on tasks to completion rather than

6    shifting back and forth; an environment where she can

7    take frequent rests because she quickly cognitively

8    burns out and needs to remove herself from her

9    environment.

10    **Q.**    Do you have an opinion as to whether she could

11    find actual employment with an environment such as you

12    describe?

13    **A.**    At the point I wrote this report, I didn't know.

14    Seeing the chronicity of her --

15            MR. LAWLER:  Objection.  Request sidebar.

16            (Discussion at sidebar)

17            MR. CHARNAS:  That's a surprise to me, Judge.

18    So, I'll ask a different question.

19            THE COURT:  Okay.

20            MR. LAWLER:  I want the question stricken.

21            MR. CHARNAS:  I have no problem with that.

22            THE COURT:  Okay.  How much more do you have

23    left on direct?

24            MR. CHARNAS:  Very little.  Five minutes.

25            THE COURT:  Okay.

1        (End of discussion at sidebar)

2        THE COURT:  The objection is sustained.  The

3   question is struck.

4   **Q.**   Dr. Hibbard, what's a vocational counselor?

5   **A.**   A vocational counselor is an individual who has

6   studied vocational psychology typically and is an

7   expert on job descriptions, occupational handbooks of

8   work, things like that.  They will often provide

9   guidance for individuals about if they can work and, if

10  so, what would be ideal environments for them.

11  **Q.**   Are you a vocational counselor?

12  **A.**   No, I am not.

13  **Q.**   When it comes to making a determination as to

14  whether Megan Irwin could actually find employment,

15  given her impairments, would you defer to the opinion

16  of a vocational counselor?

17  **A.**   Ultimately, I would.

18  **Q.**   Now, do you have a prognosis in regard to her

19  cognitive and affective dysfunction that you described

20  for us?

21  **A.**   Her prognosis, in my professional opinion, is

22  guarded.

23  **Q.**   And what does guarded mean?

24  **A.**   Meaning that the nature of her injury and the

25  long-term chronicity of her problems will continue

1    onward rather than dissipate; her overall level of

2    functional improvement over time will be minimal

3    because impaired brain function is impaired brain

4    function and that, to the extent she has learned

5    compensatory strategies, she may function better,

6    slightly better, but there will not be a dramatic

7    return to the level she was before.

8         MR. CHARNAS:  Thank you, Doctor.

9         Those are all the questions I have, Your Honor.

10        THE COURT:  Okay.  Why don't we take our lunch

11   break now.  And as I said, we'll have a shortened lunch

12   break, but you have lunch upstairs waiting for you, so

13   we'll -- Ms. Folan will come back to get you in about

14   30 or 35 minutes, okay?  Thanks, everyone.

15        THE CLERK:  All rise for the jury.

16        (The jury is not present for the following)

17        THE COURT:  So, what we'll do, we'll come back

18   in about half an hour, you'll start your cross of her,

19   we'll break at 2:00, I'll give them a short break,

20   we'll swap witnesses, and you'll do your direct

21   examination of the next witness.

22        MR. LAWLER:  Okay.  Your Honor, I -- just for an

23   administrative matter, I would like -- I think

24   Dr. Hibbard's report should be marked an appellate

25   exhibit.  It's not an -- she's been reading from it

1    along with her CV.  I mean, there should be some record

2    I think --

3             THE COURT:  We'll mark it as an exhibit.

4             MR. LAWLER:  Thank you.  It's a non -- it's an

5    exhibit that's not going to go to the jury, obviously.

6             THE COURT:  Correct.

7             MR. LAWLER:  Okay, that's all.  Thank you.

8             THE CLERK:  Court is in recess.

9             (Recess at 12:54 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    <u>C E R T I F I C A T I O N</u>

3

4

5

6

7

8

9            I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18                    /s/ Debra D. Lajoie

19

20

21

22

23                    5/18/16

24

25