1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3
       * * * * * * * * * * * *    13CV10974-ADB
4      MEGAN IRWIN and          *
       THOMAS IRWIN             *
5                              *    OCTOBER 1, 2015
       VS.                      *    10:00 A.M.-1:00 P.M.
6                              *
       ECLECTIC DINING, INC.   *
7                              *    BOSTON, MA
       * * * * * * * * * * * * *

8

9        BEFORE THE HONORABLE ALLISON D. BURROUGHS

10                    DISTRICT JUDGE

11                     (Jury Trial)

12                     **VOLUME IV**

13                  **EXCERPT TRANSCRIPT**

14
       **APPEARANCES**:
15

16    FOR THE PLAINTIFFS:    SCOTT E. CHARNAS, ESQ.
                             Charnas Law Firm, P.C.
17                           66 Long Wharf
                             Boston, MA 02110
18
       FOR THE DEFENDANT:    JOHN F.X. LAWLER, ESQ.
19                           HEATHER M. GAMACHE, ESQ.
                             Prince Lobel Tye LLP
20                           Suite 3700
                             One International Place
21                           Boston, MA 02110

22    Court Reporter:        Debra D. Lajoie, RPR-FCRR-CRI-RMR
                             One Courthouse Way
23                           Boston, MA  02210

24

25            Proceeding reported and produced
              by computer-aided stenography

1                          I N D E X

2

3    <u>PLAINTIFF WITNESS</u>                              <u>PAGE</u>

4    <u>Brian Greenwald, MD</u>
     Continued Cross-examination by Mr. Lawler        3
5    Redirect Examination by Mr. Charnas             25
     Recross Examination by Mr. Lawler               39
6    Re-redirect Examination by Mr. Charnas          49

7    <u>Dr. Hibbard</u>
     Continued Cross-examination by Mr. Lawler       51
8

9

10                        E X H I B I T S

11

12   <u>PLAINTIFF</u>                    <u>FOR ID</u>        <u>IN FULL</u>

13   151                                              51

14

15

16

17

18

19

20

21

22

23

24

25

1          1 OCTOBER 2015 -- 10:00 A.M.

2              (The jury is present for the following)

3          THE COURT:  Good morning, everyone.  Thank you

4     for being on time.  I'm delighted we can start right at

5     10:00.

6              Mr. Lawler.

7          MR. LAWLER:  Thank you, Your Honor.

8          THE COURT:  Dr. Greenwald, I'd like to remind

9     you that you're still under oath.

10         THE WITNESS:  Thank you.

11         MR. LAWLER:  Good morning, Ladies and Gentlemen.

12         **CONTINUED CROSS-EXAMINATION BY MR. LAWLER**

13    **Q.**   Dr. Greenwald, good morning.  How are you?

14    **A.**   Good morning.  I'm okay, thank you.

15    **Q.**   Yesterday I asked you a number of questions, and I

16    just want to pick up on one particular area, and that

17    deals with information that's contained in your report.

18    Do you have that in front of you, sir?

19    **A.**   I do, yes.

20    **Q.**   Could you turn to Page 9 of your report.  And if

21    you could look at the seventh line down on that report,

22    and just so I can get you in the right place, it's the

23    sentence that says, "Her medical history was notable

24    for two prior head injuries sustained in field hockey

25    in high school."

1          I read that correctly; is that right?

2     A.    Yes, that's correct.

3     Q.    So, essentially, what you did was, in reviewing --

4     you talked about it yesterday, in reviewing the records

5     during the eight-hour period when you were working to

6     complete this particular report, you were reviewing

7     records and then dictating what you thought was

8     significant in to your Dictaphone, and then that was

9     completed in to the report; is that right?

10    A.    That's correct.

11    Q.    Okay.  So, you were aware that Mrs. Irwin had two

12    concussions while in high school; is that right?

13    A.    That's correct.

14    Q.    And were you aware that the first concussion

15    occurred when she was about 14 or 15 years old when she

16    was playing field hockey?

17    A.    Correct.

18    Q.    And is it your understanding that she suffered a

19    loss of consciousness in that particular incident?

20    A.    I don't have a specific loss of consciousness or

21    not.

22    Q.    Okay.  Would that information, whether she

23    suffered loss of consciousness just in that particular

24    incident, would that be significant or insignificant to

25    you?

1   **A.**   I knew she had a concussion.  The loss of

2   consciousness wouldn't be significant or not.

3   **Q.**   It wouldn't be?

4   **A.**   No.

5   **Q.**   Even if it was for a couple of minutes?

6   **A.**   No.

7   **Q.**   Okay.  Well, would you agree with me that an

8   impact that results in a loss of consciousness of one

9   second is less severe than an impact that results in

10  the loss of consciousness of a minute or two minutes?

11  **A.**   I think you're talking --

12  **Q.**   Yes or no?

13  **A.**   I think you're talking about old data.  I'm sorry.

14  I can't answer it.  Ask it in another form.

15  **Q.**   You can't answer whether one is more severe than

16  the other?

17  **A.**   No.

18  **Q.**   Okay.  All right.  The -- are you aware that

19  Mrs. Irwin also suffered another concussion while

20  playing field hockey?

21  **A.**   Yes, I am.

22  **Q.**   Okay.  Were you aware that, with both concussions

23  when she was playing field hockey, that she was struck

24  in the head by the field hockey ball and essentially

25  knocked out for a period of time?

1   **A.**   I know that she had a concussion.  I wasn't aware

2   of specifically that she was knocked out.

3   **Q.**   Okay.  From your review of the records, are you

4   aware as to whether or not Mrs. Irwin suffered any

5   other concussions other than the two playing field

6   hockey and the one that occurred on August 5th, 2012,

7   at the Olde Salt House?

8   **A.**   Yes, I am.

9   **Q.**   Okay.  And so you're aware of how many more

10  concussions other than that?

11  **A.**   I know of at least one more concussion, the one

12  where she struck her head on a pipe or something of

13  that sort.

14  **Q.**   Okay.  So, that's the incident that occurred at

15  the restaurant when she struck her head on the pipe; is

16  that right?  Does that sound familiar?

17  **A.**   The restaurant?

18  **Q.**   Okay.  What's your understanding of how that

19  particular concussion occurred?  And if you don't know,

20  you don't know.

21  **A.**   I can look in my report.

22  **Q.**   Well, look at your report, then, if you would.

23  Thank you.

24  **A.**   I just have here that she struck her head on a

25  pipe, but I don't have the location of where she was at

1    the time.

2    **Q.**    Okay.  There's testimony or evidence that

3    Mrs. Irwin, in addition to the field hockey

4    concussions, the two that were sustained in high

5    school, that Mrs. Irwin likely sustained two other

6    concussions prior to August 5th, 2012.  One occurred in

7    New York City at a restaurant, and the other occurred

8    in Mr. and Mrs. Connolly's house in Osterville,

9    Massachusetts.

10        I take it you're not aware of the one that

11   occurred in Osterville, Massachusetts; is that right?

12   **A.**    I don't have information about that.

13   **Q.**    Okay.  So, you don't -- it's not your

14   understanding that there were four concussions before

15   August 5th, 2012, but there were three; is that right?

16   **A.**    I'm aware of three.

17   **Q.**    Okay.  Now, are you also aware of a concussion, or

18   a likely concussion, that Mrs. Irwin sustained in

19   September, 2014, when she fell from a taxicab in New

20   York City?

21   **A.**    I know that -- I've reviewed records, but I didn't

22   see any evidence of a concussion per se.

23   **Q.**    Okay.  Well, when you reviewed the record, did you

24   see that there were records after that particular

25   incident that indicated that Mrs. Irwin's headaches

1    were much more severe than they were prior to that

2    particular incident?

3    **A.**    I didn't realize it was related to that incident.

4    There's a lot of records talking about how severe her

5    headaches are.

6    **Q.**    And in fact the records -- you said yesterday

7    that, again, that you worked for about seven hours

8    reviewing records that we talked about yesterday and

9    that you then created the report in addition to the

10    hour spent with Mrs. Irwin; right?

11    **A.**    Correct.

12    **Q.**    And that Mr. Charnas sent to you some additional

13    records in the last month or so that covered a period

14    of time, like, 2014 and 2015; right?

15    **A.**    That's correct.

16    **Q.**    Okay.  But it's safe to say that -- and isn't it

17    safe to say that there were hundreds of pages of

18    records that were provided to you?

19    **A.**    I'm a fast reader, but I have to know what to look

20    for.  I'd say it was a lot of records.

21    **Q.**    And you spent -- today's Thursday, so you spent

22    two hours on Tuesday reviewing some of those records;

23    right?

24    **A.**    Correct.

25    **Q.**    Okay.  And did you see anything in those records

1    about the taxi accident of September, 2014?

2    **A.**    I did.  Most of it focused on her -- because she

3    had injured her right leg, I believe, her ankle, a lot

4    of it was focused on that.

5    **Q.**    Okay.  Well, in addition to that, did you see that

6    there was some indication that she struck her head on

7    the roadway on that particular day?

8    **A.**    I did not look for that, no.

9             MR. LAWLER:  Okay.  One moment, Your Honor?

10            (Pause)

11   **Q.**    Now -- I'm going to come back to that in a second.

12   I'm going to try to find that particular exhibit.

13            But I want to talk to you -- now, I think

14   yesterday you talked about the term "post-traumatic

15   amnesia;" right?

16   **A.**    I did, yes.

17   **Q.**    Okay.  And there's also different terms that

18   neurologists use in reference to describing amnesia --

19   correct? -- retrograde and anterograde?

20   **A.**    Yes.

21   **Q.**    Okay.  You're not a neurologist, by the way, are

22   you?

23   **A.**    I'm not.

24   **Q.**    Okay.  So, what is retrograde amnesia?  Can you

25   explain that to the jury?

1  **A.**   Sure.  Having difficulty -- difficulty remembering

2  things that occurred prior to an incident.

3  **Q.**   Okay.  So, retrograde amnesia is having amnesia

4  that occurred prior to the incident; correct?

5  **A.**   No.  Of things that occurred prior to the

6  accident.

7  **Q.**   Okay.  All right.  So, if -- just to simplify it

8  for me, so if I'm struck in the head and I'm knocked

9  unconscious and I don't remember five minutes of what

10 occurred before I was struck in the head, that's

11 retrograde amnesia?

12 **A.**   Correct.  Well said.

13 **Q.**   Okay.  And if I'm struck in the head and then I

14 don't remember five minutes after the impact, then

15 that's anterograde amnesia?

16 **A.**   I'm sorry.  I was --

17 **Q.**   That's fine.

18 **A.**   Could you say it --

19        THE COURT:  My fault.  I was having trouble

20 hearing him.  I thought they might be having trouble

21 hearing him.

22        MR. LAWLER:  Can you hear me okay, Your Honor?

23        THE COURT:  I can hear you fine.

24        MR. LAWLER:  Okay.

25 **Q.**   So, if I'm hit on the head and knocked unconscious

1    and I have amnesia covering the events that occur five

2    minutes after I was knocked unconscious, that's

3    anterograde amnesia; correct?

4    **A.**   Anterograde amnesia, correct.

5    **Q.**   But you call them both post-traumatic amnesia; is

6    that right?

7    **A.**   That's correct, which covers both anterograde and

8    retrograde amnesia, which is often what you see in

9    someone who's had a trauma to the head and a traumatic

10   brain injury.

11   **Q.**   Okay.  And I'm confused by that term because

12   usually the "post" means after, but you say it doesn't

13   matter; just it means either amnesia before or amnesia

14   after; right?

15   **A.**   Well, it's the post-trauma, so it's after a

16   trauma, so that's -- the post refers to the trauma.

17   **Q.**   Okay.  So, let's simplify it and let's talk about

18   amnesia before the incident and then amnesia after the

19   incident; fair enough?

20   **A.**   Sure.

21   **Q.**   Okay.  So, it's safe to say, in reference to

22   August 5th, 2012, Mrs. Irwin has no amnesia before the

23   impact; correct?

24   **A.**   Are you speaking retrograde amnesia?

25   **Q.**   Yes.

1    **A.**    Yeah, I think you're right.

2    **Q.**    Okay.  But is it your opinion that there's a

3    slight amount of amnesia that follows the impact?

4    **A.**    Correct.

5    **Q.**    And that's basically the period of time when

6    Mrs. Irwin remembers being hit by the umbrella and then

7    the next memory is her mom, I guess two seconds later,

8    putting ice on her face; right?

9    **A.**    I imagine it's a little longer than two seconds,

10    but yes, there's some period of time.

11    **Q.**    Okay.  Well, we can obviously wait and see what

12    Mrs. Connolly's testimony's going to be about that, but

13    that's fine.

14         Now, in the records there's an indication that,

15    when Mrs. Irwin was in the ambulance, that the EMTs

16    asked her about what her son's birthday was, and she

17    couldn't remember that; do you remember that?

18    **A.**    I do.

19    **Q.**    Okay.  And that in fact, Doctor, is not amnesia;

20    it's really just either some confusion or some anxiety

21    that causes someone to forget; would you agree with

22    that?

23    **A.**    I think you're right.

24    **Q.**    Okay.  Because she can remember not remembering,

25    so it's not amnesia; right?

1    **A.**    It would be -- I think you're right.  You

2    categorize it as confusion.  I think you're right.

3    **Q.**    Well, or anxiety over the situation; right?  Like,

4    for instance, if you're in high school and you've got a

5    big exam and you've got to get your books out of the

6    locker and you're already two minutes late for class

7    and you can't remember the combination because you're

8    nervous and things kind of get out of control; is that

9    right?

10    **A.**    Is that after you've had an injury?

11    **Q.**    To the head, you mean?  No, not an injury to the

12    head at all.

13    **A.**    Okay.

14    **Q.**    But just in life in general.

15    **A.**    I'm just speaking about this case.

16    **Q.**    Okay.  So, you're not buying in to my example at

17    all, huh?

18    **A.**    I'm sorry.

19         MR. LAWLER:  Okay.  All right.  We'll move on.

20    I'm going to come back to that particular record.

21    Would you pull up No. 90, please?  Could you highlight

22    it, please?

23         Okay.  Could you go to the top so the Doctor

24    could see that the record is the right day?  This is

25    Exhibit 90, Mr. Charnas.  Do you want to wait?

1          MR. CHARNAS:  No.  Go ahead.

2          MR. LAWLER:  Could you highlight, please, the

3     date so we can see it?  It's hard to see.

4     **Q.**   Okay.  You see the date, it's September 18th,

5     2014, Cornell Adult Department, New York City

6     Presbyterian; you see that?

7     **A.**   I see it.

8     **Q.**   And down below, if you could highlight the portion

9     you just did earlier, please?

10         Thank you.

11         I'll just read it to you.  It says, "Patient was

12     getting in to cab, had one leg in door, cab sped away,

13     patient fell backwards hitting back of head, right leg

14     got run over by tire, complains of pain to right leg

15     and headache.  Patient in C collar and backboard.

16     Patient says, 'I don't think I passed out.'  Patient

17     oriented times three."

18         MR. LAWLER:  And if you could go below that,

19     please.

20     **Q.**   Okay.  Does that refresh your recollection that

21     you saw that record on Tuesday?

22     **A.**   I believe so, yes.

23     **Q.**   Okay.  Do you also remember seeing a record where

24     there was a Dr. Ulin that was questioning a concussion?

25     Do you remember seeing that?

1    **A.**    Not specifically, no.

2    **Q.**    That's the next record there.  Can you take a look

3    at that?

4          MR. LAWLER:  Would you highlight the top of it,

5    please?  Thank you.

6    **Q.**    Okay.  That's a September 26th, 2014, record;

7    right?

8    **A.**    Just to clarify, this is -- this is about two

9    years after she was injured in August of 2012 and about

10   six months after I saw her, you understand that; right?

11   **Q.**    Oh, I understand that.  That's what I'm saying,

12   this is -- this was not -- this did not occur when you

13   saw her, but it's occurred since you saw her?

14   **A.**    Okay.

15   **Q.**    Okay.  And I'm just really asking you about

16   concussions and headaches and all that, whether you're

17   aware of it because you've been testifying about

18   headaches.

19          So, would you agree with me that the diagnosis

20   and pertinent findings is -- and I'll -- it's

21   handwriting, so I'll read it.  It looks like,

22   "Diagnosed with a fracture to the right fibula,

23   laceration right foot and concussion."

24          I read that correctly; right?

25   **A.**    You did read that correctly.  What type of doctor

1    is Dr. Ulin?

2    **Q.**    I don't know, sir.  I think -- I don't know.  I

3    don't know.

4    **A.**    Okay.

5    **Q.**    He's a doctor at, I think, New York Presbyterian.

6         Okay.  Now, let me change gears a little bit,

7    and we're going to go back to 2012.  Are you aware that

8    there was an MRI taken by East River Imaging, which is

9    dated September 11th, 2012?

10    **A.**    Yes, I am.

11    **Q.**    Okay.  And this particular MRI, it revealed --

12    I've got to read it to make sure I get it right --

13    "Non-specific peri-ventricular sub-cortical white

14    matter changes;" is that correct, even though I

15    mispronounced the word "sub-cortical"?

16    **A.**    That was great.

17         MR. LAWLER:  Could we put that up on the screen,

18    please?

19    **Q.**    Now, you're familiar with this particular term;

20    correct?

21    **A.**    I am.

22    **Q.**    And remember yesterday when you talked about

23    axons, the white matter in someone's brain?

24    **A.**    Yes.

25    **Q.**    Okay.  And essentially, the white matter is made

1    up of axons sitting in the center of the brain and

2    connect up to different parts of your brain; right?

3    **A.**    That's correct.

4    **Q.**    And it's your testimony and your opinion that

5    non-specific peri-ventricular sub-cortical white matter

6    changes are not consistent with someone who has a mild

7    traumatic brain injury; right?

8    **A.**    That's not what you would expect from someone

9    who's had a mild traumatic brain injury.

10    **Q.**    So, it's your testimony that it's not what you

11    would expect, so -- so, you wouldn't expect to see

12    these white matter changes with someone who has a mild

13    traumatic brain injury; correct?

14    **A.**    It's the location, the peri-ventricular region,

15    that you wouldn't expect it in.

16    **Q.**    I'm going to ask that -- I don't think, with all

17    due respect, Doctor, that you answered the question

18    fully.

19    **A.**    Okay.

20    **Q.**    Is it your testimony that non-specific

21    peri-ventricular sub-cortical white matter changes are

22    not consistent with someone who has a mild traumatic

23    brain injury?

24        THE COURT:  Yes or no.

25    **A.**    I just don't -- I don't know how to -- there seem

1    to be too many negatives in there for me to answer that

2    question yes or no.

3              MR. LAWLER:  Okay.  May I approach, Your Honor?

4              THE COURT:  Yes.

5    **Q.**   Doctor, I'm handing you -- so I don't block the

6    jury.

7              I'm handing you a deposition of your testimony,

8    which was taken August 1st, 2014, in New York City.

9    And you remember that deposition; right?

10   **A.**   I do.

11   **Q.**   Okay.  You've been deposed a number of times in

12   various cases; right?

13   **A.**   I haven't.

14   **Q.**   How many times have you been deposed,

15   approximately?

16   **A.**   In depositions, probably about 30 times.

17   **Q.**   And obviously before you testify, you're sworn in

18   under oath; right?

19   **A.**   Correct.

20   **Q.**   Just like you are today; correct?  Okay.

21             What I'm going to do is I'm going to ask you

22   some questions from that particular transcript.  I'm

23   going to go back to my podium, and then we'll look at

24   that.

25             If you could turn, please, to Page 48 -- excuse

1    me.  I'm sorry.  It's Page 52.  I apologize for that.

2    And if you could look at Lines 2 -- and I'm going to

3    read the question to you, Doctor.

4         And the question is:  "Well, is this

5    non-specific peri-ventricular sub-cortical white matter

6    changes, is that consistent with someone who has mild

7    traumatic brain injury?"

8         And, sir, did I read that question correctly?

9    A.    Much better in here.  You read it better here.

10   Q.    Okay.  Are you being a wise guy?

11   A.    No, no.  Just this question's better than the

12   question that you asked me before.

13   Q.    Okay.  And your answer, which is on Line 6, says,

14   No.  The peri-ventricular region, you can see changes

15   at the sub-cortical level on a number of different

16   places, not unusually the peri-ventricular regions.

17        I read that correctly; right?

18   A.    No.  The last line is, Not usually, not usually

19   the peri-ventricular regions.

20   Q.    Okay.  And you said, when I asked you specific

21   questions about what this means for Mrs. Irwin, having

22   these white matter changes in the sub-cortical area,

23   that it could be just an incidental finding; right?

24   A.    That's correct.

25   Q.    Okay.  And explain to the jury what an incidental

1    finding is.

2    **A.**   It's just something that you're born with or that

3    develops but has no clinical significance.

4    **Q.**   Right.  So, it could be -- I think -- is the term

5    when you're born with something, is that congenital?

6    **A.**   Congenital is the term.

7    **Q.**   So, some people can be born with a congenital

8    disorder that's going to produce white matter changes

9    in their brain quicker than the normal population;

10   right?

11   **A.**   No.

12   **Q.**   Okay.  Now, would you agree with me, Doctor, that

13   you can get peri-ventricular changes from a disease

14   called multiple sclerosis, MS?

15   **A.**   Yes.  Yes.

16   **Q.**   And you talked about axons yesterday; right?

17   **A.**   Yes.

18   **Q.**   And what MS does is it attacks axons, it attacks

19   the sheath -- you described the sheath on the axons

20   yesterday; right?

21   **A.**   That's correct, the myelin sheath.

22   **Q.**   And so the sheath is called the myelin sheath;

23   right?

24   **A.**   Correct.

25   **Q.**   And that's actually -- this finding of

1    peri-ventricular sub-cortical white matter changes,

2    that's consistent with someone who has early signs of

3    MS; right?

4    **A.**    Early signs of MS is a clinical diagnosis, and

5    these are some of the radiologic findings that you can

6    see with that.

7         MR. LAWLER:  Okay.  Now, if you could pull up

8    Exhibit 34-D, and if you could highlight, please, the

9    top of the document, Cort, please, so we can see what

10   type of document it is and what's the date on it.

11   **Q.**    So, this is a progress note from Brian Im, MD,

12   dated 7/28/2015; you see that?

13   **A.**    Yes.

14   **Q.**    And do you know who Dr. Im is?

15   **A.**    Yes, he did his training at the program that I'm

16   the Director of.

17   **Q.**    Okay.  And is he a psychiatrist as well?

18   **A.**    Yes.

19   **Q.**    And is it your understanding that he's

20   Mrs. Irwin's psychiatrist at this time?

21   **A.**    Yes.

22   **Q.**    So, he's monitoring her health basically; is that

23   the story?

24   **A.**    He's taking care of her brain injury and

25   rehabilitation needs.

1      MR. LAWLER:  Okay.  If you could go down -- and,

2  again -- I'm sorry.  Go back to the top again, please.

3  Thank you.  I can't see it.

4  **Q.**  It's dated July 29th, 2015, just about two months

5  ago; right?

6  **A.**  Yes.

7      MR. LAWLER:  Okay.  If you could go down,

8  please, and highlight the bottom half of that document,

9  please.

10  **Q.**  Do you see where it says, "Patient expresses

11  desire for further neuro eval for other potential

12  causes of her symptoms, such as MS;" do you see that?

13  **A.**  I see that.

14  **Q.**  Did you see that when you looked at the records on

15  Tuesday?

16  **A.**  I did.

17  **Q.**  You did see that?

18  **A.**  I did.

19  **Q.**  Okay.  Now, I'm going to switch gears again a

20  little bit here.

21      Yesterday you talked about these DTIs, which are

22  advanced MRIs; right?

23  **A.**  Correct.

24  **Q.**  Okay.  And really what a DTI is, is it's a regular

25  MRI that goes through a lot of processing by

1    individuals on a computer; correct?

2    **A.**    Correct.

3    **Q.**    And so, they do all these machinations and somehow

4    come up with this picture; is that right?

5    **A.**    It's a computer model.  It's actually more numbers

6    than pictures.

7    **Q.**    Okay.  And so, what they do is basically -- and

8    it's relatively new; correct?

9    **A.**    Relative to MRI, yes, it's relatively new.

10   **Q.**    Okay.  I mean, really in the last, you know, ten

11   years or so; right?

12   **A.**    Yes.

13   **Q.**    And basically what these DTIs do is that they look

14   at MRIs that have been processed, and they compare it

15   against other MRIs of supposedly normal people; right?

16   **A.**    It's an oversimplification, but that's reasonable.

17   **Q.**    Okay.  That's probably the best you're going to

18   get from me.

19        So -- and getting back to it, I mean, as we age,

20   our white matter changes; right?

21   **A.**    Yes.

22   **Q.**    Okay.  And the -- and as we age, our axons break

23   down; right?

24   **A.**    Yes.

25   **Q.**    Now, getting back to the DTIs, it is safe to say

1  that you, as a medical doctor, are unable to offer an

2  opinion to a medical degree of certainty as to whether

3  or not the DTIs that supposedly depict axonal damage to

4  Mrs. Irwin's brain were due to the August 5th, 2012,

5  concussion or the earlier concussions; is that safe to

6  say?

7  **A.**   It's hard to say within a reasonable degree of

8  medical certainty.  We know that she had no symptoms

9  from the prior concussions, but it's hard to say for

10  sure.

11  **Q.**   Well, not only is it not hard to say for sure; you

12  understand, when you testify in a court of law, that

13  you testify when you offer an opinion to a medical

14  degree of certainty; right?

15  **A.**   Is that the same thing as a reasonable degree of

16  medical certainty?

17  **Q.**   I think it is.

18  **A.**   Okay.

19  **Q.**   Is that right?

20  **A.**   That's what I believe, yes.

21  **Q.**   And what was the term that you just used?

22  **A.**   A reasonable degree of medical certainty.

23  **Q.**   Okay.  And so, using your term, Doctor, you cannot

24  testify to a reasonable degree of medical certainty

25  that the axonal damage supposedly showed on the DTIs is

1    attributable to the August 5th, 2012, event or is due

2    to other prior concussions or other prior events; is

3    that right?

4    **A.**   I cannot.  You're right.

5         MR. LAWLER:  Okay.  One moment, Your Honor,

6    please.

7         (Pause)

8         MR. LAWLER:  I'm fine, Your Honor.  Thank you.

9         THE COURT:  Any redirect, Mr. Charnas?

10        MR. CHARNAS:  Yes, Your Honor.

11        Your Honor, I wonder if we could have that

12   graphic put back up that the defense used with the

13   1 through 12 of Dr. Greenwald's report, the same

14   graphic.

15        THE COURT:  You're asking the wrong person.

16        MR. CHARNAS:  Well, I'm not allowed to talk to

17   him directly.  Is that okay?

18        THE COURT:  Could somebody make that graphic

19   appear on our screens?

20        MR. LAWLER:  I will make it appear.  You can ask

21   me.  I'll do it.  I'm fine with it, Your Honor.

22        THE COURT:  If you could make that graphic

23   appear, please?  Thank you.

24             **REDIRECT EXAMINATION BY MR. CHARNAS**

25   **Q.**   Dr. Greenwald, do you remember this graphic that

1    was put up during cross-examination yesterday?

2    **A.**   I do, yes.

3    **Q.**   What I'd like do is go through with you each one,

4    and I want you to tell me about the frequency and

5    quality of each symptom before the incident of

6    August 5th, 2012, as compared to after the incident of

7    2012.

8          So, let's start with headache.  What was the

9    frequency and quality of Mrs. Irwin's complaints of

10   headache before August 5th, 2012?

11   **A.**   She said she was not having chronic headaches

12   prior to August 5th, 2012.

13   **Q.**   And what about after August 5th, 2012?

14   **A.**   She said that the headaches can be very severe and

15   come on three to four times in the last six months.

16   She has daily headaches that range from two over ten to

17   an infrequent ten over ten.

18   **Q.**   Is ten out of ten -- I guess it doesn't get worse

19   than ten out of ten; correct?

20   **A.**   Correct.

21   **Q.**   There's no 11 out of ten.

22          Now, let's go to the next one, the dizziness.

23   What was the quality and frequency of dizziness

24   complained of by Megan Irwin before August 5th, 2012?

25   **A.**   She said she was not having chronic dizziness

1    prior to August 5th, 2012.

2    **Q.**    And how about after August 5th, 2012?

3    **A.**    That she was having dizziness about three times

4    per week.  It was better while she was on the -- when

5    she started Amantadine, which had been started by

6    Dr. Stone, and that also the vestibular therapy that

7    she was getting had also helped to decrease the

8    frequency.

9    **Q.**    Let's take a look at No. 3, feeling of being

10    foggy.  What was the frequency and quality of her

11    feeling foggy before August 5th, 2012?

12    **A.**    She said she didn't have any chronic symptoms of

13    feeling foggy prior to that.

14    **Q.**    Now, you've read medical records which are in

15    evidence about her pre-incident history; correct?

16    **A.**    Correct.

17    **Q.**    Do you remember seeing anything in there about her

18    feeling foggy?

19    **A.**    No.

20    **Q.**    Now, what was her condition in regard to fogginess

21    after August 5th, 2012?

22    **A.**    She talks about being easily overwhelmed by too

23    much reading or cognitive stressors, and she said

24    sometimes the cognitive stressors can be simple things

25    like reading or discussing complex things but then

1    sometimes could also just -- she was just trying to

2    find Madison Avenue, and she was very close to her

3    home.

4    **Q.**   The next one, No. 4, is irritability.  What was

5    the frequency and quality of her complaints about

6    irritability prior to August 5th, 2012?  And, again,

7    you've seen all the records in evidence pre-incident.

8    **A.**   She said she wasn't having chronic irritability

9    prior to August 5th, 2012.

10   **Q.**   Did you see anything in the pre-incident records

11   about irritability?

12   **A.**   I did not see irritability discussed.

13   **Q.**   Now, tell the jury, after August 5th, 2012, what

14   was the frequency and quality of her complaints about

15   irritability?

16   **A.**   She talks about that she had a low frustration

17   tolerance for people, including her three children.

18   **Q.**   Let's go to No. 5, fatigue/tiredness.  What was

19   the frequency and quality of her complaints about

20   fatigue/tiredness before the incident?

21   **A.**   She said that she had not -- was not having

22   chronic fatigue or tiredness prior to the incident.

23   **Q.**   And when you say chronic, what do you mean?

24   **A.**   Meaning that -- on a daily basis.  I know there

25   were specific incidences of it in the records, like

1    when she had that viral infection, but it wasn't

2    something that she was dealing with on a day-to-day

3    basis.

4    **Q.**   What about the complaints about fatigue and

5    tiredness after that umbrella struck her on the head?

6    **A.**   That is continuing since then.

7    **Q.**   Difficulty with organization and planning, that's

8    No. 6, what was the frequency and quality of her

9    complaints about difficulty with organization and

10   planning before August 5th, 2012?

11   **A.**   She said that organization and planning was one of

12   her strengths, and it was part of the reason that she

13   was so successful in her job was her good organization

14   and planning and that this was a real strain for her

15   after her injury on August 5th, 2012.

16   **Q.**   And did you see any reference in the pre-incident

17   medical records of difficulty with organization and

18   planning?

19   **A.**   Only that one note from the psychologist that's

20   just saying that she was feeling overwhelmed at work at

21   that time, but not that, that it was actually impairing

22   her from doing the work.

23   **Q.**   Now, let's talk about anxiety, No. 7.  What was

24   the frequency and quality of her complaints about

25   anxiety before the umbrella struck her in the head?

1    **A.**    She said that she has had anxiety for a long time

2    but that the quality of it changed after August 5th,

3    2012.

4    **Q.**    Have you ever heard the term "situational

5    anxiety"?

6    **A.**    Yes.

7    **Q.**    What does situational anxiety mean?

8    **A.**    That in certain situations, like testifying in a

9    courtroom, where you might feel anxious but not

10   something that's chronically there for you.

11   **Q.**    And what was her -- what was the frequency and

12   quality of her complaints about anxiety after the

13   incident?

14   **A.**    She said after the incident that she -- she

15   described it as free-floating anxiety, when she feels

16   it just all the time.

17   **Q.**    Now, let's look at No. 8, easily overwhelmed.

18   Before the incident, is there any evidence in the

19   medical records or anything that you've seen in regard

20   to this case that she was easily overwhelmed before the

21   incident?

22   **A.**    I did not see that.

23   **Q.**    Now, is there any evidence that she was

24   overwhelmed at times before the incident?

25   **A.**    With all the things that she had going on, it was

1    noted that at times she was overwhelmed.

2    **Q.**    Now, talk to us, Doctor, about the frequency and

3    quality of her complaints about being easily

4    overwhelmed now, after she was hit in the head by that

5    umbrella.

6    **A.**    That she felt that it was -- that it was a low

7    threshold, that it was easy for her to become

8    overwhelmed by smaller things, not like in the old days

9    where she could handle her three children, one with a

10   chronic disability, her challenging husband and a

11   high-stress job.

12   **Q.**    No. 9, sensitivity to light and noise, were there

13   any complaints before August 5th, 2012, about

14   sensitivity to light and noise that you saw in the

15   record?

16   **A.**    I did not see any evidence of that.

17   **Q.**    And how has that changed since August 5th, 2012?

18   **A.**    It's now a chronic problem for her, as far as

19   sensitivity to light and noise.

20   **Q.**    No. 10, frustration over not recovering yet, I

21   guess that didn't apply before the incident.

22         How about difficulty with word-finding?  Were

23   there any instances that you saw in the records where

24   she complained of difficulty with word-finding?

25   **A.**    I did not see that.

1    **Q.**    So, she was actually a successful salesperson;

2    correct?

3    **A.**    Correct.

4    **Q.**    And deviated nasal septum and recurring sinus

5    infection, I don't think that's particularly relevant.

6    Thank you, Doctor.

7            Now, the last visit that Mrs. Irwin made to her

8    primary care physician, Dr. Lash, before the incident,

9    I believe that Mr. Lawler mentioned it, it's

10   Exhibit 25-G -- I'll save you some time.

11           MR. CHARNAS:  May I approach, Your Honor?

12           THE COURT:  Yes.

13   **Q.**    This is the record in evidence of July 24th, 2012,

14   which is the last visit that Mrs. Irwin made to

15   Dr. Lash, her primary care physician, before she was

16   struck on the head with the umbrella.

17           Can you summarize her condition for us at that

18   time?

19   **A.**    Well, to start with, her chief complaint was that

20   she was just there for a physical exam.  She had no

21   specific complaints beyond that.

22           He reviews basic things, her past family

23   history, her social history, her allergies, but then if

24   you look at her review of systems, so this is just he

25   asked questions about certain things but in different

1  organ systems, so she had no general complaints.  She

2  did have worsening night vision but no other visual

3  complaints like things of light sensitivity or anything

4  of that sort.

5       Her cardiovascular system, they note a positive

6  for palpitations but specifically with too much stress,

7  too much coffee and not enough sleep or water, not so

8  unusual.  No respiratory complaints, no GI complaints,

9  no musculoskeletal complaints, as far as the bones,

10  muscles or nerves.

11       And really looking beyond that, no neurologic

12  complaints at all, no endocrine complaints, no allergic

13  complaints.  And her only complaint with regard to

14  psychiatric issues is, "Not sleeping much-three kids."

15       So, really nothing significant on review of

16  systems.

17       Her physical examination was, you know,

18  basically all normal, including her neurologic

19  examination, her musculoskeletal examination.  Her eye

20  examination, her ears, nose and throat examination were

21  really all normal.

22       And the impression was only, "Routine medical

23  exam," and he recommended she take some more Vitamin D

24  and increase her calcium and limit her sun use.  And

25  then there's a note about the breast lump and that she

1  needed a further mammogram and sonogram.

2       But this is -- so, I think the significance of

3  this is this is July 24th, 2012, you know, a couple of

4  weeks prior to the injury of August 5th, 2012, a very

5  normal examination with no significant complaints.

6       MR. CHARNAS:  Thank you.

7       May I approach, Judge?

8       THE COURT:  Yes.

9  Q.  Mr. Lawler talked to you a bit about Dr. Ulin.

10 That's the doctor that she went to when her leg was

11 hurt in the taxi accident, fractured.

12      Do you go to a brain-injury doctor for a

13 fractured leg?

14 A.  They might refer you to an orthopedist but not the

15 usual place you would go.

16 Q.  You mentioned in your testimony that a negative

17 nystagmus was found -- was not found.  That's not a

18 good way of putting it.

19      At some point, there's a reference to Mrs. Irwin

20 having a negative nystagmus.  What is that?

21 A.  Nystagmus is a finding on physical examination of

22 the eyes having jerky movement as they move from left

23 to right.

24 Q.  If a doctor finds that there's no nystagmus at a

25 particular time, does that mean the patient doesn't

1    have traumatic brain injury?

2    **A.**   It does not mean that.

3    **Q.**   And what's the basis of your answer?

4    **A.**   My 20 years of education in this and having looked

5    at thousands of patients, because it really refers to

6    only a certain area of the brain that would be affected

7    and specifically looking at the vestibular system or

8    certain areas of the vestibular system.

9    **Q.**   Earlier you were discussing Mrs. Irwin's prior

10   concussions, and you said that it wasn't significant to

11   you whether or not she had lost consciousness during

12   those prior concussions; do you remember that

13   testimony?

14   **A.**   I do recall that.

15   **Q.**   Can you tell us why it wouldn't be significant to

16   you?

17   **A.**   Well, we talked yesterday about how that loss of

18   consciousness is only one component or one possible

19   reason that you'd say someone had, had a concussion, so

20   loss of consciousness in itself is not the important

21   part.

22        What I'm looking for is, What were the

23   functional consequences afterwards?  And we see that,

24   in her case, that she was able to go to school

25   afterwards, after the more recent concussions, that she

1    was able to host a party afterwards.  The loss of

2    consciousness itself is not a significant finding.

3    Q.    Now, Doctor, let's change gears for a second.

4          I'm going to show you Exhibit 35-A, which is a

5    record dated -- sorry -- August 11th, 2014.  It's

6    Exhibit 35-A.

7          MR. CHARNAS:  May I approach, Judge?

8          THE COURT:  Yes.

9    Q.    Now, Doctor, that's a record from Mrs. Irwin's

10   headache doctor, Dr. Myrna Cardiel; do you see that?

11   A.    Yes.

12   Q.    Now, this is August, 2014.  The taxi incident was

13   September 18th, 2014.

14         Does Dr. Cardiel, the headache doctor, discuss

15   in August, 2014, the frequency and quality of

16   Mrs. Irwin's headaches in that record?

17   A.    Yes.

18   Q.    And could you tell the jury, what are Mrs. Irwin's

19   complaints about headache the month before the

20   incident?

21   A.    Here, towards the bottom of this page, she talks

22   about -- the headaches are described as three different

23   types, the more common as the sensitivity of the

24   scalp -- on her scalp, all over her head and neck; the

25   other is described as a sharp stabbing headache on the

1   top of her head, these headaches are brief but very

2   severe; the last headache type is described as

3   frontotemporal, worse on the right, associated with

4   nausea, the pain is throbbing in nature.

5        Naproxen helps all three different headache

6   types.  However, she is constantly having to take it.

7   She asks for help, remedy with her headaches.  They

8   occur randomly throughout the day.  Common triggers are

9   bright noisy places, and participating in therapy also

10  may be a trigger.

11       MR. CHARNAS:  Thank you.

12       May I approach, Your Honor?

13       THE COURT:  Yes.

14       MR. CHARNAS:  Thank you.

15  **Q.**   Now, Doctor, these non-specific peri-ventricular

16  sub-cortical white matter changes -- I haven't had a

17  chance to practice -- does that have anything to do

18  with this traumatic brain injury?

19  **A.**   No.

20  **Q.**   Now, do you think Mrs. Irwin was born with

21  traumatic brain injury?

22  **A.**   Absolutely not.

23  **Q.**   Do you think, when that umbrella smashed her in

24  the head, that she suddenly developed multiple

25  sclerosis?

1          MR. LAWLER:  Objection.  It's leading.

2          THE COURT:  Could you rephrase the question,

3     please.

4     **Q.**    Do you think multiple sclerosis can be caused by

5     an umbrella strike to the head?

6     **A.**    No.

7     **Q.**    Do you have an opinion as to whether Mrs. Irwin

8     has multiple sclerosis?

9          MR. LAWLER:  Objection.  Lack of foundation.

10         MR. CHARNAS:  Let me rephrase it.

11    **Q.**    Doctor, in the course of your practice, your

12    education, training and experience as a physician, do

13    you have occasion to determine whether or not people

14    have multiple sclerosis?

15    **A.**    I actually have a book chapter about this topic

16    specifically.

17    **Q.**    I'm sorry?

18    **A.**    I have a book chapter about this topic

19    specifically.

20    **Q.**    And what's the -- what book is the chapter in?

21    **A.**    It's in "Physical Medicine and Rehabilitation

22    Reviews."

23    **Q.**    And do you know what the name of the chapter is?

24    **A.**    "Multiple Sclerosis."

25    **Q.**    Doctor, do you have an opinion as to whether

1    Mrs. Irwin has multiple sclerosis?

2    A.    I have no reason to think that Ms. Irwin has

3    multiple sclerosis.

4    Q.    And please tell the jury the complete basis of

5    your answer.

6    A.    The type of symptoms that you'd expect to see in

7    someone who has multiple sclerosis, the visual changes,

8    the sensory changes, the motor changes, are completely

9    inconsistent with the issues that Ms. Irwin has.  Plus,

10   I wouldn't expect them to start suddenly after being

11   hit in the head.

12         MR. CHARNAS:  Your Honor, that's all I have.

13   Thank you.

14         THE COURT:  Any recross, Mr. Lawler?

15         MR. LAWLER:  I do, Your Honor, thank you.

16         You can put that up too.  Thank you.

17              **RECROSS-EXAMINATION MR. LAWLER**

18   Q.    Doctor, looking at this list of 12 items, remember

19   you left the stand yesterday at 4:00?

20   A.    I remember that.

21   Q.    Okay.  Between now and when you left the stand at

22   4:00, did you speak to Attorney Charnas regarding this

23   list of 12?

24   A.    No.

25   Q.    Okay.  Now, if you could look at the first one,

1    the headaches, and focus on that?

2         MR. LAWLER:  Could we have Exhibit 35-B?

3         Okay.  And if you could please, Cort, just focus

4    on the top of the document.

5    **Q.**  And the date on this is --

6         MR. LAWLER:  Can you focus?  I can't see it.

7    Can you focus on the top right corner?

8         Thank you very much.

9    **Q.**  The date on this is September 29th, 2014; is that

10   right?

11   **A.**  That's correct.

12   **Q.**  Okay.  And if you could go down the list, please.

13        MR. LAWLER:  Could you go up a little bit,

14   please?

15        Can you focus on the top -- I'm sorry.  The top

16   of the document.  That's fine, the bottom, and then

17   highlight it.

18   **Q.**  Okay.  Do you see there where it talks about

19   "Interval History"?  Do you see that in this --

20   **A.**  Yes.

21   **Q.**  It's almost three quarters of the way down on the

22   page?  You see that, Doctor?

23   **A.**  Yes.

24   **Q.**  Okay.  And this is a record from Dr. -- is it NYU

25   Hospital Center?  Do you see where it says that, "She

1    tells me she was hit by a taxi several weeks ago, and

2    since then, her headaches have worsened"?

3    **A.**    Yes.

4    **Q.**    You agree with me that's what it says?

5    **A.**    Correct.

6    **Q.**    Now, in regard to dizziness, would it surprise you

7    that someone who is dizzy constantly wears high heels

8    when they travel about?  Would that surprise you?

9    **A.**    If they just feel dizzy?  No, it wouldn't surprise

10   me.

11   **Q.**    Okay.  You don't think that would make someone who

12   feels dizzy more unsteady on their feet, when they wear

13   high heels?

14   **A.**    I think it's difficult to wear high heels, but

15   fashion seems to win out.

16   **Q.**    Okay.  Now, you talked about --

17          MR. LAWLER:  If we can go back to that list of

18   12, please, again?  Thank you.

19   **Q.**    You talked about feeling foggy, and I think you

20   mentioned that Mrs. Irwin told you that sometimes she

21   gets confused when she's in her own neighborhood; is

22   that right?

23   **A.**    That's correct.

24   **Q.**    Okay.  And you mentioned something about

25   Madison -- what did you say about Madison, Madison

1    Avenue?

2    **A.**    Yeah, that she had difficulty finding Madison

3    Avenue, which should otherwise be easy for her to find.

4    **Q.**    Okay.  Do you understand that Mrs. Irwin -- you

5    probably know New York City a lot better than I do.

6    **A.**    I'm sure.

7    **Q.**    You're from, what, Brooklyn?

8    **A.**    But then I worked in New York City for about ten

9    years.

10    **Q.**    Okay.  But Mrs. Irwin lives in the upper east

11    side; right?

12    **A.**    Correct.

13    **Q.**    And she lives in between Park Avenue and

14    Madison Avenue; are you aware of that?

15    **A.**    Correct.

16    **Q.**    Okay.  So, she basically told you that somehow she

17    gets confused finding Madison Avenue, which is less

18    than one block away from her house?

19    **A.**    She gave it as an example, that she's had

20    difficulties like that.

21    **Q.**    Okay.  Well, when you saw Mrs. Irwin, tell the

22    jury where you saw her.

23    **A.**    I saw her in my office in New Jersey.

24    **Q.**    Okay.  And how did Mrs. Irwin get there?

25    **A.**    She had come by taxi.

1    **Q.**    Okay.  And so, did you ask her that, how she got

2    there, and she told you she got there by taxi?

3    **A.**    Correct.

4    **Q.**    Okay.  Are you also aware that Mrs. Irwin has

5    traveled to, for instance, she traveled to see

6    Dr. Benson; right?

7    **A.**    Correct.

8    **Q.**    Are you aware of that?

9    **A.**    I am.

10    **Q.**    Okay.  And are you aware that Dr. Benson is

11    situated in a suburb of Detroit, Michigan?

12    **A.**    I'm aware of that.

13    **Q.**    Okay.  And are you aware that Mrs. Irwin traveled

14    by herself via airplane and other public transportation

15    or whatever to Detroit, Michigan?  Are you aware of

16    that?

17    **A.**    Yes.

18    **Q.**    Okay.  And are you aware that then she met with

19    Dr. Benson and then stayed in a hotel somewhere in the

20    Detroit area?  Are you aware of that?

21    **A.**    I don't know the specifics of her travel there.

22    **Q.**    Okay.  Are you aware that, on one day she saw

23    Dr. Benson and then on the subsequent day, the next

24    day, she went to Harper Hospital to actually obtain the

25    MRI?

1    **A.**    I don't know the specifics of her travel there.

2    **Q.**    Okay.  But you'd agree with me that the travel --

3    a person who travels from New York City to Detroit and

4    then goes to two places in Detroit is a whole lot more

5    difficult than traveling one block away from your home;

6    would you agree with that?

7    **A.**    You're right.

8    **Q.**    Okay.  You'd agree with me that -- you're familiar

9    with the term "executive functioning;" right?

10   **A.**    I am.

11   **Q.**    I mean, that's a term that's found in psychology;

12   right?

13   **A.**    It is.

14   **Q.**    Okay.  So, executive functioning is basically how

15   you get through the day; right?  You have to make

16   decisions about, for instance, you know, if you're in

17   high school, you've, you know, got make sure you set

18   your alarm clock and you get up, and then -- so, you go

19   down and have your breakfast, and then you go and get

20   the bus to school, I mean, that's executive

21   functioning -- right? -- figuring out how to get

22   through life; right?

23   **A.**    Those are some of the components.

24   **Q.**    Okay.  And would you agree with me that it takes

25   executive functioning for someone to travel from

1    New York City to La Guardia Airport to an airport in

2    Detroit and then to a doctor in a suburb of Detroit and

3    then to a hotel and then the next day to Harper

4    Hospital to get an MRI?  Would you agree with me that,

5    that takes executive functioning to figure all that

6    out?

7    **A.**   Executive functioning or some sort of compensatory

8    mechanisms to do that, one of those two.

9    **Q.**   Now, let's talk about fatigue.  You said you wrote

10   a book about fatigue or a chapter about fatigue?

11   **A.**   A whole book.  I edited a book.  I have a chapter

12   in my own book.

13   **Q.**   Okay.  You're familiar with the term "somatic;" is

14   that right?  Somatic, is that the right pronunciation?

15   **A.**   Correct.

16   **Q.**   Okay.  Tell the jury what somatic means.

17   **A.**   As a result of psychological and brain-related

18   issues, that it expresses itself as body-related

19   issues.

20   **Q.**   Okay.  So, would the use of "somatic," would that

21   mean, for instance, depression has some somatic

22   symptoms?

23          MR. CHARNAS:  Objection, Your Honor.  Beyond the

24   scope.

25          THE COURT:  Overruled.

1          MR. LAWLER:  Okay.  I'll ask the question again.

2     **Q.**   When you say -- use the word "somatic," for

3     instance, if I say someone has depression, somatic, as

4     applied to the symptoms would be the symptoms related

5     to depression; is that right?

6     **A.**   Not exactly, but --

7     **Q.**   Well, let's --

8     **A.**   Do you want me to explain more exactly?

9     **Q.**   What is it exactly?

10    **A.**   So, it can -- when someone has depression, some of

11    their bodily symptoms that may be there can be

12    exacerbated or worsened.

13    **Q.**   Okay.  So, if someone has depression -- and the

14    somatic complaints of depression, for instance, are

15    fatigue; right?  That's one of them; right?

16    **A.**   Depression can cause fatigue.

17    **Q.**   Okay.  So, you are aware -- again, you know, I

18    know we've gone over this several times.  I'm going to

19    try to do it quickly.

20          You're aware that Dr. Sontz diagnosed

21    Megan Irwin with adjustment disorder with mood and

22    anxiety components; right?

23    **A.**   Correct.

24    **Q.**   And those mood and -- the mood disorder translate

25    in to somatic complaints of fatigue; correct?

1    **A.**    Well, we talked about adjustment disorder, not

2    depression.

3    **Q.**    No adjustment disorder, but Mrs. Irwin was

4    diagnosed under DSM-V -- I thought we went over that

5    yesterday -- with anxiety and mood disorders; right?

6    **A.**    We specifically discussed that adjustment disorder

7    is temporary, meaning that it generally lasts three to

8    six months.  So, at the point -- beyond the three to

9    six months, all those things would expire.

10    **Q.**    Okay.  But they didn't expire in her case because

11    she just discontinued treatment with Dr. Sontz; right?

12    **A.**    I can't say that for sure.

13          MR. LAWLER:  Could we pop up --

14    **Q.**    I think you said she didn't have a whole lot of

15    fatigue prior to --

16          MR. LAWLER:  This is 40-B, please.  Thank you.

17    Sorry about that.  Can you go to the next page, please?

18    And then the next page.  Okay.  How about the next

19    page?  I'm sorry about this.

20    **Q.**    This particular record, if you can look at it,

21    it's dated 7/28/2006; right?  Do you see that in front

22    of you on the screen?

23    **A.**    I do.

24    **Q.**    Are you looking at the document in front of you?

25    You look like you're --

**A.**   Yes, I'm just looking -- I hadn't had a chance to
look at that, so I wanted to -- sometimes you don't
bring up everything about a record.  I just wanted to
read my own thoughts about it.

**Q.**   Oh, go ahead.  I didn't mean to do that.

**A.**   Okay.

**Q.**   Now, that's a record that is dated in 2006,
July 28th, and it's complaints by Mrs. Irwin claiming
fatigue and bruising easily, feels cold all the time,
and then there's a notation that anemia runs in the
family, has not been ruled out.

So, have you seen this particular record before?

**A.**   I have.  It's in my report.

**Q.**   Okay.  So, would you agree with me that there were
several notations of Mrs. Irwin suffering from fatigue,
both hospital records, psychological records, doctors'
records, prior to August 5th, 2012?

**A.**   I would not agree to that.

MR. LAWLER:  Okay, that's fine.  And that's all
I have.  Thank you very much.

MR. CHARNAS:  Just a few follow-up, Judge, very
quickly.

MR. LAWLER:  Your Honor, is this allowed?

THE COURT:  We did not discuss it.  I am not a
big fan of this, of re-redirect and re-recross.  I'll

1    give you, like, two minutes.

2        MR. CHARNAS:  I don't even need that, Judge.

3        MR. LAWLER:  I will have no questions,

4    Your Honor.

5        **RE-REDIRECT EXAMINATION BY MR. CHARNAS**

6    **Q.**   Madison Avenue is a pretty main thoroughfare in

7    New York, isn't it?

8    **A.**   That's correct.

9    **Q.**   Did Mrs. Irwin ever tell you she couldn't find

10   Madison Avenue from her apartment?

11   **A.**   She said she was having difficulty finding

12   Madison Avenue from where she was, which wasn't far

13   away from where she was.

14   **Q.**   But did she tell you that she couldn't find it

15   from her apartment?

16   **A.**   We didn't talk about that specifically.

17   **Q.**   Do you know whether, when Mrs. Irwin arrived in

18   Detroit to see Dr. Benson, do you know whether a car

19   picked her up?

20   **A.**   I don't know any of the details of her trip there.

21   **Q.**   So, you don't know whether a car picked her up to

22   take her to anywhere when she was in Detroit; is that

23   fair?

24   **A.**   That's correct.

25       MR. CHARNAS:  Thank you.  That's all I have,

1    Judge.

2           THE COURT:  Dr. Greenwald, you're excused.

3    Thank you.

4           THE WITNESS:  Thank you.

5           THE COURT:  Would it make sense to give them

6    their morning break now, or would you prefer to start

7    with the --

8           MR. LAWLER:  I think it probably would.  I think

9    that's a good idea.

10          THE COURT:  Okay.

11          MR. LAWLER:  That would give me a chance to set

12   up.

13          THE COURT:  So, while we're swapping witnesses,

14   we're going to give you your morning break, about

15   15 minutes.

16          (The jury is not present for the following)

17          MR. LAWLER:  Can we just eliminate the

18   re-redirect at this point onward?

19          THE COURT:  Mr. Charnas, I am not a fan of

20   re-redirect, that you probably anticipated that move

21   very quickly to the podium, and unless it's related to

22   extenuating circumstances, then I'd like to talk about

23   it before we do it.

24          MR. CHARNAS:  Very well, Judge.

25          (Recess, 11:09 a.m.)

1          (Resumes, 11:25 a.m.)

2          (The jury is present for the following)

3          THE COURT:  Brian Greenwald's report marked

4     Exhibit 151.

5          (Exhibit No. 151 was admitted in full)

6          THE COURT:  We're resuming the cross-examination

7     of Dr. Hibbard today, which we started yesterday and

8     we'll finish today.

9          Dr. Hibbard, you're still under oath.

10         THE WITNESS:  Thank you.

11              **CONTINUED CROSS-EXAMINATION BY MR. LAWLER**

12    **Q.**  Good morning, Dr. Hibbard.

13    **A.**  Good morning.

14    **Q.**  I know we started yesterday, and I may have jumped

15    around a little bit, but if at any time I confuse you

16    insofar as time periods and things like that, just let

17    me know, and I'll make sure I rephrase the question.

18         Now, Doctor, you saw Mrs. Irwin on three

19    different occasions in 2014, March 20th, March 26th and

20    April 1st; is that correct?

21    **A.**  That's correct.

22    **Q.**  Now -- and your office is located at 240 East 36th

23    Street in New York City; is that right?

24    **A.**  2 -- would you repeat that?

25    **Q.**  Sure.  That's fine.

1          Your office is located on 240 East 36th Street

2     in New York City; right?

3     **A.**    Incorrect.

4     **Q.**    Okay.  Where is your office located?

5     **A.**    My office has changed in the last several years,

6     somewhere in -- I don't know if it was 2012 that we

7     moved from 34th Street.  NYU Medical Center moved, Rusk

8     Institute, from 34th Street to 38th Street.

9          The new address is 240 East 38th Street.

10    **Q.**    So, I was wrong.  It's not 240 East 36th; it's

11    240 East 38th; is that right?

12    **A.**    240 East 38th is correct.  That's current.

13    **Q.**    Okay.  And --

14    **A.**    Well, it's no longer current.  It was.  I have

15    subsequently retired from my position there, and I am

16    now in private practice.

17    **Q.**    Right, okay.  So -- well, let's talk about that

18    for a second.

19          When did you retire from that position and enter

20    private practice?

21    **A.**    From my most recent position?

22    **Q.**    Yes.

23    **A.**    My position at NYU as the Director of Psychology

24    Services, I stepped down in December of 2012.

25    **Q.**    Okay.  And since December, 2012, you've been in

1    private practice; is that right?

2    **A.**    Sorry.   2014.   And I've been in private practice

3    for the last two years.

4    **Q.**    Okay.   And are you working full time now, or are

5    you working part-time?

6    **A.**    I am working part-time.

7    **Q.**    Okay.   And is it safe to say that about 50 percent

8    of your part-time work is involved in medical/legal

9    cases?

10    **A.**    Yes, but my part-time work is very part-time at

11    this point.

12    **Q.**    Okay.   What, about three days week; is that right?

13    **A.**    No.   About two days a month is my current goal.

14    **Q.**    So, you're really moving in to full retirement,

15    then?

16    **A.**    I am planning it very carefully, trying to.

17    **Q.**    Got it, okay.

18            So, I guess the question that I want to ask is:

19    Tell the jury where your office was located when

20    Mrs. Irwin came to see you in March and April of 2014.

21    **A.**    I have to look at the original bill, and I don't

22    have it here with me.   I don't have the bill with me.

23    It's in a folder in -- back there, so I can't -- I

24    would -- I believe I was at my 38th Street office

25    then --

1    **Q.**   Okay.

2    **A.**   -- which was part of the Outpatient Department,

3    Department of Rehabilitation Medicine.

4    **Q.**   And is that located on a floor in that particular

5    building?

6    **A.**   15th floor.

7    **Q.**   15th?

8    **A.**   Correct.

9    **Q.**   And if I went there today and I wanted to go up on

10   the 15th floor, could I just walk in and take the

11   elevator to the 15th floor, or do you have to go

12   through security?

13   **A.**   Pretty much you can just walk in because it is a

14   huge outpatient conglomerate for multiple medical

15   disabilities and services, so there's thousands of

16   patients coming through the place every day.

17   **Q.**   So, when Mrs. Irwin came for her interview and

18   then the testing on those three occasions, you asked

19   her how she got there; is that right?

20   **A.**   That's correct.

21   **Q.**   And Mrs. Irwin told you that she took public

22   transportation to get to your office; is that right?

23   **A.**   Correct.

24   **Q.**   Now, did you ask Mrs. Irwin what type of public

25   transportation she took to get to your office on those

1    three occasions?

2    **A.**    I didn't explicitly ask what she took those days,

3    but she was taking a combination of either a bus or a

4    subway.

5    **Q.**    Okay.  So, we talked about executive function and

6    working memory and things like that yesterday; do you

7    remember that?

8    **A.**    Yes, I do.

9    **Q.**    Okay.  Would you agree with me -- and, by the way,

10   Mrs. Irwin, she always arrived on time for the

11   appointments with you; right?

12   **A.**    That's correct.

13   **Q.**    Okay.  And she also arrived alone; right?

14   **A.**    That's correct.

15   **Q.**    Okay.  So, would you agree with me, for someone

16   to leave their apartment in the upper east side of

17   New York City and travel by bus or subway to your

18   office and find their way to the 15th floor of your

19   office and get there in a timely manner, that, that

20   would require executive functioning?

21   **A.**    It would be if it was the first time she had ever

22   been at the facility.  She was already coming to NYU

23   for vestibular work and would come once a week or more

24   frequently.  So, she knew the facility, she had

25   practiced multiple times before I saw her the route

1    there, and so this was a continuation of a practiced

2    skill.

3    Q.    Okay.  Well, in regard to that hypothetical that I

4    just gave you, would you agree with me that, if I go to

5    one location in the upper side -- east side of New York

6    City to your particular office, if I go on one occasion

7    and then I go back on the second and third occasion or

8    fourth occasion, that, that requires working memory

9    because I learned it the first time, and now I remember

10   it the second time, the third time and the fourth time;

11   would you agree with that, that requires working

12   memory?

13   A.    Her testing would suggest that repetition helps

14   her, so --

15   Q.    Doctor, if you could just answer my question,

16   we're going to get through this a lot quicker.  Would

17   you agree with me that, that scenario I gave you

18   requires working memory?  Yes or no.

19   A.    A component, yes.

20   Q.    Okay.  Now -- and would you agree with me -- you

21   understand that -- well, you saw her last on April 1st,

22   2014; correct?

23   A.    Yes.

24   Q.    And you realize that she went to see -- she, I'm

25   sorry, I apologize for that -- Mrs. Irwin went to see

1    Dr. Benson on April 4th, 2014; correct?

2    **A.**   I did not know if I was privy to that on the date.

3    I don't remember whether she said that or not

4    specifically.

5    **Q.**   Okay.  I'm going to represent to you that there's

6    records and information that indicates that Mrs. Irwin

7    traveled from New York City to Detroit, Michigan, on

8    April 4th, 2014, just a few days after she saw you;

9    okay?

10          Now, would you agree with me that, for someone

11   to go from their apartment in upper east side of

12   New York City to the airport and then fly to Detroit

13   and then go see a doctor in a suburb of Detroit one day

14   and then go to a hospital in inner city Detroit the

15   next day, that, that would require executive

16   functioning on her part; is that right?

17   **A.**   Either executive functioning or a lot of written

18   instructions.  I can't tell the difference.

19   **Q.**   Okay.  Well, we're going to come back to executive

20   functioning, but just quickly, executive functioning is

21   how we all get through the day; right?

22   **A.**   That's correct.

23   **Q.**   It's how we get to school on time or work on time,

24   how we wake up in the morning, make decisions about

25   where we go to lunch, where we go to dinner, what kind

1    of shopping we have to do for our kids, things like

2    that; right?

3    **A.**    That's correct.

4    **Q.**    Okay.  Now, I didn't ask you this yesterday in

5    regard to your qualifications, but you would agree with

6    me that you are not a neurologist; correct?

7    **A.**    That's correct.

8    **Q.**    You are not a medical doctor; correct?

9    **A.**    That's correct.

10    **Q.**    You cannot prescribe medications; correct?

11    **A.**    Not in New York State, you cannot.

12    **Q.**    Okay.  Well, that's where you practice; right?

13    **A.**    That's correct.

14    **Q.**    And you cannot perform a neurologic exam; is that

15    correct?

16    **A.**    That's correct.

17    **Q.**    Okay.  What I want to do is I'm going to travel

18    through your report that's dated April 24th, 2014, and

19    I know we did a little bit of that yesterday, but I

20    kind of want to go through some of it because we were a

21    little hurried by the time.

22         Could you turn to Page 3 of your report, the

23    first full paragraph, third sentence from the bottom,

24    and I'll read it and see if you can locate it.  It

25    says, "She held her position at Shire Pharmaceuticals

1    for approximately eight years;" is that correct?

2    **A.**   That's what she reported.

3    **Q.**   Okay.  Are you aware that Mrs. Irwin only worked

4    for Shire for six years, from 2006 to 2012?  Are you

5    aware of that?

6    **A.**   I did not ask for work records, no.

7    **Q.**   Okay.  So, you never saw any work records at all

8    related to Mrs. Irwin?

9    **A.**   I have not, no.

10   **Q.**   And the last sentence of that, "She sought" -- I'm

11   going to read it.  "She," being Mrs. Irwin; correct?

12   **A.**   Correct.

13   **Q.**   "She sought psychological counseling approximately

14   one year prior to her accident to address

15   adjustment" --

16   **A.**   Where are you now?

17   **Q.**   I'm sorry?

18   **A.**   Where are you now?  I want to make sure I'm on the

19   same paragraph.

20   **Q.**   I'm sorry.  I'm sorry.  Same page, Page 3.

21   **A.**   Two paragraphs down, I see.

22   **Q.**   No.  Last two sentences of the page.  And I'm

23   going to read it, and then we're going to talk about it

24   a little bit.

25        It says, "She sought psychological counseling

1    approximately one year prior to her accident to address

2    adjustment issues in her marriage and her concerns

3    about her husband's continued drinking problem."

4         Now, you talked a little bit about that

5    yesterday, but when you say, "She sought psychological

6    counseling," that was from Dr. Sontz; right?

7    A.   That's correct.

8    Q.   And, as we discussed yesterday, Dr. Sontz

9    described -- or diagnosed her as suffering from an

10   adjustment disorder with anxiety and mood components;

11   right?

12   A.   That's correct.

13        MR. LAWLER:  Okay.  If we could bring up 41-A,

14   please.  If you could go to the next page, and then the

15   next page, and then the next page.  If you could

16   highlight the first -- thank you.

17   Q.   Now, as we discussed yesterday, and I'll just get

18   over it briefly, Axis 1 is 309.28, and that is

19   adjustment disorder with anxiety and mood components;

20   correct?

21   A.   That's correct.

22   Q.   And tell the ladies and gentlemen what Axis 1

23   means.

24   A.   Axis 1 is your primary psychological diagnosis.

25   It's a five-tier axis that psychiatrists and

1    psychologists use.

2    **Q.**    Okay.  And what's Axis 2?

3    **A.**    Axis 2 are personality variables that might

4    attribute to the picture.  Axis --

5    **Q.**    Okay.  And then Axis 3 is what?

6    **A.**    Axis 3 are medical conditions that might impact

7    what the presenting problem is.

8    **Q.**    Okay.  And Axis 4 is what?

9    **A.**    The compounding psycho-social issues that may be

10   integral to the problem being presented for therapy.

11   **Q.**    Okay.  And Axis 5 is what?

12   **A.**    Axis 5 is based on a scale of 100.  It's

13   generalized -- something -- functioning, GAF,

14   generalized adjustment functioning?  I don't remember

15   what the A stands for at this moment.  And the higher

16   the score, the most functional the person; the lower

17   score, the least functional the person.

18   **Q.**    Okay.  So, that puts her a little bit above what I

19   guess the average would be; right?

20   **A.**    Correct.

21   **Q.**    A patient that's receiving psychological

22   treatment; right?

23   **A.**    Correct.

24   **Q.**    Okay.  So, getting back to that last sentence on

25   Page 3, you mention adjustment issues in her marriage

1    and concerns about her husband's continued drinking

2    problem but no mention about the medical issues, the

3    pelvic damage, the pelvic separation; right?

4    **A.**   That's correct.

5    **Q.**   Why is that?

6    **A.**   Because she was primarily focused on the marital

7    relationship at the point that the accident occurred,

8    and that was what she was presenting as issues.  Her

9    pelvic damage was a past issue, significant albeit, but

10   it was related to the birth of her youngest child,

11   which the child was now three or two.

12   **Q.**   So, you're interpreting basically what's the most

13   important thing for Dr. Sontz; is that what you're

14   doing?

15   **A.**   You're asking me to interpret why I think that's

16   written there, and I gave you my interpretation.  I did

17   not -- I in no way am interpreting Dr. Sontz.

18   **Q.**   Right, okay.  But, in any event, would you agree

19   with me that you left the medical issues out when you

20   completed this report; right?

21   **A.**   They did not seem relevant or pertinent to her

22   current diagnosis.

23   **Q.**   Now, 309.28, adjustment disorder with anxiety and

24   mood, that mood basically means that the patient is

25   having symptoms of depression; correct?

1    **A.**    It does.

2    **Q.**    I mean, that's what we -- we read that yesterday,

3    that the components of that particular diagnosis

4    concern anxiety and depression; right?

5    **A.**    Yes, but both anxiety and depression have a range.

6    **Q.**    There's no question in front of you, Doctor.

7    Thank you.

8         MR. CHARNAS:  Could she finish her answer,

9    please?

10        THE COURT:  Are you waiting for me?  I think she

11   did answer the question.

12        THE WITNESS:  I did.  I did.

13        THE COURT:  She finished, answered the question.

14        MR. LAWLER:  Oh, thank you.

15   **Q.**    And there's a word that I know you use and other

16   doctors use it, it's "somatic;" right? -- "somatic,"

17   s-o-m-a-

18   **A.**    Yes, I know the word "somatic."  In what context

19   are we talking about somatic?

20   **Q.**    Okay.  Well, I want you to explain what the

21   definition of somatic is.

22   **A.**    Somatic is a more physical manifestation of an

23   illness or a problem.  There are intra-psychic, and

24   there are somatic manifestations of, for example,

25   depression.

1    **Q.**    Okay.  So, basically somatic means that there are

2    physical manifestations of some particular ailment;

3    correct?

4    **A.**    That's correct.

5    **Q.**    And you would agree with me that the somatic

6    symptoms of depression are fatigue; correct?

7    **A.**    Correct.

8    **Q.**    Sleep problems; correct?

9    **A.**    Correct.

10    **Q.**    Concentration problems; correct?

11    **A.**    Correct.

12    **Q.**    So, all those particular problems are tied in to

13    someone who's suffering from depression; correct?

14    **A.**    To a greater or lesser degree potentially, yes;

15    not necessarily all.

16    **Q.**    Turn to Page 4, and it's the first full paragraph.

17    Now, in that particular paragraph, you're finding out

18    information from Mrs. Irwin that pertains to prior

19    concussions; right?

20    **A.**    That's correct.

21    **Q.**    And Mrs. Irwin reported to you that her first

22    concussion occurred around age 14 to 15 during a field

23    hockey game in high school, that was your

24    understanding; right?

25    **A.**    That was, as reported by the patient.

**Q.**   And in that particular situation when she was describing that particular incident, she denied that she suffered a loss of consciousness in that particular incident; correct?

**A.**   As recorded by the patient, yes.

**Q.**   Okay.  Would you be surprised to learn that the medical records and other testimony in the case indicates that she suffered a loss of consciousness in that particular incident?

**A.**   I am not sure -- I don't -- would that be a surprise?  Not particularly, but it's certainly possible.

**Q.**   Okay.  Then she reported to you -- it's continuous in that particular paragraph -- she said that she reported a second concussion while playing field hockey during an away game in East Bridgewater, Massachusetts, for her high school, that was your understanding; right?

**A.**   Correct.

**Q.**   Reported to you by the patient, Mrs. Irwin; right?

**A.**   Correct.

**Q.**   And she denied a loss of consciousness in that particular situation?

**A.**   Correct.

**Q.**   Would it surprise you to learn that, again,

1    there's going to be testimony in regard to that and

2    evidence in regard to that, that in fact she did suffer

3    a loss of consciousness when she was struck by one of

4    those hard field hockey balls in her head?

5    **A.**    Without the specific content, I can say the most

6    important thing about loss of consciousness is, Is it

7    present and what was the duration?  So, a blanket yes,

8    loss of consciousness, tells me very little.

9    **Q.**    Okay.  And then you report that Mrs. Irwin

10   sustained another concussion in 2008 when she hit her

11   head on a basement pipe in a restaurant; correct?

12   **A.**    Correct.

13   **Q.**    And then, finally, in regard to that paragraph,

14   she reported that she suffered a fourth possible

15   concussion that occurred in 2010 when she accidentally

16   hit her head on a low-hanging basement pipe in her

17   parents' home; right?

18   **A.**    Correct.

19   **Q.**    Now, are you also aware of another concussion that

20   occurred in September, 2014, when Mrs. Irwin was

21   leaving a taxi?

22   **A.**    September, 2014, was after I saw the patient.

23   **Q.**    Right.

24   **A.**    I did note that there was a note about that in a

25   report that I reviewed, but I did not know that at the

1    time of writing this report.

2    **Q.**    No.  I understand that.  Obviously, it's

3    subsequent to your -- and I don't mean to -- the date

4    of your report is April 24th, 2014.  The date of the

5    taxi accident, for lack of a better phrase, is sometime

6    in September, 2014.

7         So, I know you didn't know of that information,

8    obviously, when you met with Mrs. Irwin because you

9    haven't met her since, have you?

10   **A.**    I have not.

11   **Q.**    That was the first and only time you met with her;

12   right?

13   **A.**    That's correct.

14   **Q.**    But you have reviewed records in preparation of

15   your trial testimony; right?

16   **A.**    That's correct.

17   **Q.**    Okay.  What was your understanding of the incident

18   by the taxi that occurred in September, 2014?

19   **A.**    I have very little on that.  It was just a

20   notation, and it was a possible hit her head, wasn't

21   sure.

22   **Q.**    She wasn't sure whether she hit her head?

23   **A.**    No.  It was a "Questionable loss of consciousness,

24   hit her head in a taxi."

25   **Q.**    Okay.  I'm just trying to clarify it.  I

1    understand what you said about loss of consciousness.

2         Is it your understanding it's unclear as to

3    whether or not she struck her head?

4    **A.**   It says, "Hit her head."  I don't know what that

5    means.  It was a very short note from a neurologist or

6    an acupuncturist.  I'm not quite sure who it was at

7    this moment.  It was just part of a history that was

8    taken about her prior history of concussions.

9    **Q.**   You didn't see the emergency room record that

10   pertained to --

11   **A.**   I did not, no.

12   **Q.**   Well, didn't you get a whole stack of records?

13   **A.**   I got the most current records to -- my request

14   was to get current records so that I could see if there

15   had been significant improvement or change in Megan

16   over this period of time.

17   **Q.**   So, tell us what records you've received since

18   April 24 -- excuse me -- April 1st, 2014.  Do you have

19   a list of those?

20   **A.**   I just have a few notes on the -- I skimmed a few

21   of them.  I didn't really need -- to answer my question

22   of whether, from a functional point of view, was she

23   doing better, I really needed updated physiatry

24   reports, so I have an updated series of reports from

25   Dr. Im.

1    I've also reviewed Dr. Halpern who is the

2    specialist that she's now seeing for continued

3    migraines and chronic headaches and the treatment she's

4    receiving there.  And there was a report from, I think

5    it's an acupuncturist, giving a small very brief

6    history about the patient, including this, "? hit her

7    head," and that's all I know about it.

8    Q.   Well, were you aware that Mrs. Irwin, in hospital

9    records, indicated that headaches became much more

10   severe after the taxi incident of September, 2014?

11   Were you aware of that?

12   A.   I'm telling you what I have read.  That was not

13   part of my information, so I can't --

14   Q.   Okay.  But wouldn't you think that would be

15   significant information before you offer an opinion as

16   to Mrs. Irwin as to what the nature of her current

17   situation is to the ladies and gentlemen of the jury?

18   A.   I've been asked to render my impressions at the

19   time I saw the patient, and these are my impressions.

20   Reviewing reports are to give me an insight in to

21   whether there were significant improvement or

22   stability.

23        I think it would be very difficult, from what

24   I've read from her reports, for Megan to even have a

25   qualitative difference in her headaches because they

1    were so pervasive to begin with, and her migraines were

2    so pervasive, according to updated reports that I

3    reviewed.

4    **Q.**    Okay.  So, I get it now.  Your opinions really

5    only pertain to the period of April 2nd, 2014?  They

6    don't carry the day up until now; is that correct?

7         MR. CHARNAS:  Objection.  That's not what she

8    said.

9         THE COURT:  Well, she can answer the question

10   and clarify what she said.

11   **A.**    Would you rephrase the question?

12   **Q.**    Sure.  Is it safe to say that you basically said

13   just a few moments ago on cross-examination that your

14   opinion really pertains to the period ending around the

15   beginning of April, 2014, when you last saw Mrs. Irwin?

16   **A.**    My opinions are based on my interview and my

17   testing of the patient in 2014, yes.

18   **Q.**    Okay.  So --

19   **A.**    Those are the most updated that I have that I'm

20   personally involved in.

21   **Q.**    So, for instance, your opinion doesn't take in to

22   account whether or not, since April of 2014, Mrs. Irwin

23   has gotten better or worse; correct?

24   **A.**    I can't, in 2014, predict where she'll be in 2015.

25   **Q.**    Okay.  All right.  Well, let's stay with that

1    point and talk about word-finding problems.

2    Did you determine during the course of your

3    evaluations whether or not Mrs. Irwin had word-finding

4    problems?

5    **A.**    In my opinion, the answer was not -- she did not

6    have word-finding problems.  She could name information

7    on testing performance in the -- let me just be sure

8    I've got this right -- was in the average range, so she

9    had average performance on classic naming tasks.

10    What I did notice and did notice in my

11    behavioral observations of Megan was that she was

12    totally disorganized in the way she presented

13    information.  That's different than a naming problem.

14    Naming problem is, "This is called a -- I don't know

15    what it's called, but you can put liquid in it."  The

16    person can describe the functioning of the activity but

17    can't remember that it's called a cup.  That's just an

18    example.

19    She often talked in convoluted sentences.  By

20    the time she finished a sentence, she couldn't figure

21    out where she had started the sentence from.  That's

22    behaviorally suggestive of executive dysfunctions.

23    She's having trouble planning what she's going to say,

24    organizing it and then delivering it.

25    **Q.**    Now, when you, just a few moments ago, used the

1    word "average," and you said she was average in regard

2    to word-finding situations; is that right?

3    **A.**    She was average on her Boston Naming Test.

4    **Q.**    When you say average, what does that mean,

5    average?  Is that a percentile?

6    **A.**    Average is a classification for a range of

7    percentages for intellectual abilities.  There is a

8    normal bell curve of performance, and it starts at the

9    very end on one end with impairment, borderline

10    impairment, low average impairment, average

11    functioning, high average functioning, superior and

12    then very superior.

13        So, there are categories of classifications of

14    performance relative -- and these performance scores

15    that are reported in my report are based on norms for

16    Megan in her own age group and where she ranks relative

17    to the rest of the people in her age group and

18    education group.

19    **Q.**    Okay.  And staying with that, so does average --

20    and does that equate or correlate to IQ as well, those

21    same --

22    **A.**    Those terminologies are also used for IQ scores.

23    That is the classification.  And so that an average IQ

24    would be between the 25th percentile and the 74th

25    percentile.

1    **Q.**    Okay.

2    **A.**    That's the widest range of IQ, and that is the

3    range that I use to determine that someone has an

4    average performance on X test and, in this case, the

5    Boston Naming.

6    **Q.**    Okay.  So, if someone -- if you say someone is

7    average on a particular test, they can either fall in

8    the 25th percentile, the 50th percentile or the

9    75th percentile or anywhere between them?

10    **A.**    74th percentile is the cut.

11    **Q.**    74th, okay.  So, let me ask it again.  So, if

12    someone's in normal range, they're basically in between

13    25 and 74?

14    **A.**    That's correct.  That is the normal range of

15    variability that's expected.

16    **Q.**    Okay.  And so you don't characterize someone like,

17    for instance, low average or average average or high

18    average?

19    **A.**    That's a department of redundancy.  There is a low

20    average classification, and that one goes from the 9th

21    percentile to the 24th percentile.  The further out on

22    this bell curve, the labels get a little bit more

23    distinct.

24    **Q.**    Okay.  Now, in regard to word-finding problems --

25    okay.  Let me ask you this question:  Do you think the

1    ladies and the gentlemen of this jury are able to pick

2    up word-finding problems if someone testifies in front

3    of them for several hours?

4    **A.**    No.

5    **Q.**    No?

6    **A.**    No, unless you're looking for it.  You just listen

7    to the person.  That requires focused, "I need to be

8    looking for word-finding problems."  People don't look

9    for that when they're listening to content, the average

10   person on the jury or just in general.

11   **Q.**    Well, either in general or in a courtroom, if

12   you're listening to a witness and the witness is

13   articulate and appears to be able to understand

14   questions and then answers the questions, for instance,

15   are they capable of assessing whether someone can do

16   that in a --

17   **A.**    I think the word "assessing" is the thing I'm

18   objecting to.  My role was to assess that issue and did

19   not find it.  What I did find was disorganization in

20   the way she presented things.

21   **Q.**    Okay.

22   **A.**    I think that may be something that's easier to

23   observe from the jury box than it would be word-finding

24   problems.

25   **Q.**    Okay, back to your report, please.

1          Let's go down to -- well, let's go to Page 5,

2     and it's the second to last paragraph, third sentence,

3     "She reports ongoing sensitivity to bright lights and

4     loud sounds, with both making her headaches worse."

5          I read that correctly; right?

6     A.   Correct.

7     Q.   Okay.  So, sensitivity to bright light is called

8     photophobia; is that right?

9     A.   No.  Photosensitivity.

10    Q.   Photosensitivity.  And then to loud sounds is

11    phonosensitivity?

12    A.   Correct.

13    Q.   Okay.  Now, in regard to sensitivity to bright

14    light, did you explore that with Mrs. Irwin?

15    A.   She volunteered, "Could you turn down the lights a

16    little bit?"

17    Q.   Okay.  Did she say to you that the sunlight also

18    causes her problems as well?

19    A.   She just said any bright light.  She didn't

20    specify sunlight versus neon lights.  I don't know.

21    She didn't say.

22    Q.   Okay.  Well, would it surprise you if someone --

23    we're not talking about Mrs. Irwin -- someone who had

24    photophobia and they spent long periods of time at the

25    beach in bright sunlight, would that surprise you?

1    **A.**   No, because many people wear very dark sunglasses

2    and hats to prevent the sun glare.  There are ways to

3    compensate for that.  It may not make it most

4    convenient for her or comfortable, but there are ways

5    to work around that.

6    **Q.**   Okay.  And in regard to other questions, now,

7    let's turn to Page 6, and I want to draw your attention

8    to the third paragraph where it starts off with,

9    "Mrs. Irwin reports additional;" do you see that?

10    **A.**   Yes, I do.

11    **Q.**   Okay.  I know we talked a little bit about the

12    fact that Mr. Irwin spoke to you and gave you some

13    information about the marriage, but I want to direct

14    your attention to what Mrs. Irwin told you.

15         So, it says, "Mrs. Irwin reports additional

16    strain on her marriage post-accident of August 5th,

17    2012.  She feels her husband does not understand the

18    changes in her behaviors and mood.  She feels he

19    continues to have the same expectations of her

20    abilities as he did pre-injury."  I read that

21    correctly; right?

22    **A.**   That's correct.

23    **Q.**   Okay.  "She continues" -- I'm going to continue

24    on, next sentence, "She continues to be concerned about

25    her husband's abuse of alcohol and reports his drinking

1    is greater since the accident, since she now relies on

2    him to make many more decisions for the children and

3    the household;" correct?

4    **A.**    That's correct.

5    **Q.**    So, Mrs. Irwin told you that, after the accident,

6    her husband's drinking problem actually worsened; isn't

7    that right?

8    **A.**    That's not atypical.

9    **Q.**    I'm not saying whether it's typical or atypical,

10    and that's a fair assessment.  But the question for

11    you, Dr. Hibbard, is:  Mrs. Irwin, as a historian, told

12    you on that occasion that, since the accident, her

13    husband's drinking problem had worsened, not

14    bettered or not stayed the same; right?

15    **A.**    That's correct.

16    **Q.**    Okay.  And did she get in to the description of

17    her husband's drinking problem either before the

18    incident or after the incident, for instance, like, how

19    often he drank and how bad the problem was?

20    **A.**    The focus of my interview was the patient and her

21    stressors in life before and after, not a detailed

22    assessment of family, extended family.

23    **Q.**    Okay.  So, the answer to my question would be no;

24    is that right?

25    **A.**    That's correct.  If she had been the one drinking,

1    it would be a primary focus.

2    **Q.**    Okay.  Let's go to -- I'm just going page to page.

3    **A.**    That's fine.  That's fine.

4    **Q.**    That's probably the best way to do it.

5         Page 7, do you see the second to last paragraph,

6    and it is the third sentence from the bottom,

7    "Mr. Irwin reports his wife is having" -- do you see

8    that?

9    **A.**    Wait a minute.  I haven't found it.

10   **Q.**    So, do you see the word "finally" in that second

11   to last paragraph, "finally," the word "finally"?

12   Page 7.

13   **A.**    Page 7.  Just start the paragraph, read for me.

14   **Q.**    Okay.  Well, the paragraph begins, "As Mr. Irwin

15   reports his wife has problems."

16   **A.**    Got it.

17   **Q.**    Okay.  So, go down --

18   **A.**    To "finally."  I got it.

19   **Q.**    Go down nine?

20   **A.**    Yeah, I got it.  Sorry.

21   **Q.**    That's okay.

22   **A.**    I've read this so many times, I can't see it

23   anymore.

24   **Q.**    So, it says, "Mr. Irwin reports his wife is having

25   difficulty managing the finances of the house and is

1    spending more money than pre-accident;" do you see

2    that?

3    **A.**    I do.

4    **Q.**    Okay.  Was that important to you, to learn that

5    Mrs. Irwin was having problems handling the finances?

6    **A.**    That was one of the many things she reported on

7    her self-report, and again, this is not an uncommon

8    finding because handling finances is an executive

9    decision.

10    **Q.**    Okay.  Are you aware that Mrs. Irwin testified the

11    other day that her husband handles all the finances and

12    that she doesn't do any of it and that it was true

13    before the accident as well?

14    **A.**    This is as she reported it.

15    **Q.**    So, that information, if it was true, that would

16    throw off your little opinion that you just gave about

17    executive functioning; right?

18    **A.**    No.  No, it doesn't.  I mean --

19    **Q.**    Still the same opinion even though --

20        MR. CHARNAS:  Could she please finish her

21    answer?

22    **A.**    -- there are many situations where it's not

23    potentially paying bills but managing finances is the

24    issue, and it's related in this case to spending.

25    Spending is not managing the budget.

1          MR. LAWLER:  One moment, please.

2          (Pause)

3     Q.   What I'd like to do now is I would like to review

4     with you some of the tests that you administered to

5     Mrs. Irwin in March or April.

6          Do you have those tests with you?  I'm going to

7     pop them up on the screen.

8     A.   Yes, I do.

9          MR. LAWLER:  They've been admitted in to

10    evidence as Exhibit 46, and I'd like No. 46, Page 1 of

11    that exhibit.

12    Q.   Okay.  This is a FrSBe self-rating form; is that

13    right?

14    A.   It stands for Frontal Systems Behavior checklist.

15    That's what that acronym is.

16    Q.   Okay.  And if you could go, please, to the full

17    page of the document.  And first of all, let me talk a

18    little bit about this document.

19          This is what we talked about yesterday briefly,

20    the self-report; right?

21    A.   That's correct.

22    Q.   Okay.  So, the patient completes this document

23    before you even see them; is that right?

24    A.   That's correct.

25    Q.   And where do they complete the document, in your

1    office or at home before they come?

2    **A.**   No.  They sit in a quiet section of the waiting

3    room and complete the document, and then it's reviewed

4    in session.

5    **Q.**   Okay.  Now, let's focus on the examples, to begin

6    with.  Okay.  So, it gives you, the person who's taking

7    the self-report form, it gives you instructions on how

8    to respond to the questions that are asked of you;

9    correct?

10   **A.**   Correct.

11   **Q.**   Okay.  And look -- for instance, it explains to

12   you, "Before the illness or injury," you know, put down

13   between one to five and then at the present time, one

14   to five; right?

15   **A.**   Correct.

16   **Q.**   Okay.  And the example that you give is No. 1, "I

17   feel confused;" right?

18   **A.**   That's not the example I give; that's part of the

19   test instructions.

20   **Q.**   Okay.  I apologize.

21         So -- but if I'm taking this test, I sit down

22   and I read the example; correct?

23   **A.**   Correct.

24   **Q.**   And I have to make sure I understand the

25   instructions so I can complete it adequately; correct?

1    **A.**    That's correct.

2    **Q.**    Okay.  And it's safe to say that Mrs. Irwin, when

3    she completed this particular self-rating form, that

4    you believe she understood the instructions; right?

5    **A.**    I reviewed the instructions in addition verbally

6    with the patient, took the first item -- took the item

7    and reviewed it with her again to be sure she

8    understood it.

9    **Q.**    Okay.  You would agree with me, though, the first

10   example, it says, "I feel confused, before illness or

11   injury," and No. 1 is circled; right?

12   **A.**    Correct.

13   **Q.**    And then it says, "At the present time," No. 4 is

14   circled; right?

15   **A.**    Correct.

16   **Q.**    So, basically, in the example for the self-report,

17   it's basically telling the patient that the symptoms

18   are going to get worse; right?

19   **A.**    Not necessarily.  The second illustration

20   highlights that, if you made an error, you could change

21   it, and the numbers go from before to a -- at a three

22   and a four post, which is a very different rating than

23   one versus four.

24   **Q.**    Okay.

25   **A.**    I did not make up these illustrations.  This is

1    part of a standardized test.

2    **Q.**    Oh, I understand that.

3        MR. LAWLER:  The next page, please, Page 2.  And

4    if you could just focus on the Question 1 to maybe

5    Question 6.  It doesn't -- just so we can see

6    something.

7    **Q.**    So, No. 2, it says, "Is easily angered or

8    irritated, has emotional outbursts without good

9    reason," and Mrs. Irwin circled No. 1 before the

10   illness or injury and then No. 4 at the present time;

11   correct?

12   **A.**    That's correct.

13   **Q.**    Do you see the underline of "without good"?

14   **A.**    Yes.

15   **Q.**    Would you agree with me that, that was probably

16   done by Mrs. Irwin, the underlining of that two words?

17   **A.**    Well, I didn't write it, so I assume she must

18   have.

19   **Q.**    Okay.  So, she's basically saying that she doesn't

20   get easily angered or irritated "without good" being

21   stressed; right?  So, she knew essentially what to

22   articulate in regard to answering that question; right?

23   **A.**    That's an interpretation, but it's a possible one.

24       MR. LAWLER:  Okay.  That's all for that

25   particular test .

1    **Q.**   Now, why don't we turn to -- we'll start -- so the

2    jury knows, why don't we start with the same Exhibit

3    number but Page 4, which is a brain injury screening

4    questionnaire.

5         And it's a little bit difficult to read, but you

6    can read the caption in the gray -- right? -- that says

7    "Brain Injury Screening Questionnaire"?

8    **A.**   Yes.

9    **Q.**   Okay.

10    **A.**   I'm sorry.  I didn't realize you were asking me.

11    **Q.**   And I think we talked about this yesterday.  This

12    is a self-report as well?

13    **A.**   That's correct.

14    **Q.**   And is this also completed by Mrs. Irwin in the

15    waiting room outside?

16    **A.**   That's correct.

17        MR. LAWLER:  Okay.  If you could turn, please,

18    Cort, to --

19    **Q.**   And, by the way, there are several pages in this

20    document.  I'm not going to go through all of them, but

21    just for the jury to understand, there are several

22    pages in this document; right?

23    **A.**   There are 100 symptoms that she needs to fill out,

24    yes, and she -- and some prior history and some past

25    psycho-social medical history.

1        MR. LAWLER:  Okay.  If you could turn to, on the

2    screen, Page 11.

3    Q.    And this is -- I guess it's called a few more

4    questions, and that's what happens, there's a few more

5    questions; right?

6    A.    Having gone through a doctor's office, the answer

7    is always yes on that one, just a few more questions.

8    Q.    I'm sorry?

9    A.    It's part of the questionnaire.

10   Q.    Okay.  And that particular page --

11        MR. LAWLER:  If you could give the full page,

12   please.

13   Q.    -- it asks eight questions; right?

14   A.    Correct.

15   Q.    And Mrs. Irwin answered all the questions except

16   for No. 6; right?

17   A.    Correct.

18   Q.    And if you could focus on No. 6, please.  And the

19   question says, "Were you ever (or this person) ever

20   labeled as having a learning disability or an

21   attention-deficit disorder?"  And Mrs. Irwin did not

22   answer that question, did she?

23   A.    That's correct.

24   Q.    Okay.  Now, as a result of Mrs. Irwin not

25   answering that question, did you go back and determine

1  whether or not she had been questioned as a child as

2  having an attention-deficit disorder?

3  **A.**  I did.  I did ask her about that question, and she

4  said she was never officially labeled one way or the

5  other on whether she had either problem.

6  **Q.**  Okay.  So, they inquired -- they must be public

7  school officials?

8  **A.**  Some school officials.  She didn't specify who.

9  **Q.**  Right.  Okay.  So --

10  **A.**  And she had never had any testing done, so she

11  says, "I guess it was okay, I didn't have to do

12  anything about it."

13  **Q.**  Okay.  I mean, it is what it is.  But at some

14  particular point, she was I guess targeted perhaps of

15  having a learning disability at some point; is that

16  right?

17  **A.**  I don't know what the situation was that raised

18  those questions.

19  **Q.**  Okay.  But I guess this is the question -- I mean,

20  there's plenty of people with learning disabilities,

21  and they do, obviously, very, very well.

22       But if someone has a history of a learning

23  disability, is that important information for you to

24  know in regarding IQ tests and in regarding other

25  neuropsychological tests?  Is that important

1    information?

2    **A.**    It's important information if it's officially

3    diagnosed, if the person is on medication for that

4    particular problem.  More importantly, you would go

5    back and look at her academics, see if she had been

6    left back, had not finished school in the normal period

7    of time, had major failures or not and, if so, what

8    were they in.  So that you look at history to support

9    it or not.

10    **Q.**    Okay.  And so, in regard to that, when you talk

11    about academic records as well, you, in your report,

12    you indicate that she has, like, for instance,

13    approximately a 2.8 grade point average at Catholic

14    University; right?

15    **A.**    That's correct.

16    **Q.**    Okay.  And you point out in your report that most

17    of her grades run in to the B range, B-minus range and

18    that, in one particular semester, I think it was a

19    history course, she received an F; is that right?

20    **A.**    That's correct.

21    **Q.**    Okay.  You don't mention, however, that she also

22    received a D during one semester, did you?

23    **A.**    No, I did not.  I didn't note that, no.

24    **Q.**    Okay.  Were you aware that she received a D in

25    Spanish during her second semester, I think, as a

1    freshman?  Were you aware of that?

2    **A.**   You know, it's funny, I think she talked about it

3    because she hated the language, but --

4    **Q.**   Okay.

5    **A.**   -- but it was not significant enough to warrant

6    putting in every detail that the person reports here.

7    **Q.**   Okay.  Did she hate history as well?

8    **A.**   I didn't -- she just tied that to her dislike of

9    Spanish.

10   **Q.**   Okay.  Now, we talked yesterday about another

11   test, and this was the -- is it called the Rey, R-e-y,

12   Complex Copy Test?  Is that what it's called?

13   **A.**   No.  The Rey Visual Figure, Rey Visual Figure.

14   **Q.**   RCFT, what does that stand for?

15   **A.**   Rey Complex Figure Test.

16   **Q.**   Okay.  And essentially what you have to do is you

17   give the person this complex figure -- and we're going

18   to see it in a few moments when it goes up on the

19   screen -- and the person is asked to copy it; right?

20   **A.**   That's correct.

21   **Q.**   And then you take a look at how well they do, and

22   then you grade them and assign them a particular

23   percentile; right?

24   **A.**   You take each component of the figure, and you

25   determine, Is it accurately drawn and correctly placed?

1    And then you determine, on a 0-2 scale, does the person

2    get full credit, which is 2 for that component or zero

3    or a half a point or a point?

4    **Q.**    Okay.  So -- and you can either get a 2, a 1 --

5    **A.**    Yeah.

6    **Q.**    -- a .5 or a zero; right?

7    **A.**    Correct.  And there are criteria for all of those

8    subcategories.

9    **Q.**    Right.  And there are 18 grading events basically;

10    right?

11    **A.**    Correct.

12    **Q.**    Okay.  And so, the maximum score you can get is a

13    36; right?

14    **A.**    Correct.

15    **Q.**    And then, obviously, I guess the minimum score

16    would be, if you couldn't copy it at all, would be a

17    zero; is that right?

18    **A.**    That's unable to do.  You don't even --

19    **Q.**    Right.

20    **A.**    You just recognize that the person can't even

21    enter in to the task.

22         MR. LAWLER:  Okay.  So, let's -- why don't we

23    put on -- we're going to go back -- there's two

24    documents, I'm going to go back and forth.  One is the

25    Rey sheet that shows the complex figure -- and by the

1    way, is -- let me -- I'm going to show the jury this --

2    can I show this to the --

3             THE COURT:  Sure.

4             MR. LAWLER:  This is a document that's been

5    admitted in to evidence, and you'll see it on the

6    screen in a second, but I just want to -- can I

7    approach, Your Honor?

8             THE COURT:  Sure.

9    Q.   Dr. Hibbard, is the patient, who in this case is

10   Megan Irwin, is she actually shown this particular

11   photograph?

12   A.   No, no.  She is given -- as I explained earlier to

13   the jury, the picture is much enlarged on a clean white

14   glossy visual.

15   Q.   Okay.

16   A.   It does not include any of the numbers.  She has

17   no idea that numbers exist for anything on this.

18            MR. LAWLER:  Okay.  So, let's put on the screen

19   the same exhibit, Page 13.

20   Q.   And that's the figure that Mrs. Irwin drew;

21   correct?

22   A.   That's correct.

23   Q.   Okay.  That's -- and how long are you given to

24   draw that?

25   A.   It's un-timed.  There's no time limit.  It took

1    Megan three minutes and 13 seconds to do it.

2    **Q.**    Three minutes and 13 seconds.  Is that fast or

3    slow or medium or average or what?

4    **A.**    I would say that's slow.

5    **Q.**    I'm not a real good drawer.  If I asked for a

6    ruler if I took this test, would you give me one?

7    **A.**    No, I would not.

8    **Q.**    Okay.  Have you ever heard of the old expression

9    that sometimes some people can't draw a straight line?

10   **A.**    I've heard the expression.

11   **Q.**    Okay.  Well, I'm one of those people.

12   **A.**    I'm sorry.

13   **Q.**    Would you agree with me that some people can't

14   draw a straight line, they have trouble with that?

15   **A.**    I would agree that some people have more

16   difficulty than not, yes.

17   **Q.**    Okay.  Just because I can't draw a straight line,

18   am I -- well, I'm afraid for this answer -- am I

19   impaired?

20   **A.**    Potentially.

21   **Q.**    Fair enough.  I asked for what I got.

22   **Q.**    All right.  Now, let's go to Page 12.

23   **A.**    Page 12 of the report?

24   **Q.**    No.

25        MR. LAWLER:  I'm sorry.  I'm telling Cort, my IT

1    specialist, who helps me out.  Thank you.

2    **Q.**    This is the scoring sheet; right?

3    **A.**    That's correct.

4          MR. LAWLER:  Okay.  Cort, if you could --

5    **Q.**    Okay.  And that's the diagram that tells you what

6    particular parts of that RCFT are being scored;

7    correct?

8    **A.**    Correct.

9    **Q.**    Now, let's -- so, like, for instance, No. 1 is

10   the -- up in the left-hand corner is the cross, and the

11   face, the funny face, is 11 and things like that;

12   right?

13   **A.**    Correct.

14   **Q.**    Okay.  And so a person can get either 2, 1, .5 or

15   zero, and the scoring criteria is set forth in that

16   little area to the right of the diagram; right?

17   **A.**    Correct.

18          MR. LAWLER:  Okay.  Cort, if you could, just

19   could we see the last half of the diagram, please?  If

20   you could kind of blow that up, see if we can see that

21   pretty good.

22   **Q.**    Okay.  Can you see that, ma'am?

23   **A.**    I can.

24   **Q.**    So, her total score was a 29 out of 36; right?

25   **A.**    That's correct.

1    **Q.**    And this particular test, this test actually --

2    and it's redundant here -- this test tests executive

3    functioning; correct?

4    **A.**    Along with other things, yes.

5    **Q.**    Okay.  What are the other things?

6    **A.**    The other things are visual perceptual skills or

7    complex visual attention.

8    **Q.**    Okay.  So, I think it's your handwriting.  The

9    score is 29.0; do you see that?

10   **A.**    Yes.

11   **Q.**    Okay.  And underneath that, it looks like

12   one percent; right?

13   **A.**    Less than one percent.

14   **Q.**    Less than one percent?

15   **A.**    Correct.

16   **Q.**    So, you're basically saying that, that particular

17   drawing by Mrs. Irwin is in the -- is less than one

18   percent of the people who can copy that particular

19   drawing; right?

20   **A.**    No.  I'm saying that, relative to norms for women

21   of her age group, the expectation is much higher than

22   that, and relative to those norms, she's at less than

23   first percentile.

24   **Q.**    Okay.  So, I guess in layman's terms, she did

25   really bad on that test; right?

1    **A.**    Relative to her age group, yes.

2    **Q.**    And are you able to tell me -- and you don't have

3    to necessarily give me the exact figures, but you would

4    agree with me that, if she gets a 30 instead of a 29,

5    that she goes up a few percentage points; is that right

6    or not right?

7    **A.**    She may go up, but it will be minimal because the

8    bias is the fact that this is an un-timed task, that

9    you will do it accurately as -- and it isn't accurate.

10    **Q.**    Okay.  So, if -- again, if I take the test and I

11    get a 36, I would assume that I'm in the hundred

12    percentile; right?

13    **A.**    No.  Your score will be interpreted as greater

14    than 75th percentile.  That is a nomenclature of this

15    particular score.

16    **Q.**    Okay.  Greater than 75th percentile.  So, what

17    score out of the 36 do I need to get to get greater

18    than 75 percentile?

19    **A.**    It's either 34 or 35 out of 36.

20    **Q.**    Okay.  And so, either -- you're not sure?

21    **A.**    I'm not sure because I don't have the norms with

22    me, but it's very close to perfect score.

23    **Q.**    Okay.  So, basically, 34, 35, 36, you're above the

24    75 percentile.  How about if you get a 33?  Where do

25    you drop it to?

1    **A.**    You'd probably be -- it's a fairly precipitous

2    drop for copy, it's less so for immediate and recall --

3    **Q.**    Okay.  But we're on copy right now.  Let's stay on

4    this one.

5    **A.**    On copy?  Again, I can't answer that question

6    because I don't have the norms in front of me.  It

7    would definitely decline, and it declines rather

8    rapidly.

9    **Q.**    Okay.  So, on the -- let's -- I have the scoring

10   sheet.  We're not going to be able to do this if we're

11   on the same page, but that's okay.

12         I have the scoring sheet, and I'm going to put

13   the drawing back up.

14         MR. LAWLER:  Cort, if you can make that bigger.

15   **Q.**    And I take it, you know, like, when my kids, when

16   they have a test sometimes and they don't do as well

17   and they go back to the teacher and they argue for a

18   few extra points, I take it that you can't do that on

19   neuropsychological tests, can you?

20   **A.**    Not according to the protocol, no.

21   **Q.**    Okay.

22   **A.**    And a person doesn't know what the score is at the

23   end.

24   **Q.**    Okay.  So, vertical cross is the cross up in the

25   left-hand corn er; right?

1    **A.**    Can I touch the screen?  I can show you where it

2    is.

3         MR. LAWLER:  Cort, do you see that vertical

4    cross?  Could you highlight that in yellow?  Just keep

5    it in yellow.  Thanks.

6    **Q.**    You only gave her a one.  How come?

7    **A.**    Well, if you look at the original drawing with

8    those numbers on it, which is my scoring sheet, the

9    instruction is she has the cross, that's true -- all

10    right? -- but the cross bar here that connects it

11    should be up towards the top of the figure, and it's

12    not; it's in the wrong location relative to the page,

13    so she moves a detail around of that number one score.

14    **Q.**    Okay.  And then the next one, two, is the large

15    rectangular -- excuse me -- large rectangle.  You only

16    gave her a one on that one; right?

17    **A.**    That's because, if you remove all of the

18    information on the inside and outside and just leave

19    the rectangle, it's a piecemeal rectangle.  Look at

20    that top line.  It's not a continuous straight line.

21    **Q.**    Yeah, she can't --

22    **A.**    It's obviously composed of two sub-boxes, which is

23    the way she drew the information.

24    **Q.**    -- can't draw a straight line; right?

25    **A.**    No.  She started -- if you notice where I have the

1    start here, that's always my reminder of where someone

2    starts this particular design, and she started

3    technically in the middle of the design, or a detail at

4    the top of the design is where she chose to start,

5    which is probably not the most efficient way to do

6    this, but it's something that I see very often.

7    **Q.**   Okay.  No. 8 is the four parallel lines?

8    **A.**   Right.

9    **Q.**   It looks to me like she's got one, two, three,

10   four parallel lines.  You only gave her a one?

11   **A.**   Right.  The four lines are not exactly parallel;

12   they're going up in the air.  They are not evenly

13   spaced.  She had to erase one.

14        MR. CHARNAS:  Your Honor, can the witness use

15   the screen to make marks on the --

16        THE COURT:  Sure.

17   **A.**   Oh, sure.  It's this section here.

18        MR. LAWLER:  This is my examination, counsel, by

19   the way, but you can do that.  Thank you.

20        THE WITNESS:  Okay.

21   **Q.**   Okay.

22   **A.**   I have had people who did 36 out of 36.  It is

23   possible.

24   **Q.**   Oh, I betcha.  I'd need a ruler, but that's beside

25   the point.

1           Now, 17, that's the bottom cross; is that right?

2    **A.**    That's right.

3    **Q.**    And she only got a one on that?

4    **A.**    Yeah, in part because it's connected to the

5    design, not in the middle of the design; it's off to

6    the right of the design -- all right? -- the -- and the

7    spacing, therefore, between the box that she has, which

8    is that thing in the corner, this thing here, and where

9    this line is, is different.

10   **Q.**    So, I guess let's cut to the chase on this one.

11   So, basically, because of those mistakes that you've

12   gone over, you put her in what category?  What's less

13   than one percent?

14   **A.**    It's the impaired category, and I didn't put her

15   there; her performance put her there relative to norms.

16   **Q.**    Well, let's talk about that.  It's subjective,

17   your grading is subjective; correct?

18   **A.**    No.  My grading is based on criteria.  The

19   criteria is up in the right corner of the grid, and

20   it's very explicit in Rey, that you need to be a

21   stickler on detail.

22   **Q.**    So, you would say that basically -- let's just

23   deal with 17 with the cross at the end, you're saying

24   that all the neuropsychologists who administer this

25   particular test are going to give her a one in that

1    situation?

2    **A.**   I can't say that.  I follow normative materials

3    and instructions on the test booklet.  Over the years,

4    this exam has become more finite.  Years ago, there was

5    not a dual criteria for scoring, but over time, the

6    explicitness of the detail and scoring have improved.

7    **Q.**   But this isn't like, you know, math where you say

8    two plus two is four -- right? -- you know the answer;

9    right?  This is more like olympic gymnastics; right?

10   **A.**   No, it's not.  This involves how somebody

11   organizes the total percept and then actually goes

12   about organizing in doing it.  If you notice, in my

13   notes down the bottom of the page, it starts with,

14   "horizontal midline."

15        She drew a line right down the middle of the

16   page.  That's where she started -- all right? --

17   working piecemeal approach, frequently erasing and

18   correcting, and I'm putting in parenthesis for my own

19   impression, it's poor planning.  Obviously, she does

20   this very poorly.  Most people do not start that way.

21        MR. LAWLER:  All right.  We're done with this

22   test.  Let's move on to another one.

23   **A.**   All right.

24        MR. LAWLER:  If you could put up 21, the same

25   Exhibit.  And so why don't you, if you would, please,

1      highlight, Cort, the beginning of the paragraph.

2      **Q.**    I know this is Part 5 of the test, Doctor --

3      **A.**    Correct.

4      **Q.**    -- but I wanted to, you know, not go to the

5      beginning; I'd rather just start -- do you know which

6      test this is?

7      **A.**    Yes, I do.

8      **Q.**    Okay.  Can you tell the jury what test this is?

9      **A.**    This is called the vocabulary sub-test of the IQ

10     test, the Wechsler Adult Intelligence Scale No. IV.

11     **Q.**    Okay.  And this particular test, I mean, for --

12     it's a vocabulary test; right?

13     **A.**    It's a vocabulary test, but it needs -- it is

14     looking at the ability to conceptualize a very tight

15     definition of a given word.

16     **Q.**    Okay.  So -- and is that your handwriting on --

17     **A.**    Yes, it is.

18     **Q.**    It is?

19     **A.**    Yes.

20     **Q.**    Okay.  So, for instance --

21            MR. LAWLER:  Highlight, Cort, if you could,

22     please, the first one.

23     **Q.**    So, do you just start with No. 5, you just don't

24     do No. 1 through 4; is that right?

25     **A.**    There's instructions up at the top of the page

1    that talk about reversal.  If there's an early failure

2    on these easier items, you go back upward.

3    **Q.**    Okay.

4    **A.**    I did not have to do that.  Her answer, in

5    essence, was a red fruit, and that was fine.

6    **Q.**    So, how do you administer the test?  Do you have

7    this in your hand and she is not looking at it, or does

8    she have something in front of her too?

9    **A.**    She has a card that has these words written on it,

10   numbered but written on it, and the instruction is to

11   give me the best definition that you can for each of

12   these words.

13   **Q.**    Okay.  So, you essentially -- are you sitting

14   across the table from her?

15   **A.**    That's correct.

16   **Q.**    Okay.  So, you're sitting across the table from

17   her, she has a list of words, you have the scoring

18   sheet in your hand, and you're taking down the

19   information; correct?

20   **A.**    Correct.

21   **Q.**    Okay.  So, you say to her, or to anybody taking

22   the test, "Apple," and then she --

23   **A.**    No.  I usually say, "Can you give me a good

24   definition of an apple?"

25   **Q.**    Okay.  "Can you give me a good definition of an

1    apple?"  And then how long does the person have to

2    respond to that particular question?

3    **A.**    These are un-timed responses.

4    **Q.**    Okay.  So you say -- I'm taking the test.  You

5    say, "John, Apple, just give me a good word for apple,"

6    and I said, "Red fruit that I love to eat;" right?

7    Would I get two points?

8    **A.**    Yes, you would.

9    **Q.**    And so, we keep going down the list; is that

10   right?

11   **A.**    That's correct.

12   **Q.**    And you get zero if you don't know the word at all

13   basically; right?

14   **A.**    That's correct.

15   **Q.**    And you get one if you know the word -- right? --

16   know part of the word?

17   **A.**    You know part of the word or it's not a complete

18   definition.

19   **Q.**    Okay.  And then No. 2 you get if you get it right,

20   like, I would have got the right answer for apple;

21   right?

22   **A.**    That's correct.

23   **Q.**    So, you know, obviously -- and we can just kind of

24   go through a few of them.

25          MR. LAWLER:  Let's go to 12 -- or actually, why

1    don't you do 12, 13, 14 and 15.

2    **Q.**    Okay.  So, we have -- in front of us, we have four

3    words, we have "tranquil, ponder, reluctant," and then

4    "confide;" right?

5    **A.**    Correct.

6    **Q.**    So, the first one, 12, you asked -- and this is

7    obviously Mrs. Irwin now, you're asking her, "What

8    is -- the word is 'tranquil.'  What's a good definition

9    for tranquil?"

10          And, obviously, the right definition is probably

11    peaceful or something like that, serenity,

12    peacefulness, something like that; right?

13    **A.**    Correct.

14    **Q.**    Okay.  And Mrs. Irwin, she gets that word wrong,

15    that's not within her lexicon; right?

16    **A.**    She gets that word wrong.

17    **Q.**    Okay.  Well, when I say -- do you know what

18    lexicon, the word "lexicon" means?

19    **A.**    Yes, I do.

20    **Q.**    That means within your vocabulary; right?

21    **A.**    Potentially, yes.

22    **Q.**    Okay.  I mean, some people have the word

23    "tranquil" within their vocabulary, and some people

24    don't; right?

25          But, in any event, she gets the word wrong?

1    **A.**    Correct.

2    **Q.**    So, she gets zero points, I understand.

3         Okay.  The word -- the next word, though --

4         MR. LAWLER:  Can you highlight that one, please?

5    **Q.**    -- "ponder, the word is 'ponder.'  What's a good

6    definition of ponder?"

7         And she says, "To wonder."  That sounds pretty

8    good to me.

9    **A.**    You only get one credit, unfortunately.  There are

10   standardized scoring for each of these items, and a one

11   includes those thoughts without the implicit that there

12   is a long period of time in which you think about

13   something.  There's a period of time missing that's not

14   in --

15   **Q.**    Oh, so you can't ponder something quickly; it's

16   got to be over a long period of time?

17   **A.**    I did not make the definitions or the criteria for

18   this test.  This test goes back to 30, 40 years now.

19   It has been well-normed on people.  It is now in its

20   fourth revision, and there are criteria to follow.

21   **Q.**    Okay.  Can I get a dictionary from my --

22        THE COURT:  Sure.

23   **Q.**    "Ponder:  To weigh in the mind, to think about, to

24   think or consider."  That sounds like to me like to

25   wonder; right?

1    **A.**    Unfortunately, that's a -- which dictionary is

2    that?

3    **Q.**    It came from my house.  It is Michael Lawler's

4    dictionary, Michael F.X. Lawler.

5              MR. CHARNAS:  Your Honor, I object.

6              THE COURT:  Sustained.

7    **Q.**    It's the tenth edition.  He's 28 years old in

8    November, so --

9              MR. CHARNAS:  Objection.  May we approach

10   sidebar for a quick moment, Judge?

11             THE COURT:  Can it wait till 1:00?

12             MR. CHARNAS:  Really quick, Judge.

13             (Discussion at sidebar)

14             MR. CHARNAS:  Your Honor, I haven't said

15   anything up until now, but Mr. Lawler has repeatedly

16   made references to his family --

17             THE COURT:  Okay.

18             MR. CHARNAS:  -- as an attempt to ingratiate

19   himself to the jury.

20             THE COURT:  I don't know if it's an attempt

21   to --

22             MR. LAWLER:  Well, on that example, she asked me

23   a question, and that's Michael Lawler's dictionary

24             THE COURT:  The answer she was looking for is

25   the Miriam Webster Dictionary --

1        MR. LAWLER:  Okay, understood.

2        THE COURT:  -- as I think you very well knew.

3   But I take his point.  You can't draw a straight line

4   and you can't --

5        MR. LAWLER:  I think that is perfectly fine

6   cross-examination.

7        THE COURT:  It's not a question.

8        MR. CHARNAS:  It's also inappropriate to inject

9   yourself like that in to the question.

10       MR. LAWLER:  All right.  Understood.  Thank you.

11       THE COURT:  Thank you.

12       (End of discussion at sidebar)

13  Q.   Okay.  Let's -- I mean, 14 she gets right,

14  "reluctant, not wanting to do an action," so she gets

15  two points for that; right?

16  A.   Correct.

17  Q.   "Confide," so you say to Mrs. Irwin, you say,

18  "Give me a definition for the word 'confide,'" and --

19  and what you write down is, "To speak to someone about

20  personal thoughts."  I can't read the --

21  A.   -- "or private thoughts."

22  Q.   -- "or private thoughts."  And you give her a one

23  for that.

24  A.   Initially I had scored it as a two, and when I

25  went back to double-check my criteria from the

1    Wechler's Manual, it's a one, so I downgraded it to a

2    one.  There is an assumption that the confide needs to

3    include a "maintain privacy and confidentiality"

4    component to it, and it doesn't.

5    **Q.**   So, let's go to the next page, which is 22.  16,

6    if you would, the word "remorse.  It's to feel badly

7    for someone or something."  And you only give her one

8    on that one.

9    **A.**   Again, the criteria says this is a one response.

10   **Q.**   What's wrong with that answer?

11   **A.**   I don't remember without my criteria book here,

12   but I would assume it has something about an element of

13   not doing it again.  There's an element in it that is

14   missing.

15   **Q.**   Okay.  The next word is "plagiarize;" correct?

16   **A.**   Correct.

17   **Q.**   "To falsify documents, statements that were not

18   originally yours, falsify."  What's wrong with that?

19   You only give one point.

20   **A.**   Because, to get a two-point answer, you need to

21   say, "Use as your own and not acknowledge that it's

22   anyone else's."

23        MR. LAWLER:  Okay, that's all for that.

24        We can take that off the screen, please, I think

25   the last one for the tests.

1          If you could put up No. 25, please.

2     Q.   This is information?

3     A.   That's correct.

4     Q.   And what does that mean, information?

5     A.   The information sub-test of the intellectual test.

6     It's a component of the intellectual test.  There are

7     basic factual information that you ask a person, and

8     there's typically only one answer for it because it's

9     facts.

10    Q.   Okay.  So, for instance, like on No. 7, you say,

11    "What's the chemical make-up of water?"

12    A.   That's correct.

13    Q.   And H2O, and they get a --

14    A.   Is one of the answers.

15    Q.   Now, what does this test lead to, though, as far

16    as -- is this a determination of IQ or pre-morbid

17    functioning or what?

18    A.   Neither of the above.  It is a sub-component of

19    the verbal comprehension measure, and collectively the

20    verbal comprehension measure is a suggestion of IQ, but

21    it is one of a composite of other measures that become

22    a verbal comprehension score.

23    Q.   Okay.  But would you agree with me that people

24    always don't have the same strengths in certain

25    subjects, like, for instance, someone may be good at

1    history and English, and someone is better at

2    mathematics and chemistry and all that?

3    **A.**    I think that's probably why these composite scores

4    for the IQ consist of multiple measures, so that they

5    can make up for some of those differences.

6    **Q.**    So, is this test, though, to determine IQ?

7    **A.**    No.  It's one of the components of -- I think

8    there's ten measures or 12 measures that make IQ, not

9    one standing by itself.

10   **Q.**    But it's a component of it?

11   **A.**    It's a component of it.

12   **Q.**    Okay.  So, like, for instance, let's look at

13   Question 11 and also Question 18.

14        MR. LAWLER:  So, underline Question 11 and

15   Question 18.

16   **Q.**    So, for instance, "Civil War," what do you do in

17   that situation?  What's the --

18   **A.**    The question was, "Who was President during the

19   Civil War?"

20   **Q.**    Okay.  And then for Sacagawea, what's the question

21   for Sacagawea?

22   **A.**    You know, I don't remember the specifics of it,

23   but it has to do -- a Native American that was very

24   influential in -- I don't remember the wording of it --

25   development of the west, something like that.

1    **Q.**    Lewis and Clark Expedition; right?

2    **A.**    Yeah.  They don't mention Lewis and Clark

3    specifically, but they allude to it in the --

4    **Q.**    Okay.  So -- but isn't it safe to say that

5    someone, for instance, who didn't like history or do

6    well in history just might not get those answers

7    because they didn't have the interest in that; correct?

8    **A.**    That's a possibility.

9    **Q.**    Okay.  So, like, for instance, with Mrs. Irwin, I

10   mean, she didn't do in college that well in her history

11   courses; right?

12   **A.**    Her failures were very few or her poor scores were

13   very few --

14   **Q.**    Where, in college or in these tests?

15   **A.**    In college.  I can't answer that question.  I

16   mean, you know, there are many people who know lots of

17   information and still hate the subject in school.

18   Which it is for her, I don't know.

19         MR. LAWLER:  Okay.  You can take that down,

20   please.

21         THE COURT:  Mr. Lawler, is this a topic that's

22   going to be two minutes or less, or would you like to

23   break for lunch?

24         MR. LAWLER:  No.  It's going to be more than two

25   minutes, but I'm getting close to being done.  I mean,

 1    I probably have 15 minutes left, maybe a little bit

 2    more than that, but it's certainly not two minutes.

 3         THE COURT:  All right.  I'm going to break for

 4    lunch.  You can come back.

 5         Okay.  So, I understand -- is an hour too long

 6    for lunch?  Would you all like shorter, or is an hour

 7    about right?  I thought there was some interest in

 8    having lunch a little shorter and the day a little

 9    shorter?

10         THE JUROR:  Yeah, we talked about it, but we

11    didn't come to a decision.

12         THE COURT:  Okay.  Why don't we try 45 minutes

13    today.

14         THE JUROR:  Okay, great.

15         THE COURT:  And you can see how that feels,

16    okay?  So, quarter of 2:00?

17         THE JUROR:  Sure.

18         (The jury is not present for the following)

19         THE COURT:  So, if they come back at quarter of

20    2:00, we're likely going to have to take another break

21    in the afternoon.  I don't think I can make them sit

22    from quarter of 2:00 until 4:00, so we'll take a short

23    recess at some point.  Okay.

24         (Recess, 1:00 p.m.)

25                        *  *  *.

C E R T I F I C A T I O N

        I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do
hereby certify that the foregoing pages are a true and
accurate transcription of my stenographic notes in the
above-entitled case.




                    /s/ Debra D. Lajoie




                    5/18/16