1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
2

3    MEGAN C. IRWIN and THOMAS L.        )
     IRWIN, INDIVIDUALLY AND AS          )
4    FATHER AND NEXT FRIEND OF MINOR     )
     CHILDREN M.1, M.2 AND T.1,          )
5                                        )  CA No. 13-10974-ADB
                 Plaintiffs              )  Pages 1 - 92
6                                        )
                  -VS-                    )
7                                        )
     ECLECTIC DINING, INC., d/b/a        )
8    ATLANTICA'S OLDE SALT HOUSE,        )
                                         )
9                Defendant               )

10

11            **JURY TRIAL - DAY THREE - PART TWO**

12

          BEFORE THE HONORABLE ALLISON D. BURROUGHS
13              UNITED STATES DISTRICT JUDGE

14

15                           United States District Court
                             1 Courthouse Way, Courtroom 17
16                           Boston, Massachusetts  02210
                             September 30, 2015, 1:29 p.m.
17

18

19

20

21

22                        LEE A. MARZILLI
23                     OFFICIAL COURT REPORTER
                      United States District Court
24                     1 Courthouse Way, Room 7200
                          Boston, MA  02210
25                         (617)345-6787

1    A P P E A R A N C E S:

2         SCOTT E. CHARNAS, ESQ., Charnas Law Firm, P.C.,
     66 Long Wharf, Boston, Massachusetts, 02110, for the
3    Plaintiffs.

4         JOHN F. X. LAWLER, ESQ. and HEATHER M. GAMACHE, ESQ.,
     Prince Lobel Tye, LLP, 100 Cambridge Street, Boston,
5    Massachusetts, appearing for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3       WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS

4       MARY HIBBARD

5            By Mr. Lawler:                 4

6       BRIAN GREENWALD

7            By Mr. Charnas:      29

8            By Mr. Lawler:                           62

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2          (Resumed, 1:29 p.m.)

 3          THE CLERK:  All rise.

 4          (Jury enters the courtroom.)

 5          THE CLERK:  Court is in session.  Please be seated.

 6          THE COURT:  Because of some of the travel difficulties

 7   with the witnesses, Mr. Lawler is going to begin his

 8   cross-examination of Dr. Hibbard.  Then we'll have a short

 9   break, and then Mr. Charnas will do his direct examination of

10   the next witness.  And then Mr. Lawler will do his

11   cross-examination of that witness, and then we will finish

12   Dr. Hibbard's cross-examination, and we expect that both

13   cross-examinations will proceed tomorrow.  So two crosses and

14   then a short break.  Where we can, we try to accommodate the

15   witnesses' schedules.

16          Mr. Lawler?

17          MR. LAWLER:  Thank you, your Honor.

18          Good afternoon, ladies and gentlemen.

19   CROSS-EXAMINATION BY MR. LAWLER:

20   Q.   Dr. Hibbard, my name is John Lawler.  We met in New York a

21   while back.

22   A.   Yes, we did.

23   Q.   Good afternoon.  How are you?

24   A.   Good, thanks.

25   Q.   Now, right before the break, during your direct
</pre>

1  examination, you used the phrase "a 100-pound umbrella."  Is

2  that correct?

3  A.    That's correct.

4  Q.    Okay.  And that was your understanding of how much the

5  umbrella weighed on the day that it struck Megan Irwin, right?

6  A.    No.  That was abstracted from her medical report in one or

7  two places.

8  Q.    Okay.  But you believe today that the umbrella weighs 100

9  pounds, right?

10  A.    It was the fact abstracted from the medical report.

11  Q.    Okay.  But you considered that fact, a 100-pound umbrella,

12  in arriving at your conclusions, correct?

13  A.    No.  It represents, an umbrella is a weighted object

14  falling at force.  I have no idea how high it flew, I have no

15  idea, but there is a force impacting her head.  That meets the

16  criteria for a traumatic blow to the head.

17  Q.    Okay, and you believe that that force was a 100-pound

18  umbrella; is that right?

19  A.    No.  She had a force that created altered mental status.

20         MR. LAWLER:  Okay, may I approach the umbrella, your

21  Honor?

22         THE COURT:  Yes.

23         MR. LAWLER:  Thank you.

24  Q.    Would it surprise you, Doctor, to realize that the

25  umbrella weighs 15 pounds?  Would that surprise you?

1    A.    Uhm, well, it's contrary to the medical documentation.  It

2    doesn't change what happened to the patient, however.

3    Q.    Okay.  Now, during direct examination, Doctor, you spoke

4    briefly about your qualifications, your background, your

5    education, et cetera, right?

6    A.    That's correct.

7    Q.    And I'm not sure if I heard it correctly.  Did you say on

8    direct examination that you have a doctorate in psychology?

9    A.    That's correct.

10    Q.    Okay.  Do you have your expert report in front of you and

11    your CV?

12    A.    I have my CV.

13    Q.    Is that Page 2 of your CV?  Is it there?

14         (Witness examining document.)

15    A.    "Education, Doctorate in Philosophy."  That is the

16    doctoral category for the psychology degree.  It's under the

17    Philosophy Department.  It is a subdivision of the Philosophy

18    Department.

19    Q.    Okay.  But what you have in front of you is a copy of your

20    resume` or curriculum vitae, right?

21    A.    That's correct.

22    Q.    And under Education, from 1976 to 1984, it says "Doctorate

23    in Philosophy, New York University, New York," correct?

24    A.    That's the official title of the doctorate.

25    Q.    All I'm asking you, Doctor, is what I just read, is that

1    correct?

2    A.    That's correct.

3    Q.    Thank you.  Now, you were retained in this particular case

4    by Attorney Charnas; is that correct?

5    A.    That's correct.

6    Q.    And when were you retained by Attorney Charnas?

7    A.    Probably in January or February.  I don't have the

8    documentation of the specifics of it.

9            MR. LAWLER:  May I approach, your Honor?

10           THE COURT:  Yes.

11   Q.    I'm showing you or I'm going to hand to you a revised

12   bill, and I'm just going to walk back to my podium and I'll ask

13   you some questions on that.  Now, this is a bill to

14   Attorney Charnas, and your name is at the bottom of it.  It's a

15   signature from you, Mary Hibbard, correct?

16   A.    That's correct.

17   Q.    And it essentially articulates the work that you did in

18   reference to this particular case, right?

19   A.    Correct.

20   Q.    And it's safe to say that the work that you did in

21   reference to preparing this particular report, the one that you

22   were reading from, I think, during your direct examination, you

23   charged $350 an hour, correct?

24   A.    That is my fee per hour for my work, yes.

25   Q.    Okay.  So if you can just -- what I want to do is, I just

1    want to follow line by line the work that you did in the case,

2    okay?

3    A.   Correct.

4    Q.   Okay, so the first entry is "Medical documentation review

5    and abstraction."  What's abstraction?

6    A.   Highlighting the important components of a medical chart

7    and then synthesizing it into a beginning semblance of a report

8    of that area.

9    Q.   Okay.  And you performed that particular work from

10   March 20, 2014, to April 22, 2014; is that correct?

11   A.   That's correct.

12   Q.   And the next entry is March 20, 2014, correct?

13   A.   Correct.

14   Q.   And that involved the clinical interview of the patient,

15   right?

16   A.   Correct.

17   Q.   And in this case, it was Mrs. Irwin, right?

18   A.   Correct.

19   Q.   Two hours, and you charged $700 for that, right?

20   A.   That's correct.

21   Q.   Okay.  And then the next entry on the bill -- and I know

22   it's not in chronological order, but that's fine -- the next

23   entry is "Clinical interview of husband," and that was done on

24   April 2, 2014, right?

25   A.   Correct.

1    Q.    And there's an hour entry for that, right?

2    A.    Correct.

3    Q.    And the husband is Thomas Irwin, the husband of Mrs. Megan

4    Irwin, correct?

5    A.    Correct.

6    Q.    And you conducted that interview over the telephone,

7    right?

8    A.    That's correct.

9    Q.    And then the next entry says "Neuropsychological testing,

10   day one, March 20," and that's for one hour, right?

11   A.    Correct.

12   Q.    So on the same day that you interviewed Mrs. Irwin, you

13   also tested her for an hour as well, right?

14   A.    Yes, I did.

15   Q.    Okay.  And then the next entry is "Neuropsychological

16   testing, day two," and that's on March 26, 2014, correct?

17   A.    Correct.

18   Q.    And that's for three hours, right?

19   A.    Correct.

20   Q.    And the next entry is "Neuropsychological testing, day

21   three."  That's for three hours, and then that's on April 1,

22   2014, right?

23   A.    Correct.

24   Q.    And then "Scoring of data and preparation of appendix,"

25   that was done on April 15, 2014, and that took two hours,

1    right?

2    A.    Correct.

3    Q.    And then you prepared the report; is that correct?

4    A.    That's correct.

5    Q.    And the report, you have a copy in front of you, don't

6    you?

7    A.    Yes, I do.

8    Q.    And that's dated April 24, 2014, correct?

9    A.    Correct.

10   Q.    And to prepare the report, that took you seven hours,

11   right?

12   A.    That's correct.

13   Q.    And you charged for the preparation of the report $2,450,

14   right?

15   A.    Correct.

16   Q.    And then also on April 23, 2014, you prepared the

17   treatment recommendations that you talked about during direct

18   examination, right?

19   A.    That's correct.

20   Q.    And that took an hour, right?

21   A.    Correct.

22   Q.    Now, the last entry on that is "Review of report/revisions

23   with lawyer," right?

24   A.    Correct.

25   Q.    And that was done on April 24, 2014, right?

1    A.    Correct.

2    Q.    And you charged two hours for that, right?

3    A.    Correct.

4    Q.    $700, right?

5    A.    Correct.

6    Q.    And so what you did was, did you do the revisions -- when

7    you say "attorney," is that Attorney Charnas?

8    A.    Yes.

9    Q.    Okay, so do you speak on the phone with Attorney Charnas

10   while you're doing your revisions to the report, or do you meet

11   with him?

12   A.    No.  It's usually on the phone.

13   Q.    Okay.  So it's safe to say that you prepared a report, and

14   then you revised it based on your conversation with

15   Attorney Charnas, correct?

16   A.    Uhm --

17   Q.    Either "yes" or "no," ma'am.

18   A.    Yes.

19   Q.    Okay.  Now, do you have a copy for us to see of the report

20   that existed before you revised the report with Attorney Charnas?

21   A.    I do not have a copy with me.

22   Q.    Could you get us a copy?  You're going to testify

23   tomorrow.  Could you get us a copy?

24   A.    I don't know if I can.  I can see if I have one.  I don't

25   know.

1    Q.    And you probably don't because you destroyed the earlier

2    copies; isn't that correct?

3    A.    No, that doesn't assume that.  I just don't want to say

4    "yes" or "no" if I don't know for sure if it's -- I don't have

5    a file of it here is all I can say "no" to.

6    Q.    Okay.  Now, getting back to the fee schedule, and when I

7    deposed you in New York City -- I think it was approximately

8    maybe a year ago or so, a little bit longer -- you charged me

9    $5,000 for that deposition, right?

10   A.    That's correct.

11   Q.    And for your trial testimony today, can you tell the

12   ladies and gentlemen of the jury what you charge for your trial

13   testimony?

14   A.    $6,000.

15   Q.    $6,000, does that include if you have to come back

16   tomorrow too?

17   A.    Yes.

18   Q.    Okay, so $6,000 overall?

19   A.    Correct.

20   Q.    Now, you prepared the report, and what I want to do is, I

21   want to go through the report with you.

22        THE COURT:  Mr. Lawler, can I see you at the sidebar

23   for one minute before you --

24        MR. LAWLER:  Certainly.

25

 1   SIDEBAR CONFERENCE:

 2        THE COURT:  Your next witness is in the courtroom.  I

 3   just wanted to make sure you were okay with that before we

 4   start.

 5        MR. LAWLER:  No.  I want him out.  I'll ask him to

 6   leave.  Thank you, your Honor.

 7        (End of sidebar conference.)

 8   BY MR. LAWLER:

 9   Q.   Now, Dr. Hibbard, I would like to talk a little bit about

10   your report this afternoon.  Could you please turn to the

11   second page of your report.  Actually, why don't we start at

12   the beginning.  Why don't we go back to the first page.  And on

13   the first page you state what records you have looked at in

14   regard to this particular case before you completed the report,

15   right?

16   A.   That's correct.

17   Q.   And it also tells us what tests you administered, correct?

18   A.   That's correct.

19   Q.   And on Page 1 and Page 2, you list a number of tests that

20   were administered to Mrs. Irwin, correct?

21   A.   That's correct.

22   Q.   And a number of these tests Mrs. Irwin completes before

23   you ever see her; is that correct?

24   A.   A very limited number of tests are done, and those are

25   self-report measures of how she's feeling.

1    Q.    Right.  So can you go down the list with me.  I'm going to

2    start at the first one.  And when you say "self-report," that

3    means the patient reports, right?

4    A.    Typically, yes.

5    Q.    Right.  So, for instance, there might be a question that

6    says, "Do you have a headache today?" and you either answer

7    "yes" or "no," and that's the patient who answers that, right?

8    A.    That's what self-report means, yes.

9    Q.    Okay.  So the first test, the Beck Depression

10   Inventory-II, that is self-report, correct?

11   A.    That is correct.

12   Q.    The Beck Anxiety Inventory, that is self-report?

13   A.    Correct.

14   Q.    The Brain Injury Screening Questionnaire, that is

15   self-report, correct?

16   A.    Correct.

17   Q.    The Minnesota Multiphasic Personality-2-Restructured Form,

18   the MMPI-2-RF, that is self-report, correct?

19   A.    Correct.

20   Q.    Are there any other tests listed on those two pages that

21   are self-report other than those ones that I just mentioned?

22   A.    No.

23   Q.    So essentially four of the eighteen tests are self-report,

24   correct?

25   A.    Might I qualify that the remaining tests on the list

1    are -- many say "select subtest," so it's not a test but a

2    composite of tests.

3    Q.    Understood, so one test may have a number of tests within

4    it?

5    A.    A large number.

6    Q.    And it's safe to say that when you look at a self-report

7    test, when you look at the results of the self-report, you

8    believe what the patient is telling you, correct?

9    A.    I think that's the principle of any interview of a

10    professional with a patient:  You do believe what they have to

11    say at their face value.

12    Q.    Right.  So if I come in to you and you say to me, "Do I

13    have a headache?" and I say "Yes," even though I feel great, I

14    have no headache at all, if I tell you I have a headache, you

15    say, "John Lawler has a headache," right?

16    A.    No.  In review of that self-report, when I saw that item,

17    I'd say, "Tell me about your headache."

18    Q.    Okay.  And you're going to say to me, "How does it feel on

19    a 0 to 10 range?" and I say, "It feels like a 6," and you write

20    that down, right?

21    A.    That is a self-report response, yes.

22    Q.    And you believe what I say?

23    A.    That's why there are tests of effort in this measure.

24    Q.    Okay.  Well, in regard to tests of effort -- and we're

25    going to come back to this, but this is a point that you made

1    in direct examination -- you believe that Mrs. Irwin gave

2    effort, full effort, right?

3    A.    I do.

4    Q.    Okay.  Is it safe to say that when you were testing her

5    and interviewing her, that she refused to turn off her iPhone?

6    A.    Is it safe to say?

7    Q.    Yes.  Did she do that?

8    A.    She -- she did not.  She was -- this was part of her

9    hypervigilance issue that I discussed earlier, that she

10   couldn't -- she was petrified to leave her phone off.

11   Q.    Okay, so --

12   A.    -- for fear of the children getting hurt.

13   Q.    But you certainly see people with their iPhones today,

14   whether it's a voice message or more likely a text message,

15   they can't be away from it for more than, you know, 30 seconds,

16   right?

17   A.    That's correct.  Under certain tasks, I'd have her turn

18   off her phone for brief periods of time, and then she'd turn it

19   back on as soon as it was done to see if anything had happened.

20   Q.    Okay, so maybe she wanted to complete some tasks quicker

21   than she was supposed to then in order to get the phone back

22   on?

23   A.    I don't think that had anything to do with the speed at

24   which she did tasks.

25   Q.    Okay, let's go back to the report on Page 2.  Now, in the

1    middle of that page it says that the reason for the referral is

2    to assess Mrs. Irwin's current cognitive and effective

3    functioning secondary to a traumatic brain injury occurring at

4    the time of an accident on August 5, 2012, correct?

5    A.    Correct.

6    Q.    And when Mrs. Irwin comes in to see you on the date that

7    you interview her, you assume that she's already suffered a

8    brain injury, correct?

9    A.    I've already read her medical report where it's replete

10   with that diagnosis.

11   Q.    Okay, so she's coming into the office, and you believe

12   that she has a brain injury, and you want to test her?

13   A.    No.  My purpose is to validate whether she's had one or

14   not.

15   Q.    Okay.  And Mrs. Irwin is aware when you start to talk to

16   her that you have been retained by her lawyer in a lawsuit; is

17   that right?

18   A.    Always a question that I ask her:  "Who sent you?"  Yes.

19   Q.    Okay.  So before any answers that she provides to you, she

20   knows that you have been retained by her lawyer in this lawsuit

21   suing a defendant, correct?

22   A.    That's correct.

23   Q.    And after you get that information out to Mrs. Irwin in

24   this particular case, you then take a history from her,

25   correct?

```
1   A.   I preface it with, "The important thing here is that

2   you're honest and you leave no hidden anything in your history,

3   to be honest and upfront."

4   Q.   Okay.  And, again -- I think you said it about five

5   minutes ago -- the whole practice of psychology is that you

6   take the patient's word for it, right?

7   A.   It's the practice of many fields.

8   Q.   Okay.  I mean, but we're not in many fields right now,

9   Doctor.  We're in psychology.  So you'd agree with me that

10  that's the practice in psychology and that you practice that?

11  A.   That is the gold standard, yes.

12  Q.   And it's important for you to receive accurate information

13  in order to make an accurate diagnosis, correct?

14  A.   Yes.

15  Q.   Okay.  I know in the computer world, sometimes people use

16  this term "garbage in, garbage out," right?

17  A.   Yes.

18  Q.   You've heard that before?

19  A.   I'm familiar with that term.

20  Q.   Okay, that means basically bad information leads to

21  possibly a misdiagnosis or an improper diagnosis, right?

22  A.   Yeah.

23  Q.   Okay.  So you start to question Mrs. Irwin about her

24  background and how she feels, what she's able to do, what she's

25  not able to do, et cetera, right?
```

1    A.    Correct.

2    Q.    And in regard to her background, look at under the

3    "Self-Reported psychosocial and medical history pre-accident,"

4    in the third paragraph, do you see where it says, "She reported

5    that she played lacrosse through her four years in college"?

6    Do you see that?

7    A.    That's correct.

8    Q.    And she told you that, right?

9    A.    Correct.

10    Q.    Would you be surprised to learn that she only played one

11    year of lacrosse in college and decided to quit because it was

12    too competitive?  Would that surprise you?

13    A.    It would surprise me, but as somebody who works with

14    individuals with TBI, I'd say that's good news, but it

15    surprises me, but it doesn't change anything.

16    Q.    Okay.  And then you also decided you wanted to learn some

17    history about Mrs. Irwin's family, right?

18    A.    I routinely ask family history as part of my interview.

19    Q.    Right.  And it's important also -- it was important to you

20    to find out about the educational background of Mrs. Irwin's

21    parents and also her siblings, right?

22    A.    That's correct.

23    Q.    Okay.  And do you see the last paragraph?

24    A.    I do.

25    Q.    Okay.  And it says on the second sentence, "Her mother

1   holds a doctorate in education."  Do you see that?

2   A.   That's correct.

3   Q.   And that was information that Mrs. Irwin relayed to you,

4   right?

5   A.   That is correct.

6   Q.   Okay.  Would you be surprised to hear that Mrs. Connolly,

7   the mother of Mrs. Irwin, while she holds a master's degree in

8   education, does not hold a doctorate in education, does not

9   hold any doctorate?  Would you be surprised to hear that?

10  A.   It's the first time I'm hearing it, so I have to be

11  surprised.

12  Q.   Okay.  And it's safe to say that in arriving at the

13  premorbid functioning IQ for Mrs. Irwin, you took into account

14  the education of her parents and her siblings, right?

15  A.   Along with many other factors.

16  Q.   Understood, along with many other factors, but that was

17  one factor, right?

18  A.   It's one of many, yes.

19  Q.   Okay.  And in fact you see two sentences down from the

20  sentence you just read, it says, "Her father --" and "her

21  father" means Mrs. Irwin's father who's Edward Connolly,

22  correct?

23  A.   Correct.

24  Q.   "Her father holds nine master's degrees"?  I read that

25  correctly, right?

1    A.    I questioned it.  I said "Nine?"  She said, "Yes, nine."

2    Q.    Right, you actually questioned her in that situation

3    because that information sounded unusual to you, right?

4    A.    And she went with it, so this is her self-report.

5    Q.    Right.  Would you be surprised to learn that he only

6    has -- I say only, that's good -- only has one master's degree?

7    A.    It would be more logical, but this is her self-report.

8    Q.    Okay.  And then you go into her educational background,

9    correct?

10   A.    Correct.

11   Q.    And you question her about her grades, right?

12   A.    Correct.

13   Q.    And you learned that she graduated from Catholic

14   University in 2003, right?

15   A.    Correct.

16   Q.    And that her class ranking was 311 out of 365, right?

17   A.    That's what she reported.

18   Q.    That's the bottom 15 percent of the class, right?

19   A.    Correct.

20   Q.    Okay.  Now, you also spoke to her husband, Thomas Irwin,

21   correct?

22   A.    That's correct.

23   Q.    And you interviewed him over the phone, and then you

24   incorporated that information into your report, correct?

25   A.    That is correct.

1  Q.   Okay, turn to Page 4.  It's the middle of the report, and

2  look Line 6, please.  Do you see where it starts with Mister?

3  A.   Yes.

4  Q.   It says, "Mr. Irwin reports his relationship with his wife

5  was enjoyable and romantic pre-injury.  The couple routinely

6  planned date nights and time spent alone.  When asked about

7  potential tension in the marriage pre-accident, Mr. Irwin

8  reports that the tensions were typical of any new couple as

9  they began to start a family."  I read that correctly, right?

10  A.   That was his report, correct.

11  Q.   Okay, so that's what he told you, right?

12  A.   That's correct.

13  Q.   But you learned -- actually, you learned before you

14  interviewed him that, really, there was a completely different

15  story than what Mr. Irwin described, correct?

16  A.   That is correct.  Hence, when asked -- there's a question

17  here about it -- when asked about potential tensions in the

18  relationship, that was me asking about, are there any potential

19  relationship issues?  And this was his response.

20  Q.   Right, and in fact his response is vastly different than

21  the response of Mrs. Irwin, correct?

22  A.   That's correct.

23  Q.   Because Mrs. Irwin essentially told you that she was in a

24  terrible marriage and that she wanted to get out of the

25  marriage, correct?

1    A.    I don't think she used quite those strong terms.  Let me

2    just see what I said on it.

3              (Witness examining document.)

4    A.    I did not use those strong terms.  I said her marriage had

5    interpersonal difficulties.  "She attributes these difficulties

6    in part to the fact that she and her husband have worked full

7    time until the accident and the need to adjust to parenting

8    roles caring for the children.  She also reports that her

9    husband has a problem with alcohol abuse, which she feels is

10   related to his need to do extensive socialization and

11   entertainment as part of his job.  Finally, she reports their

12   older son's cardiac disability has added stress on their

13   marriage."

14   Q.    Okay.

15   A.    That's very different than what you just said.

16   Q.    Well, it may be different from what I said, but go back to

17   Page 1 of your report.  Could you do that, please, Page 1.  In

18   the "Medical documents reviewed," they include records from

19   Dr. Sontz, who's a psychologist, and those records were from

20   February 16, 2012, to September 11, 2012, right?

21   A.    That's correct.

22   Q.    Have you reviewed those records in preparation for today's

23   testimony?

24   A.    Yes, I have.

25   Q.    And you would agree with me that Dr. Sontz in February and

1   then all the way through to September basically recorded what

2   Mrs. Irwin told her, correct?

3   A.   That's correct.

4   Q.   Okay.  And Mrs. Irwin told Dr. Sontz that she was in a

5   horrible marriage, her husband was terrible, he was an

6   alcoholic, and he was verbally abusive, correct?

7   A.   In essence, yes.

8   Q.   Okay.  And she also told Dr. Sontz that she wanted to get

9   herself and her family away from that because it was an awful

10  relationship, right?

11  A.   That's correct.

12  Q.   Okay.  And in those reports, you would agree that

13  Dr. Sontz also stated, as a result of interviewing Mrs. Irwin,

14  that Mrs. Irwin was overwhelmed, overloaded, fatigued, and had

15  great anxiety and depression, right?

16  A.   Uhm, I don't agree with all of that.

17  Q.   Okay.  Well, we'll come back.  That's okay.  Fair enough.

18          MR. LAWLER:  If you could put on the screen, I think

19  it's 41, 41-A.  Could you go to the last page of that.  I think

20  it's four of four.

21  Q.   Do you see on the screen, Dr. Hibbard?  Actually, just so

22  it's fair, I'd like you to go back to the first page, please.

23  Okay, Dr. Hibbard, I'm showing you 41-A, which is a report from

24  Dr. Sontz.  And I take it you've seen that several times

25  before, right?

 1              (Witness examining document.)

 2    A.    I'm not sure if I recognize this one as -- I've seen

 3    reports of hers.  I'm not sure I have this report.

 4              MR. LAWLER:  Can I approach, your Honor, to see if the

 5    screen is the same?

 6              THE COURT:  Yes.

 7              MR. LAWLER:  I think it is, but --

 8    Q.    It is.  Well, Doctor, look at your report, the first page

 9    of your report.

10    A.    Yes.

11    Q.    Just so we can marry it all up, do you see Dr. Sontz?

12    A.    Yeah, I've seen it here because I realize down the bottom

13    it's familiar.

14    Q.    I'm sorry?

15    A.    As I see it, down the bottom here, I remember reading this

16    part of it.  I didn't remember the top part of what it looked

17    like.

18    Q.    Okay.  And why don't we go, just so your memory is

19    properly refreshed that this is the right document, if you

20    could the last, like, quarter of that page, just highlight it,

21    that's fine.  And see where it says, "Patient reports that her

22    husband and his family are alcoholic.  Patient is realizing

23    that her husband is a terrible husband.  She believes he is

24    emotionally abusive and that he has been disrespectful to her

25    (cheated with coworker and nanny).  Patient has been married

1  for seven years and they were both drinking a lot then."  Do

2  you see that?

3  A.    I do.

4  Q.    Okay, so we're on the right document, correct?

5  A.    Correct, yes.

6  Q.    All right, if you could go now to Page 4.  There's two

7  other pages in between.  If you want to see those, Doctor, I'll

8  certainly show them to you, but are you fine going to this

9  page?

10  A.    Yes, uh-huh.

11  Q.    Okay.  Now, there's a diagnosis that Dr. Sontz provides in

12  that February 16, 2012 interview and examination, correct?

13  A.    That's correct.

14  Q.    Okay.  And I have in my hand here -- I'm just going to

15  show the jury as well so this is --

16          MR. LAWLER:  May I walk and show the jury?

17          THE COURT:  Yes.

18          MR. LAWLER:  Thank you, your Honor.

19  Q.    This is DSM-V.  You're familiar with this, right?

20  A.    Yes, I am.

21  Q.    Okay, this is the Diagnostic and Statistical Manual of

22  Mental Disorders, right?

23  A.    That's correct.

24  Q.    And essentially it's the bible of psychologists, right?

25  A.    That's correct.

1    Q.    And you use it frequently, correct?

2    A.    Correct.

3    Q.    I know there were previous copies.  There was DSM-IV and

4    then DSM-IV-R, and now there's DSM-V, right?

5    A.    That's right.

6    Q.    So Dr. Sontz, she gave this diagnosis, correct?

7    A.    That's correct.

8    Q.    And this is 309.28, right?

9    A.    That's correct.

10   Q.    And 309.28, that's basically a -- excuse me.  One moment.

11   I'm going to get the actual page.

12          THE COURT:  Mr. Lawler, when you get through these

13   documents, we'll switch witnesses.

14          MR. LAWLER:  Okay, I should be done with this point.

15   I'll pick it up next time.

16   Q.    Now, I'm on Page 287, and that 309.28, when expressed in

17   the full language of DSM-V, says that Dr. Sontz diagnosed

18   Mrs. Irwin as having an adjustment disorder with mixed anxiety

19   and depressed mood.  Would you agree with that?

20   A.    I would agree with that.

21   Q.    And would you agree with me that that diagnosis

22   essentially says that a combination of depression and anxiety

23   is predominant, right?

24   A.    That's correct.

25   Q.    Okay.  So it's safe to say that Dr. Sontz was treating

1    Mrs. Irwin for symptoms of depression and anxiety, correct?

2    A.    That's correct.

3    Q.    Now, if you'd go back --

4           MR. LAWLER:  A couple more questions, your Honor, and

5    then we'll call it.  If you'd go back to one page on that

6    document, and if you could just highlight the top, that's

7    right, the top, that would be great.

8    Q.    Now, "Mental status exam," it basically states under

9    "Mood" that she, she being Mrs. Irwin, is sad and angry,

10   correct?

11   A.    Correct.

12   Q.    And when it says "Effect, congruent," what does that mean?

13   A.    That means her emotional demeanor, does it match her mood,

14   what she's talking about as sad and angry?

15   Q.    Right, so when the word "congruent" is used, that

16   basically means that the psychologist is evaluating the

17   demeanor of Mrs. Irwin, and she's determining that her demeanor

18   is both sad and also angry, correct?

19   A.    That's correct.

20   Q.    And I will continue whenever, I guess tomorrow.  Thank you

21   very much.

22          THE COURT:  All right, jurors, we're going to give you

23   a quick recess upstairs while we swap out the witnesses.  See

24   you tomorrow.

25          THE CLERK:  All rise for the jury.

```
 1              (Jury excused.)

 2              MR. LAWLER:  Just five minutes, ten minutes?

 3              THE COURT:  I think he's got a laptop to get hooked

 4   up.

 5              (A recess was taken, 2:11 p.m.).

 6              (Resumed, 2:18 p.m.)

 7              THE CLERK:  All rise for the jury.

 8              (Jury enters the courtroom.)

 9              THE CLERK:  Court is back in session.  Please be

10   seated.

11              THE COURT:  Call your witness, Mr. Charnas.

12              MR. CHARNAS:  Dr. Brian Greenwald.

13                        BRIAN GREENWALD, M.D.

14   having been first duly sworn, was examined and testified as

15   follows:

16              THE CLERK:  Could you please state your name and spell

17   your last name for the record.

18              THE WITNESS:  Dr. Brian Greenwald, and my last name is

19   G-r-e-e-n-w-a-l-d.

20   DIRECT EXAMINATION BY MR. CHARNAS:

21   Q.   Good afternoon, Dr. Greenwald.  You're a medical doctor,

22   correct?

23   A.   That is correct.

24   Q.   What is your specialty within medicine?

25   A.   My specialty, I'm actually dual board-certified.  I'm
```

1    specialized in both physical medicine and rehabilitation and

2    also in brain injury medicine.

3    Q.    What is brain injury medicine?

4    A.    Brain injury medicine is a subspecialty which could be

5    pursued by a physiatrist like myself, neurologists or

6    psychiatrists.  It's an area of specialization in the care of

7    people with traumatic brain injury.

8    Q.    And what is a physiatrist?

9    A.    A physiatrist, which is my primary specialty, or physical

10    rehabilitation or rehabilitation doctor, is caring for people

11    with a variety of disabilities.  Probably many of the people in

12    the field deal with musculoskeletal disabilities, but myself,

13    my area of subspecialty is dealing with people with

14    disabilities from traumatic brain injury.

15    Q.    Where do you work, Doctor?

16    A.    I'm employed by JFK Johnson Rehabilitation Institute in

17    Edison, New Jersey.

18    Q.    And do you live in New Jersey?

19    A.    I do.

20    Q.    And what is JFK?

21    A.    JFK is both a hospital and a rehabilitation institute.

22    They are very well known for many years for the care of people

23    with traumatic brain injury, of both more severe injury and

24    milder injury.

25    Q.    And tell us, what do you do there at JFK?

1    A.    Well, I have a number of titles, but beyond my titles,

2    more than half of my work is in patient care.  I'm also

3    involved with the administration there.  I'm also the

4    fellowship director there.  I have a number of teaching roles

5    there, but the majority of my work is just patient care of

6    people with traumatic brain injury.

7    Q.    How many patients do you see in a given week with

8    traumatic brain injury?

9    A.    I see about twenty -- I see twenty outpatients all

10   together per week, which the majority of those people have

11   traumatic brain injury, and my service is generally about ten

12   inpatients on a given week.

13   Q.    Could you tell us a little bit more about your clinical

14   program at JFK.

15   A.    Sure.  It's both an inpatient practice and an outpatient

16   practice.  The inpatient practice is people who have injuries

17   severe enough that they need to be hospitalized after their

18   traumatic brain injury; and the outpatients is a mix of

19   patients who were initially my inpatients and then became my

20   outpatients, or people referred to me, many of whom have had

21   mild brain injuries or concussions.

22   Q.    Do you have any positions outside JFK?

23   A.    I'm also, my academic position is, I'm an associate

24   professor at Rutgers Robert Wood Johnson Medical School, is my

25   primary academic position.

1    Q.    Could you please summarize for us your education,

2    training, and experience in the field of medicine.

3    A.    Sure.  I was an undergraduate at the State University of

4    New York at Stony Brook, and then I completed my education

5    there and stayed on there for medical school.  After finishing

6    my medical school training at the State University of New York

7    at Stony Brook, I did an internship at the University of

8    California San Francisco; and, as I promised my parents, I

9    returned to the Northeast and did any residency training for

10   three years in physical medicine and rehabilitation.  After

11   finishing my residency training, I did a fellowship training in

12   brain injury medicine at Virginia Commonwealth University.

13   Q.    Do you teach in the field of medicine?

14   A.    I do.  I'm actually the fellowship director for brain

15   injury medicine, and I have residents, and I have a lot of

16   teaching responsibilities through the medical school.

17   Q.    And are you affiliated with any hospitals?

18   A.    JFK Johnson Rehabilitation Institute, which is part of JFK

19   Medical Center, and also Robert Wood Johnson University

20   Hospital.

21   Q.    At some point did you practice medicine in New York?

22   A.    I did.

23   Q.    Where?

24   A.    For about ten years, I was over at Mount Sinai Medical

25   Center in New York City.

1    Q.    Did you know Dr. Hibbard at Mount Sinai?

2    A.    I did.

3    Q.    And what was your relationship with Dr. Hibbard?

4    A.    Well, we worked in the same department and treated many of

5    the same patients during that time.  I think we overlapped for

6    about five years in our time there.

7    Q.    I think you may have answered this before, but are you

8    board-certified?

9    A.    I am.  I'm board-certified both in physical medicine

10   rehabilitation and in brain injury medicine.

11   Q.    And you're licensed to practice medicine?

12   A.    I am.  I'm licensed to practice medicine where I see my

13   patients in New Jersey.

14   Q.    Have you ever won any awards in the field of medicine?

15   A.    I've been lucky enough to receive a lot of awards, but

16   some of the awards that I received, the Arnold P. Gold

17   Foundation Award, which is for humanism in medicine, based on

18   my caring and compassion for people with brain injury.  That's

19   a direct quote off the award.  I was also the Physician of the

20   Year at Mount Sinai.  There's about two thousand physicians at

21   Mount Sinai.  I was elected by the nursing staff at Mount Sinai

22   to be the Physician of the Year.  I've won a number of other

23   awards since, but most recently I was given the Angel Award.

24   That was for clinical care and research for patients with

25   traumatic brain injury.

1    Q.   Do you have any leadership positions in any brain injury

2    organizations?

3    A.   I probably have two or three pages' worth of leadership

4    positions, but probably some of the ones I'm most active in is

5    with the American Congress of Rehabilitation Medicine.  I'm

6    pretty involved with their Disorders of Consciousness

7    Committee, and on the flip side, also on their Mild Brain

8    Injury Committee, the American Academy of Physical Medicine and

9    Rehabilitation.  I am the Vice Chair of Education for the

10   Central Nervous System Council.  For the Brain Injury Alliance

11   of New Jersey, I've been on their Board of Trustees for about

12   twelve years; and for the North American Brain Injury Society,

13   I've also been on their Board of Trustees for, I guess it must

14   be four or five years now.

15   Q.   Have you ever gotten any grants from the government to do

16   research in the field of brain injury?

17   A.   I've had a number of grants, but I think the most

18   significant ones were the Model Systems Grants.  The Model

19   Systems Grants is, every five years people compete for these

20   grants.  They're looking at -- it's a prospective grant looking

21   at outcomes of people who have had severe brain injuries over

22   the last 25 years.

23   Q.   Doctor, what does it mean when a publication is peer

24   reviewed?

25   A.   So there are certain journals that are considered

1  peer-review journals, meaning that people, to be published in

2  those journals, they need to send in their article.  It's then

3  reviewed by people who are considered experts in the area to

4  see both if it's good science and if it's worthwhile to be

5  published; and then if it is amongst three or four experts,

6  it's then given the right to be published.

7  Q.    Do you have any peer-reviewed publications?

8  A.    About 30 peer-reviewed publications.

9  Q.    Are they generally on the subject of traumatic brain

10 injury?

11 A.    Almost uniformly on that subject.

12 Q.    Have you lectured in the field of brain injury?

13 A.    I've given about a hundred lectures around the world,

14 primarily in the field of brain injury rehabilitation.

15 Q.    Do you happen to be attending a conference here in Boston

16 right now?

17 A.    I am.  I'm stealing away from some leadership work that

18 I'm doing for the American Academy of Physical Medicine and

19 Rehabilitation.

20 Q.    Have you ever been involved in creating any videos to help

21 people with brain injury?

22 A.    You know, obviously it's a great opportunity to be able to

23 mass produce things to help people.  I have created --

24 actually, Dr. Hibbard and I created a video that was useful.  I

25 think it was "The Many Faces of Traumatic Brain Injury."  But

1    I've also done, through some of my charitable work, I've done a

2    number of other videos to help people understand some of the

3    challenges that they face after traumatic brain injury.

4    Q.    Doctor, at some point did I ask you to consult in regard

5    to this case?

6    A.    Yes, you did.

7    Q.    Have you and I ever worked before together?

8    A.    No.

9    Q.    What were you asked to do?

10   A.    I was asked to evaluate Ms. Irwin, to review a set of

11   records, and then to come together with an impression and a

12   plan which she would need for her future as a result of the

13   injuries that she sustained on 8/5/2012.

14   Q.    Would you tell us everything you did to come up with that

15   impression.

16   A.    Sure.  The first thing I do is, in a case like this, is to

17   review as many of the records that I am provided, and I have a

18   list here of the records that I was provided prior to seeing

19   Ms. Irwin.  Then I actually evaluated Ms. Irwin on March 10,

20   2014.  Some additional records beyond that were sent to me.  I

21   reviewed those also.  Those are all contained here in this

22   report I received.  So when I interviewed her, I also examined

23   her, and then with all that information put together, I put

24   together my impressions and her prognosis.

25   Q.    When you examined her, what type of examination did you

1    conduct?

2    A.    A basic head-to-toe examination, including a neurologic

3    examination.

4    Q.    I neglected to ask you, what does the term "impression"

5    mean?

6    A.    Based on all the information that I gained, both from the

7    records that I reviewed and my interview and examination, what

8    were my conclusions about her, what were the conclusions of the

9    injury that she sustained, the impairments, problems, symptoms

10    that she still has.

11    Q.    And did you arrive at a medical impression in regard to

12    Mrs. Irwin?

13    A.    Yes, I did.

14    Q.    And do you hold that impression to a reasonable degree of

15    medical certainty?

16    A.    Yes, I do.

17    Q.    Tell us, what are your impressions?

18    A.    My impression was that Ms. Irwin had sustained an injury

19    to her head when she was hit by a wooden pole of a table

20    umbrella on 8/5/2012.  She had a brief loss of consciousness,

21    or at least a period of post-traumatic amnesia, and was also

22    confused after the injury, which had been documented.  This

23    meets the ACRM criteria for mild traumatic brain injury.  She

24    was then diagnosed by her treating clinicians both with a

25    concussion and postconcussion syndrome.  And then, as a result

1    of the mild traumatic brain injury, she has chronic headaches,

2    dizziness, irritability, fatigue; impaired cognition,

3    specifically looking at memory, organization, and

4    concentration; anxiety, phonophobia, and photophobia.

5    Q.   Now, you mentioned the ACRM and their criteria.  Tell us

6    about that.

7    A.   The ACRM is the American Congress of Rehabilitation

8    Medicine, and in 1993 they published a peer-reviewed paper

9    looking at what are the clinical criteria to diagnose someone

10   with traumatic brain injury.  The criteria that they looked at

11   is, one, is an injury to the head, but, two, is to have one of

12   the -- only one of the four things.  One was a loss of

13   consciousness; two was that the person was dazed or confused

14   afterwards; three, that they have a period of post-traumatic

15   amnesia, either an inability to remember what happened right

16   before the accident or right after the accident; or, four, that

17   they have a focal neurologic sign, something like a seizure or

18   partial visual loss, and, again, this is immediately after the

19   accident.  You only need one of those four criteria to meet the

20   ACRM criteria for mild brain injury.  And that was back in

21   1993.  Since then, there's been a number of organizations that

22   have looked at these criteria to see if they are really the

23   right criteria, and that includes the World Health Organization

24   and the American Academy of Neurology, and most recently the

25   military; and all three have written papers about these

1    specific criteria but have really maintained basically those

2    criteria that I just outlined to make the diagnosis, the

3    clinical diagnosis of mild traumatic brain injury.

4    Q.    What's the basis of your belief that -- well, which of the

5    criteria did she meet?

6    A.    Well, specifically, we talked about the confusion that was

7    well documented, but also by history, having a period of either

8    a brief loss of consciousness or post-traumatic amnesia.  The

9    hard part, of course, is if someone has a period of

10   post-traumatic amnesia, meaning something that they don't

11   recall immediately afterwards, they may not know if there was a

12   loss of consciousness or not.

13   Q.    Why do you believe that she had a period of post-traumatic

14   amnesia?  Based on what?

15   A.    Based on her history that I obtained, but also the

16   information that I had was also supplemented by the people who

17   saw her afterwards; specifically, the statements from Katie

18   Hildreth and Meghan O'Neil.

19   Q.    When you say she had confusion, what are you basing that

20   on, Doctor?

21   A.    In the ambulance ride on the way home, part of the reason

22   that they were so concerned for her is the confusion that they

23   noted, which is why they then said that she had a Glascow Coma

24   Scale score of 14, and began treating not only her son but her

25   too.

1    Q.    And what's the Glascow Coma Scale?

2    A.    So the Glascow Coma Scale, also called the GCS, is a

3    measure of consciousness or unconsciousness, is primarily what

4    it's meant to look at.  It looks at eye movement, verbal

5    abilities and motor abilities.  It starts at 3 is the lowest

6    that you can get, meaning the person is deeply unconscious,

7    through 15, meaning that the person is alert and oriented, able

8    to move their arms and legs.  With the confusion that she was

9    having, they scored her verbal score as one point lower and

10    gave her a totally Glascow Coma Scale score of 14.

11    Q.    And why is that significant?

12    A.    Again, it speaks to the confusion that she was having.

13    Patients who have had mild brain injuries or mild-severity

14    brain injuries usually have a Glascow Coma Scale score of 13 to

15    15.

16    Q.    Just so it's clear, what's the period of post-traumatic

17    amnesia that you're talking about?

18    A.    Just not being able to recall what happened immediately

19    before or after the accident.

20    Q.    But in her case specifically?

21    A.    Let me look specifically at what she told me.

22           (Witness examining document.)

23    A.    So she recalls that she was hit in the face, and then the

24    next thing she recalls is that her mother was putting ice on

25    her face, but has no recollection of what happened between the

1   umbrella heading towards her face and then her mother putting

2   ice on her face.  So with that situation, it would be hard to

3   say if someone had a loss of consciousness versus a period of

4   post-traumatic amnesia.  Either way, she has clearly a period

5   of well-documented confusion, so she would meet the criteria

6   even if we are just talking about the confusion period.

7   Q.   You used the term "mild traumatic brain injury" several

8   times.  What do you mean by that?

9   A.   So the severity of traumatic brain injury is often broken

10  up or talked about as mild, moderate, or severe.  So it doesn't

11  actually relate to what your symptoms and your disability is

12  later on.  It's really just based on what you look like

13  initially.  If initially when you show up to the emergency room

14  after they resuscitate you you're awake, you're deeply

15  comatose, your DCS, you're going to be a severe brain injury no

16  matter how good of an outcome that you have, if you show up to

17  the emergency room and you're only dazed and confused, you'll

18  be considered to have a mild brain injury, no matter how many

19  impairments that you continue to have.

20  Q.   Now, is there a difference between the terms "impression"

21  and "diagnosis"?

22  A.   The diagnoses are more specific.  So in her case, let's

23  say that the traumatic brain injury is the diagnosis, but my

24  impression -- and my impression goes on for a number of

25  pages -- it gives sort of my overall thoughts and also gives

1    the specifics of why I think that.

2    Q.    Go ahead.

3    A.    Well, we talked a little bit about that she was confused

4    on the way to the ambulance and was taken to South Shore

5    Hospital, and that the following day she had headaches and

6    nausea and photophobia and phonophobia and blurred vision.

7    These are really the most common symptoms that we see in

8    persons who have had a concussion, these specific set of

9    symptoms, sometimes called "postconcussion syndrome" because

10   they're such a common set of symptoms that go together.  We

11   talked a little bit about then that she had been pending a

12   breast mass removal; and because she was still symptomatic from

13   the concussion, her neurologist had recommended that she hold

14   off in having that done, and she waited secondarily on having

15   that excised for about a month.  Then Dr. Lash, her primary

16   care doctor, seeing that she was still symptomatic, referred

17   her to Dr. Sun, who ordered an MRI and EEG, and she was then

18   treated by Dr. Sun for about a year.  Dr. Sun then referred her

19   for cognitive therapies at the Center for Cognition and

20   Communication.  She actually tried to get back to work, but

21   some of the computer -- the computer work that she had done at

22   the Center for Cognition and Communication actually worsened

23   her headaches, which is why she didn't continue to treat there.

24            It's noted in the record that her primary symptoms

25   were fatigue and headaches and irritability and sensitivity to

1  noise, as well as sensitivity to light, fogginess, dizziness,

2  and misspeaking.  Symptoms were all worse when she was

3  fatigued.

4  Q.   Why are all these symptoms significant to you?

5  A.   These are -- when you look at what are the core symptoms

6  that we see in persons who have had traumatic brain injury,

7  actually even more commonly in people that have had mild

8  traumatic brain injury, these are the symptoms.  The CBC has a

9  nice brochure that they have on the most common symptoms that

10  we see after traumatic brain injury, the 20 most common

11  symptoms.  These would all be the exact symptoms that are on

12  there for mild traumatic brain injury.

13  Q.   I interrupted you.  Please finish with those symptoms, if

14  you would.

15  A.   And then she talked about how when she tried to return to

16  work, that she couldn't follow the conversations, she

17  mispronounced the names, and all the challenges that she had

18  when she did try to return to work for the time that she was

19  trying to return to work.

20        I then talked about how that although she does have

21  life stressors, including stressors with her child and with her

22  husband, these had been prior to 8/5/2012, and it never stopped

23  her from her profession or success.  She had been the sales

24  representative of the quarter from Shire Pharmacy in the months

25  prior to her injury.  I think that really speaks about what she

1    was like prior to her injury, which is certainly an important

2    consideration in my evaluation of her.

3         I then talked about how CT scan and standard MRIs

4    wouldn't have the resolution needed to see the external damage

5    that I would expect from the injury that Ms. Irwin --

6    Q.   Could you slow down a little bit because you're reading,

7    and I know that you're going fast.

8    A.   Sure.  I noted then that CT scan and MRI wouldn't have the

9    resolution, the standard MRI, at least, wouldn't have the

10   resolution to look for the white matter damage that I would

11   expect from such an injury that she sustained on 8/5/2012; and

12   I talked a little bit about then that it's the white matter

13   damage that we see on the MRI --

14        MR. LAWLER:  Objection.  Your Honor, request a

15   sidebar.

16   SIDEBAR CONFERENCE:

17        MR. CHARNAS:  I'll try to refocus him.  I get it.

18        MR. LAWLER:  No, no, no, that's not it.

19        MR. CHARNAS:  Oh.

20        MR. LAWLER:  Well, that's part of it.  The other part

21   is, though, he's about to testify about these DTIs, these

22   advanced MRIs.  He has no real expertise in this particular

23   field.  Dr. Benson is coming in tomorrow to talk about this.  I

24   can show you the pages in the deposition where when I'm

25   questioning Dr. Greenwald and I'm getting into the specifics

1  about FA and the way they do these particular DTIs and all

2  that, that he basically says --

3       MR. CHARNAS:  Here's what's going to be the evidence,

4  Judge:  In his clinical practice, he relies regularly on DTIs;

5  that he doesn't understand the FAs and the things that

6  Dr. Benson does, just like I don't understand how an X ray

7  works.  But he uses it every day in his clinical practice, and

8  he's going to testify that after he came to a diagnosis, he

9  looked at the DTIs scans and they confirmed his diagnosis.  If

10  he uses it in his clinical practice every day, how can you

11  say he can't use it in the courtroom?

12       MR. LAWLER:  When I questioned him at his deposition,

13  and I can cite it, I started asking him questions about the

14  whole procedures and all that, and he said, "Mr. Lawler, ask

15  Dr. Benson.  You're going to depose him.  I don't know what

16  you're talking about," basically.

17       Now, in addition to that, he basically says that he

18  cannot tie in the DTIs -- the DTIs are these advanced MRIs --

19  we know about that -- he cannot tie that into the August 5,

20  2012 incident.  He cannot.  He cannot do it.  He said that.

21       MR. CHARNAS:  Judge, we're revisiting the same

22  argument about keeping Dr. Benson off.  The Court has already

23  ruled.

24       THE COURT:  I will allow him to testify to the fact

25  that he made a diagnosis, and it was corroborated by what he

1    understood the results of the DTIs were.

2            MR. CHARNAS:  That's all he's going to do.

3            MR. LAWLER:  But, no, and I want this on the record,

4    please.  In addition to that, Dr. Greenwald in his deposition

5    says that he cannot tie in -- as we know, there's been several

6    other concussions -- so he cannot tie the readings of the DTIs

7    that were done by Dr. Benson into the August 5, 2012 incident.

8    Then, therefore, therefore, the probativeness of that

9    particular testimony is minimal, and the prejudicial value is

10   extreme because you're basically not able to have the jury hear

11   that she has all these white matters, and they have no

12   information to go on --

13           THE COURT:  They are going to hear about the white

14   matters tomorrow.

15           MR. LAWLER:  I know, but that's one thing.

16           MR. CHARNAS:  This is the same argument that was made

17   to keep Dr. Benson's testimony out.  The Court has already

18   ruled on that.  I'm only going to ask him if just as the chart

19   says --

20           THE COURT:  And then you can cross-examine him.

21           MR. LAWLER:  Oh, I plan to, but what he's doing is,

22   basically he's just regurgitating what Dr. Benson says, so it's

23   cumulative.

24           THE COURT:  He can't do that.  What he can say is that

25   he looked at it, he made his diagnosis, and then he had

1    Dr. Benson's results, and based on his experience, that

2    corroborates, but that's it.

3              MR. CHARNAS:  That's it.  That's all I'm doing.

4              MR. LAWLER:  That's fine.  Thank you.

5              (End of sidebar conference.)

6    BY MR. LAWLER:

7    Q.   Doctor, let's get back to the symptoms of mild traumatic

8    brain injury that you saw in Mrs. Irwin.  Please continue.

9    A.   Okay, I'm saying that the impairments and symptoms that

10   she has, including the cognitive impairment, the mood

11   impairment, fatigue, the headaches, the sensitivity to light

12   and noise, and the dizziness, were secondary to the white

13   matter damage that she had from 8/5/2012.  There was no

14   evidence from her prior concussions that she had any sequelae

15   or any problems from them.  She was functioning well as the

16   mother of three children and a successful salesperson prior to

17   her injury.  And then I discussed that given her complex

18   impairments that she had, I do not believe she would be able to

19   return to a competitive sales position; that if she were able

20   to return to work, that she would need a structured, slow-paced

21   position that would secondarily be less financially rewarding.

22             I then went over the future medical needs that I

23   believe that she has as a result of the injuries that she

24   sustained on 8/5/2012.

25   Q.   Well, we'll get to that in a second.  By the way, I

1    neglected to ask you, your diagnosis of mild traumatic brain

2    injury, do you hold that to a reasonable degree of medical

3    certainty?

4    A.    Yes, I do.

5    Q.    Now, the symptoms that you've gone over for us, do you

6    have an opinion as to whether those symptoms are consistent

7    with mild traumatic brain injury?

8    A.    They are consistent with mild traumatic brain injury.

9    Q.    And the basis of that again is what?

10   A.    These are the core symptoms that we see.  A, she was

11   diagnosed with mild traumatic brain injury based on the

12   clinical criteria that I discussed earlier.  B, she's had a

13   consistent set of both impairments and symptoms that have been

14   noted by her clinicians that have treated her, but, C, then the

15   findings on my own examination.

16   Q.    Doctor, what does the term "objective evidence" mean?

17   A.    It's something that if two people looked at the same

18   thing, they should be able to come to the same conclusion.

19   Q.    Is it something that can't be faked?

20   A.    That is, correct.

21   Q.    So, Doctor, did you determine whether there was any

22   objective evidence of mild traumatic brain injury?

23   A.    When you say of mild traumatic brain injury, do you mean

24   the sequelae or that actually --

25   Q.    Either one.

1    A.    Objective evidence, well, one, radiology is obviously

2    objective evidence.  I know Dr. Benson is going to be

3    testifying on that.  I'm okay not to go into detail with that

4    if you'd prefer.

5    Q.    Well, we'll talk about the DTI in a moment, but other than

6    that.

7    A.    I'll leave that to the side for the moment.  Certainly on

8    examination, there is clear evidence that when you speak with

9    her about her inability to maintain a topic, her slow in

10   processing and asking questions of her, on her physical

11   examination, particularly looking at her extraocular movements,

12   which are so commonly impaired in people with vestibular

13   impairment -- she nearly fell with just doing some extraocular

14   muscle testing -- again, objective evidence on examination of

15   the impairments that she has, and very consistent also with the

16   complaints that she has or the symptoms that she has.

17   Q.    There's a reference in Dr. Collins' record to saccades, if

18   I'm pronouncing that right.  What are saccades?

19   A.    Saccades is really the eye movement from left to right,

20   which is generally smooth as you're looking across the room.

21   It's not like your eyes are jumping that way.  They're actually

22   smoothly going from left to right, although you may vary how

23   quickly you do that, where in her case, you can see on

24   examination that her saccaads (Phon) --

25   Q.    Sorry.

1  A.    -- are abnormal, and is part of the reason that she, when

2  I was doing her extraocular muscular testing, she nearly fell.

3  Q.    Now, Doctor, once you confirmed the diagnosis of mild

4  traumatic brain injury, did you do anything to corroborate that

5  diagnosis?

6  A.    That's the comprehensive record review that we did, the

7  evaluation from the neuropsychological testing, but really the

8  diagnosis is made on those clinical criteria.

9  Q.    Once you made that diagnosis, did you see a diffuse tensor

10 imaging scan or scans?

11 A.    I did.

12 Q.    Okay, now, I know you're not the expert in diffuse tensor

13 imaging, also called DTI, but do you use DTI in your clinical

14 practice?

15 A.    In my clinical practice, I commonly will order an MRI with

16 diffusion tensor imaging.

17 Q.    Can you give the jury just a general understanding of what

18 DTI is.

19 A.    Sure.

20        MR. LAWLER:  Objection.

21        THE COURT:  Sustained.  Ask him why he orders it.

22 Q.    Why do you order it?

23 A.    Well, it goes back to why a standard CT scan and a

24 standard MRI are not useful is why I order that specifically.

25 So standard CT scan really does a good job at looking at bone,

1    it looks at large hemorrhages, but is not very good at looking

2    at the brain tissue.  In our little heads, there's about a

3    hundred billion axons.  Axons are the telephone wires that

4    bring information around the brain.  So you can imagine, if

5    there's a hundred billion in our heads, that they're

6    microscopic in width.

7          Secondarily, when we do a standard MRI of someone's

8    head where we're just looking grossly at their brain tissue, it

9    gives us no information about, one, about the structure of the

10   axons, these microscopic tubes, but, two, it tells us nothing

11   about their function at all.  An MRI with diffusion tensor

12   imaging is a technique that allows us to look for white matter

13   damage which wouldn't be evaluated on standard scans, so it

14   gives us an advantage that way.

15   Q.   Doctor, you mentioned diffuse axonal injury.  I think you

16   had chart that might be useful for the jury, if we could have

17   that on the screen.

18          MR. LAWLER:  Objection, your Honor.

19          THE COURT:  What's the basis?

20          MR. LAWLER:  What we talked about at sidebar and what

21   the instructions were to the witness.

22          THE COURT:  All right, let's talk over here.

23   SIDEBAR CONFERENCE:

24          MR. CHARNAS:  First of all, I've shown this to the

25   opposing party.  He said it was okay.  That's the first thing.

1    The second thing, it shows diffuse axonal injury.  It's got

2    nothing to do with DTI.

3           MR. LAWLER:  Well, I think it does completely have to

4    do with DTI because that's what DTI shows.  It was my

5    understanding when we were here five minutes ago that you

6    instructed him to say basically that he sent this information

7    to Dr. Benson so he could corroborate it, and that's it.  And

8    so now we're getting into all this explanation --

9           THE COURT:  Does this have anything to do with DTI?

10          MR. LAWLER:  Well, that was my understanding.  If I'm

11    mistaken, then I'm mistaken.

12          MR. CHARNAS:  It shows axonal injury and shearing

13    injury.

14          MR. LAWLER:  But that's what DTI shows.

15          MR. CHARNAS:  -- we can talk about the brain because

16    the DTI shows it.

17          THE COURT:  He's not talking about DTI.  He's talking

18    about -- he shouldn't talk about DTI, but he can talk about the

19    brain.

20          MR. CHARNAS:  He's talking about what happens when you

21    have brain injuries, you have diffuse axonal injury.  He's

22    going to talk about that.  Now, DTI shows the diffuse axonal

23    injury, but that doesn't mean he can't talk about it.

24          THE COURT:  Okay, well, then go into it.

25          (End of sidebar conference.)

BY MR. CHARNAS:

Q.    Can you see that, Doctor?

A.    I can.

Q.    What are we looking at here?

A.    This is an educational model that I've used in trying to explain what diffuse axonal injury is.  It gives you an idea of the brain there, you can see on the left.  If I draw on this, will it come up?

Q.    Yes.

A.    Okay.  Here's this crazy-looking structure that is our brain that controls everything we are, all our memories, all our mood, our vision, our hearing.  Everything ours is in this crazy-looking structure here, the brain.

        With that said, as I was mentioning, in that brain is about 100 billion axons.  Axons are the telephone wires that bring information around the brain.  That's sometimes called the white matter.  The gray matter sits on the outside of our brain.  The gray matter is all the little computer cells that allow me to speak and allow you to understand the information.  Here on the right side -- you can appreciate this -- is an enlarged version of what axons would look like if they were in a bundle.  Again you can see here sort of at the edge this purple area here is the gray matter, the little cell bodies; and the axons, also called the white matter, are coming off of them, again, taking information to different parts of the

1  brain.

2          Now, remember that the skull itself is very hard, or

3  at least mine is, but inside the brain is soft.  It's like

4  formed Jell-O.  So when enough pressure, enough force is

5  applied to the skull, it's not hard to injure the brain

6  underneath.

7          Primarily the injury in a mild brain injury or in a

8  concussive injury like this is to the white matter, is both

9  shearing, meaning a mechanical force to the white matter, a

10 stretching of the white matter, but then also goes on to be

11 what's called a neurometabolic injury, meaning an injury, an

12 inability then of those axons, those telephone wires, to bring

13 information down those axons.  When that occurs, that brings on

14 the symptoms and the impairments that would commonly occur.

15 This has been understood for some time but is really understood

16 much better over this last ten years as we've done so much more

17 research on our injured veterans and our injured athletes.

18 Q.  When someone sustains mild traumatic brain injury, is it

19 just the immediate structural damage to the brain that creates

20 symptoms for the person who has that injury?

21 A.  The structure is actually the first part of it, and it's

22 that stretching of those axons as the forces goes from the

23 skull and into the soft tissue of the brain.  Really, that

24 starts off a neurometabolic cascade, which injures both the

25 cytoskeleton, the skeleton of the axons, the skeleton of that

1    telephone wire, but also what's called the myelin sheath, which

2    is the insulation around that axon; and sort of like a

3    telephone wire or an electrical wire, if the sheath, the

4    insulation around it is injured, it's certainly not going to be

5    able to conduct that information or that electricity well.  No

6    different of what we see in mild brain injury when the axons

7    are injured and the insulation of that axon is injured due to

8    the forces that we were talking about, the information is not

9    able to be sent back and forth down those axons.  So the axons

10   are still sitting here.  It's not like we're saying that

11   they've died off.  They're just not able to move the

12   information around the brain.

13   Q.   You mentioned the term "neurometabolic cascade."  What did

14   you mean by that?

15   A.   So what's happening, it's not such a simple process as

16   when electricity is going down a copper wire and the electrons

17   are just moved down the wire.  It's a very complex process

18   that's going on as information is brought down the axon, and

19   that involves a number of different microscopic parts inside

20   that axon.  That shearing injury to the axon, that pressure on

21   the axon, causes injury for the ability to move that

22   information down the axon, sometimes causing abnormality of the

23   neurometabolic cascade.

24   Q.   Thank you.  Dr. Greenwald, so in your practice, you

25   sometimes ask for DTI to be done; is that correct?

A.    Yes.  I'll sometimes send people for not just the standard MRI but MRI with diffusion tensor imaging to allow me to look at damage in the white matter.

Q.    And how long have you been doing that?

A.    I'd say it's been at least ten years.

Q.    And did you look at DTI in regard to Megan Irwin?

A.    I did.

Q.    And who did the DTI analysis?

A.    That was Dr. Randall Benson.

Q.    And did that DTI confirm your diagnosis of mild traumatic brain injury?

A.    It was consistent with my diagnosis.

Q.    And tell us the basis of your answer.

A.    Again, in someone with a mild brain injury, the injury is generally to the white matter.  So if I had not seen any white matter damage, it would have made me think that there is some sort of other psychological component or some other reason that she'd come up with such a set of symptoms.  Knowing both that she was functioning well prior to her injury, clearly had an injury that would cause such white matter damage, had symptoms immediately afterwards, has sustained symptoms since, it further corroborated my diagnosis of mild traumatic brain injury.

Q.    Now, like an X ray, if you look at the DTI scan, can you tell when the brain damage occurred?

1   A.    You could not tell.  It does not give you a time to it.

2   It's not time stamped.

3   Q.    So how did you come to the conclusion that that brain

4   damage that showed up in a DTI was caused by this incident?

5           MR. LAWLER:  Objection.

6           MR. CHARNAS:  Let me withdraw that.

7   Q.    Do you have an opinion as to whether the traumatic brain

8   injury suffered by Megan Irwin is causally related to the

9   incident of August 5, 2012?

10  A.    I do.

11  Q.    And do you hold that opinion to a reasonable degree of

12  medical certainty?

13  A.    Yes, I do.

14  Q.    And what is that opinion?

15  A.    That Megan Irwin had no evidence that she had any

16  impairments or any of the large set of symptoms --

17  Q.    Well, before you tell us the basis, what's your opinion?

18  A.    My opinion is that Ms. Irwin sustained a traumatic brain

19  injury on 8/5/2012 and has substantial impairment as a result.

20  Q.    And what's the basis of your opinion?

21  A.    Is my record review, including the MRI with diffusion

22  tensor imaging, my interview and examination.

23  Q.    Now, Doctor, are you aware that she had prior concussions

24  before August 5, 2012?

25  A.    I am.

1  Q.   And how do you know that these prior concussions aren't

2  what's causing her symptoms?

3  A.   Well, there's no evidence that she had any of these

4  symptoms.  There's certainly no evidence that she had any of

5  these impairments despite the previous concussions and

6  stressors in her life.  There's no evidence that anything minus

7  this injury itself was the cause of these impairments.

8  Q.   Well, are you aware that she had prior instances of

9  anxiety, at least one prior instance of fatigue?  Are you aware

10  of these things?

11  A.   I am.

12  Q.   And that she had prior headaches from time to time, are

13  you aware of that?

14  A.   I did note that.

15  Q.   So does that affect your opinion?

16  A.   It does not.

17  Q.   Why?

18  A.   I know that there's individual instances of mention of her

19  feeling fatigue in her records, and I reviewed extensive

20  records over time.  I know that there's individual instances of

21  noting headaches, but there's no, A, there's no diagnosis;

22  there's no chronicity to those symptoms.  Unlike what we've

23  seen since 8/5/2012 where she's consistently been noted to have

24  these impairments and symptoms, that wasn't true of any of the

25  records prior to 8/5/2012.

1  Q.    Doctor, do prior concussions make one more susceptible to

2  more severe and/or longer-lasting symptoms in the event of a

3  subsequent concussion?

4  A.    There's good evidence for that, that having had one

5  concussion, and each successive concussion puts you at higher

6  risk of symptoms for that.  There's very good data, especially

7  from our athletes, showing that there is cumulative effects of

8  concussion, and that there may be even a threshold above and

9  beyond that it may not be worth it to participate in athletics,

10 and therefore that it would increase your risk of permanency to

11 the symptoms.

12 Q.    Doctor, in the course of your evaluation of Megan Irwin

13 and writing a report in this case, did you make any

14 recommendations for future treatment?

15 A.    I did.

16 Q.    And tell us, what recommendations did you make?  And this

17 is back in the spring of 2014, I believe, correct?

18 A.    That is correct.  I recommended that Ms. Irwin be treated

19 by a specialist in the care of traumatic brain injury, someone

20 like myself.  I recommended that she have cognitive remediation

21 by a neuropsychologist to maintain compensatory strategies for

22 cognitive impairments.  I recommended that she have family

23 counseling with her husband to educate her husband and assist

24 with the change of their relationship, given her functional

25 limitations.  I recommended that she have vestibular therapy.

1    I recommended pharmacologic treatment of her fatigue and

2    cognitive impairment and mood impairment, and I gave specific

3    recommendations for that.

4        I recommended that she have an evaluation by a neuro-

5    optometrist for her traumatic brain injury and these visual

6    impairments.  I recommended that she have childcare to assist

7    while she's engaged in therapies, and that she have vocational

8    evaluation when her symptoms are better controlled and her

9    impairments are lessened.

10   Q.   Doctor, have you had an opportunity to review additional

11   medical records on Mrs. Irwin since you saw her in the spring

12   of 2014?

13   A.   Yes, I have.

14   Q.   And has she made any improvement?

15   A.   The records that I saw discussed the ongoing impairments

16   and symptoms that she had similar to when I had seen her in

17   March of 2014.

18   Q.   Doctor, do you know what a vocational counselor is?

19   A.   Yes, I do.

20   Q.   Are you a vocational counselor?

21   A.   I am not.

22   Q.   Do you have an opinion as to any type of labor that

23   Mrs. Irwin would be suited for?

24   A.   Given her current constellation of symptoms and

25   impairments, I couldn't imagine a job that she would be able to

1    do.

2           MR. LAWLER:  Objection.  Sidebar, please.

3           THE COURT:  If I sustain the objection, could we skip

4    the sidebar?

5           MR. LAWLER:  Could I have the answer stricken, please?

6           THE COURT:  The objection is sustained, and the answer

7    is stricken.

8           MR. LAWLER:  Thank you.

9    Q.   Doctor, generally speaking, what does the term "prognosis"

10   mean?

11   A.   The likelihood of something getting better or worse.

12   Q.   And do you have a prognosis for Megan Irwin?

13   A.   That Ms. Irwin's symptoms are permanent, that I wouldn't

14   expect them to show any further improvement, and her

15   impairments are permanent.

16   Q.   What's the basis of your opinion that her impairments and

17   her mild traumatic brain injury are permanent?

18   A.   Well, it's generally considered in the medical field that

19   after about a year of time, the brain will have fully recovered

20   as much as it can.  What we see in times of improvements beyond

21   a year is generally more compensatory in nature, as in learning

22   ways, work-arounds, more than actually the brain tissue itself

23   improving.  I would say that that said, now that it's been

24   three years or more than three years since her injury, or even

25   two years when I had seen her at that point, her brain injury

1    impairments would be considered permanent.

2            MR. CHARNAS:  Thank you.  That's all I have, Doctor.

3            MR. LAWLER:  Thank you, your Honor.  It's just going

4    to take me a second to set up.

5    CROSS-EXAMINATION BY MR. LAWLER:

6    Q.   Good afternoon, Doctor.  John Lawler.  We met about a year

7    ago.

8    A.   Good to see you again.

9    Q.   How are you?

10   A.   I'm doing okay.

11   Q.   Doctor, when were you retained in this particular case?

12   A.   It was in the months prior to March 10, 2014.

13   Q.   And as part of your work in this particular case, you

14   completed a report; is that correct?

15   A.   That is correct.

16   Q.   And that report is dated April 25, 2014, right?

17   A.   That's correct.

18   Q.   And, Doctor, do you have that in front of you?

19   A.   I do.

20   Q.   Now, this report basically articulates your opinions as of

21   April 25, 2014, correct?

22   A.   That's correct.

23   Q.   And it also articulates what type of work you did on this

24   particular file, right?

25   A.   In this report?

1  Q.    Yes.  I mean, this -- well, first of all, do you do any

2  other expert testifying in medical legal cases?

3  A.    I do.

4  Q.    And how long have you been doing that for?

5  A.    Since about 2003 or 2004, so about ten years or so.

6  Q.    Okay.  And obviously, I mean, you were retained in this

7  particular case by Attorney Charnas, correct?

8  A.    That's correct.

9  Q.    And you charge a fee for your hourly services, right?

10  A.    That's correct.

11  Q.    And your fee in reference to this particular case was $700

12  an hour; is that right?

13  A.    Actually, it was $600 an hour for this work that I have

14  done on this case.

15  Q.    Okay.  And then when I deposed you last year for

16  approximately five to six hours, you charged me $6,000,

17  correct?

18  A.    No.

19  Q.    How much did you charge?

20  A.    Let me take a look, but it was $700 an hour.  I believe it

21  was around $3,500.

22        (Witness examining document.)

23  A.    Let's see.  I'm sorry, you're right.  It was $4,900.

24  Q.    Okay.  I have in my hand a fee schedule for you, and you

25  obviously created that, correct?

1    A.    That's correct.

2    Q.    And it's safe to say that for today, to testify in Boston

3    in this particular case this afternoon, you charge $10,000; is

4    that right?

5    A.    That's correct.

6    Q.    And in this particular case, you spent approximately eight

7    hours of work on this particular case, is that right, up until

8    the time you completed the report?

9          (Witness examining document.)

10   A.    That's correct.

11   Q.    And of that eight hours, you essentially reviewed records

12   and completed your report, and that took about seven hours, and

13   then for the eighth hour, you met with Mrs. Irwin, correct?

14   A.    That sounds correct.

15   Q.    So essentially what you did was, you reviewed reports and

16   records, and then you completed your report, and you saw

17   Mrs. Irwin, and you did that all in eight hours; is that right?

18   A.    That sounds correct.

19   Q.    Now, as I said before, you've been an expert witness on a

20   regular basis since 2004; is that correct?

21   A.    Approximately, yes.

22   Q.    Okay.  And you talked about different businesses that you

23   were involved in early in the direct examination.  You

24   remember, right?

25   A.    Yes.

1    Q.    Remember that?  Okay, you didn't mention that you have a

2    separate corporation called -- what is it, Brian Greenwald,

3    LLC, limited liability corporation?

4    A.    That's the corporation that does these medical legal

5    evaluations.

6    Q.    Okay.  And in your work, you primarily work for plaintiffs

7    like Mrs. Irwin, correct?

8    A.    That is correct.

9    Q.    And in regard to your examination and work in regard

10   Mrs. Irwin, it's safe to say that you never talked to any of

11   her family members?  You just spoke to Mrs. Irwin, right?

12   A.    That's correct.

13   Q.    Okay.  How much time have you spent between the time you

14   completed your report and excluding the time that you did the

15   deposition, how much time have you spent on this particular

16   case?  Do you have a record of that?

17   A.    So since I completed the report and excluding the

18   deposition, is that correct?

19   Q.    Right.

20   A.    I reviewed -- yesterday I reviewed the new records and

21   then looked over my report, so I spent about, in this last 24

22   hours, probably spent another two hours in looking over

23   information.

24   Q.    Okay, so just so I can, you know, clarify this for the

25   ladies and gentlemen of the jury, you completed your report on

1    April 25, 2014, correct?

2    A.    Correct.

3    Q.    And by reviewing records, completing the report, and

4    meeting with Mrs. Irwin, that totaled eight hours, right?

5    A.    That's correct.

6    Q.    And other than being deposed in the case, the next time

7    you did any work on this particular case was yesterday; is that

8    right?

9    A.    Actually, there was an affidavit that was created in

10   between.

11   Q.    Okay.  And when was that affidavit created?

12   A.    Let's take a look.

13            (Witness examining document.)

14   A.    It was in April of 2015.

15   Q.    Okay.

16   A.    That was one hour worth of work.

17   Q.    So let's go back to the first page of your report.  Except

18   for the records that you reviewed yesterday, the report

19   specifies the records that you received and reviewed up until

20   yesterday, correct?

21   A.    I had received the additional records prior to yesterday,

22   but I reviewed them yesterday.

23   Q.    Okay.  So the first record was the Cohasset Fire

24   Department Ambulance Report, right?

25   A.    Correct.

1    Q.   And then there was a report from the South Shore Hospital,

2    and that was the one dealing with the treatment of Mrs. Irwin

3    on August 5, 2012, right?

4    A.   Correct.

5    Q.   Then there's a report from Dr. Dexter Sun?

6    A.   There's extensive records from him.

7    Q.   Okay.  Also some records from Dr. Jason Brown and

8    Dr. Michael Collins.  I think they were two individuals out of

9    Pittsburgh.  Is that right?

10   A.   No.  Dr. Brown is in New York, and Dr. Collins is in

11   Pittsburgh.

12   Q.   Okay.  And then NYU Langone, right?

13   A.   Correct.

14   Q.   And then Dr. Laura -- and I'm not going to do very well

15   with this name -- Noeleski?

16   A.   Correct.

17   Q.   And then Dr. Meredith Lash, right?

18   A.   Right.

19   Q.   And then Dr. Jennifer Sontz, correct?

20   A.   Correct.

21   Q.   And then Dr. Aaron Pearlman, right?

22   A.   Right.

23   Q.   And then Dr. Michael Stewart, right?

24   A.   Correct.

25   Q.   Okay, those were the only medical records that you

1    reviewed in regard to this particular case, right?

2    A.    Actually, the records also of Dr. David Stone.

3    Q.    Oh, I'm sorry.  I'm sorry.  Thank you.  There's a bunch of

4    different answers to interrogatories and statements, but the

5    last one is records from David Stone, right?

6    A.    That's correct, yes.

7    Q.    So those were the records that you looked at and

8    considered before you wrote this particular report, right?

9    A.    That's correct.

10   Q.    Now, in regard to your examination of Mrs. Irwin, what day

11   did that take place on?

12   A.    That was on March 10, 2014.

13   Q.    And where was that evaluation held?

14   A.    That was done at Rehabilitation Specialists in Fairlawn,

15   New Jersey.

16   Q.    Okay.  And Mrs. Irwin came to that evaluation by herself;

17   is that right?

18   A.    That's correct.  She was taken by taxi to that evaluation.

19   Q.    Okay, but did she come by herself?

20   A.    She came by herself, yes.

21   Q.    And was there anybody else present during your evaluation,

22   or is it just you and Mrs. Irwin?

23   A.    Just me and Ms. Irwin.

24   Q.    Now, in reference to your report, I want to draw your

25   attention to Page 18.  And, by the way, Doctor, how many pages

1   is your report?

2   A.   My report is 30 pages.

3   Q.   How long does it take you to create a report like this,

4   three or four hours?

5   A.   I think we discussed it already.  It was a total of eight

6   hours, minus the hour for evaluating her.

7   Q.   Well, that includes the record review, right?

8   A.   The way I do the record review is, I dictate it out into a

9   Dictaphone.  Then it goes off to be typed up.

10  Q.   Okay.  So on Page 18 and then Page 19, you list a number

11  of current problems caused by injuries sustained on August 5,

12  2012, right?

13  A.   That's correct.

14  Q.   Okay.  And then you list under that category essentially

15  twelve symptoms or problems; is that right?

16  A.   Impairments and symptoms, yes.

17  Q.   Okay.  So stay with me on this one.  So you go down the

18  list:  "Headaches, dizziness, feeling of being foggy,

19  irritability, fatigue, tiredness, difficulty with organization

20  and planning, anxiety, easily overwhelmed, sensitivity to light

21  and noise, frustration over not recovering it, difficulty with

22  word finding," and then "deviated nasal septum and recurrent

23  sinus infection."  I read those, right?

24  A.   You did well.

25  Q.   Well, I didn't do a great job, okay.  Good enough.  So the

1    next sentence in your report states, "Prior to August 5, 2012,

2    she was not having any symptoms as above," right?

3    A.    Correct.

4    Q.    Okay.  And I assume when you use the word, the pronoun

5    there "she," you mean Mrs. Irwin; is that correct?

6    A.    Yes.

7    Q.    And tell me, Doctor, when it basically says, "Prior to

8    August 5, 2012, she was not having any symptoms as above," is

9    that her telling you that, or is that your diagnosis or your

10   opinion or your impression?

11   A.    Well, that's not part of my impression.  That was my

12   asking her the problems that we were discussing, that we just

13   discussed, the last twelve issues that we discussed, "Were you

14   suffering from any of these prior to 8/5/2012, certainly on a

15   regular basis?" and she said "No."

16   Q.    Okay.  So you go through all these twelve categories, and

17   Mrs. Irwin basically says, "Doctor, I didn't have any of these

18   before the August 5, 2012 incident," is that right?

19   A.    No.  Actually, I don't go through that much.  This is an

20   open-ended question:  "Tell me the problems that you have been

21   having since 8/5/2012."  I don't actually say, "Do you have any

22   irritability?"  It's not like that.

23   Q.    But would you agree with me that you say, after the

24   listing of those twelve items, that it says, "Prior to

25   August 5, 2012, she was not having any symptoms as above"?

1    A.    That's correct, that's what it says.

2    Q.    Okay.  And so going back to the page in front of that,

3    which is Page 18, the first item is "headache," okay?  And you

4    reviewed the records of Dr. Lash, correct?

5    A.    Correct.

6    Q.    And you remember, for instance, that there is talk in 2008

7    about Mrs. Irwin striking her head and then having basically a

8    concussion, and, as a result of that, having headaches for a

9    number of months, right?

10   A.    I know it said that she had a headache immediately

11   afterwards.

12   Q.    Okay.  You don't remember the record that indicates that

13   she had the headaches for several months after that?

14   A.    I saw that there are records that say that she did have

15   headaches for a period of time afterwards, which had abated or

16   stopped.

17   Q.    Okay.  Are you also aware that in December of 2011, that

18   Dr. Lash also treated Mrs. Irwin for headaches at that

19   particular time?

20   A.    That she treated or as noted as one of her complaints?

21   Q.    Well, it was noted as one of her complaints.  Does that

22   sound familiar to you?

23   A.    I know that there are individual instances of that

24   throughout the records, yes.

25   Q.    Okay.  And so the next item is dizziness.  Can we put them

1    on the board just one after the other.  So the first one was

2    headaches.  The second one is dizziness.  Now, did you do any

3    tests to determine dizziness?

4    A.    I did.

5    Q.    Okay, is there a test called the nystagmus?

6    A.    It's not a test.

7    Q.    Okay.  What is nystagmus?

8    A.    Nystagmus is looking at jerky eye movements as you're

9    moving from one side of your eye field to the other.

10   Q.    Okay.  And does nystagmus deal with dizziness?

11   A.    You can get dizziness from nystagmus.

12   Q.    Okay, so explain to the jury how you do the test for

13   nystagmus.

14   A.    So you ask the person to look at your finger.  You ask

15   them to move to the left and move to the right, and you watch

16   the eye movement as it goes through.  That's what we were

17   talking about earlier, that saccades versus saccaads (Phon),

18   but, again, looking at sort of the smoothness of the pursuit,

19   and I did that, and the abnormalities on her exam are noted in

20   my record.

21   Q.    Okay.  But in regard to nystagmus, there was no nystagmus,

22   right?

23   A.    I did not see nystagmus.

24   Q.    Okay.  And nystagmus is an objective test; is that right?

25   A.    It's an objective finding, but it's not a test.

1  Q.   Okay, it's an objective finding?

2  A.   Correct.

3  Q.   Because you can see it or not see it, right?  Basically is

4  that it?

5  A.   Correct.

6  Q.   Okay.  And Mrs. Irwin did not have nystagmus, correct?

7  A.   Correct.

8  Q.   Now, irritability, were you aware that Mrs. Irwin suffered

9  from irritability and anger issues prior to August 5, 2012?

10  A.   On a chronic basis, or did she feel that only when she

11  didn't have coffee?

12  Q.   I'm sorry, I didn't get that.

13  A.   Did she feel chronically irritable on a chronic basis or

14  only when she didn't have coffee?

15  Q.   Okay, I mean on a chronic basis, not when you miss your

16  coffee in the morning.

17  A.   And I feel that way sometimes.  I did not see throughout

18  the records that she had chronic irritability.

19        MR. LAWLER:  Could we pull up 41-A, please.

20  Q.   Doctor, you had a chance to look at some of the records

21  from a Dr. Sontz, correct?

22  A.   Correct.

23  Q.   And you would agree with me that Dr. Sontz is a

24  psychologist who treated Mrs. Irwin starting on February 16,

25  2012, till September 11, 2012, right?

1    A.    That's correct.

2    Q.    Okay.  And have you reviewed all of her records?

3    A.    I reviewed, I believe, all of her records.

4    Q.    Okay.  Were you aware that Mrs. Irwin was diagnosed in

5    February of 2012 by Dr. Sontz as suffering from an adjustment

6    disorder with mood and anxiety issues?

7    A.    I'm aware of what an adjustment disorder is.  I don't know

8    that ICD-9 code specifically.

9    Q.    Okay, you're not aware of the 309.28?

10   A.    My knowledge base is large, but I am not specifically

11   aware of 309.28.

12          MR. LAWLER:  May I approach, your Honor?

13          THE COURT:  Yes.

14   Q.    Do you work with DSM-V at all?

15   A.    I'm familiar with DSM-V.  I'm not a psychiatrist, but I'm

16   familiar with it.

17   Q.    Can I step up there.

18   A.    Oh, please.

19   Q.    Thank you.  So I'm showing you right here.  This is

20   Adjustment Disorders, correct?

21   A.    Uh-huh.

22   Q.    Okay.  And you see 309.28?

23   A.    Let me see it.

24   Q.    Okay.  Well, you can certainly read it to the jury.

25   A.    The important part about adjustment disorder --

1  Q.   No, no, no.  I'm asking the questions.

2  A.   Okay.

3  Q.   Okay.  So it's 309.28.  I can take it back because --

4  A.   Sure.

5  Q.   With all due respect.  It says "Adjustment disorder with

6  mixed anxiety and depressed mood," correct?

7  A.   That's correct.

8  Q.   Okay.  And you'd agree with me that it also says, "A

9  combination of depression and anxiety is predominant," right?

10  A.   It's true, that does say that.

11  Q.   So first and foremost, I understand that it's your opinion

12  that Mrs. Irwin had some prior concussions prior to August 5,

13  2012, right?  You know that, right?

14  A.   I'm aware.

15  Q.   Okay.  And it's your opinion that none of her symptoms

16  that existed, for instance, in February of 2012 are related to

17  those earlier concussions, right?

18  A.   Both my opinion and reflected in the medical records.

19  Q.   Right, right, but you'd agree with me that people suffer

20  from depression and anxiety when they don't have a brain

21  injury, when they don't have trauma to the brain, right?

22  A.   They can, yes.

23  Q.   Okay.  I mean, unfortunately, you know, some people's

24  lives, they're tough, and they have difficult situations, and

25  they have problems, right?

1    A.    Yes.

2    Q.    Right.  It has nothing to do with a brain injury at all,

3    right?

4    A.    Yes, that is true.

5    Q.    So, for instance, you would agree with me that Mrs. Irwin

6    had depression and anxiety problems that were related to

7    problems in her life at that particular time; namely, being

8    married to a person who was abusive and an alcoholic, to having

9    three children under five and not a very supportive husband, to

10   having a job that was overwhelming?  You'd agree with me,

11   right?

12   A.    There's some piece I would agree with that, and then the

13   other piece I couldn't agree with.

14   Q.    Okay, I got carried away.

15   A.    You did, you did.

16   Q.    I'll come back to it.

17   A.    Okay.

18   Q.    All right, so, like, an adjustment disorder can be over a

19   particular event, right?

20   A.    An adjustment disorder is generally considered over a

21   short period of time, not a chronic thing, which is the

22   important part to realize about adjustment disorder.

23   Q.    All right.  And at some point, if an adjustment disorder

24   goes longer than six months and you have depression and anxiety

25   continuing, then it becomes another type of disorder; like, for

1    instance, a major depressive disorder or something like that,

2    right?

3    A.   Well said, yes.

4    Q.   Okay.  So in this particular case, the Diagnostic -- you

5    agree, the DSM-V is basically the bible of mental disorders,

6    the manual of mental disorders, right?

7    A.   I'm questioning the term "bible," but it is a resource for

8    that information.  That 309.28 is actually the ICD-9 code for

9    it.

10   Q.   Okay.  And would you agree with me, "The presence of

11   emotional or behavioral symptoms in response to an identifiable

12   stressor is the essential feature of an adjustment disorder,"

13   correct?

14   A.   That's correct.

15   Q.   "And the stressor may be a single event," and it gives an

16   example, a termination of a romantic relationship, "or there

17   may be multiple stressors, marked business difficulties and

18   marital problems."  Do you agree with that?

19   A.   That's correct, and that's noted here in this note.

20   Q.   And you would agree with me that when someone has an

21   adjustment disorder like 309.28 with mixed anxiety and

22   depressed mood, that the symptoms related to that adjustment

23   disorder are anxiety and also depression, correct?

24        MR. CHARNAS:  Objection, your Honor, asked and

25   answered.

1           THE COURT:  Overruled.

2    Q.    Do you want me to repeat the question?

3    A.    I think I understood it.

4    Q.    Do you agree with that?

5    A.    That's correct.

6    Q.    Now, if you could go back to my little list of the twelve,

7    please.  Thank you.  So put down 3, feeling of being foggy; 4,

8    irritability.

9          Do you think irritability and anger is pretty synonymous,

10   Doctor, or are they different?

11   A.    No, they're not the same.

12   Q.    Let's go to fatigue and tiredness.  Again, you would agree

13   with me that there are medical records that exist prior to

14   August 5, 2012, that essentially state that Mrs. Irwin was

15   suffering from extensive fatigue, correct?

16   A.    I'm not sure the word "extensive" is correct, but there

17   are individual instances in the records when Ms. Irwin was sick

18   that she noted that she had also a symptom of fatigue.

19   Q.    Okay.  One moment, please.  Now, I'll come back to that in

20   a second.  The next one, difficulty with organization and

21   planning, are you aware that Mrs. Irwin complained to Dr. Sontz

22   that she was overwhelmed by the stressors in her life to

23   include her job and taking care of her three children under

24   five?  Are you aware of that?

25   A.    I'm aware of that.  That was in the records, yes.

1    Q.    Okay.  Did you question Mrs. Irwin about that?

2    A.    We talked about how she was -- although those things were

3    hard, that she was managing all those things well and winning

4    awards at Shire, as I mention in my report here.

5    Q.    Okay, the next one is easily overwhelmed.  Anxiety, but we

6    already covered anxiety.  Easily overwhelmed, are you aware

7    that Dr. Sontz's records indicate on several occasions that

8    Mrs. Irwin complained that her life was overwhelming?  Are you

9    aware of that?

10   A.    I'm aware of that.

11   Q.    So you would agree with me that that was a symptom that

12   was in existence prior to August 5, 2012, correct?

13   A.    But not immediately prior to August 5, 2012.

14   Q.    Okay.  The next one, sensitivity to light and noise,

15   right?  I read that correctly, right?

16   A.    Yes.

17   Q.    Okay.  Now, when we talk about sensitivity to light,

18   what's the fancy word for it, photophobia?

19   A.    Photophobia, and sensitivity to noise is phonophobia.

20   Q.    So photophobia means that you're sensitive to light.  Does

21   it include not only the light here in the building but also the

22   sun?  Does it include that?

23   A.    Yes.

24   Q.    Okay.  Did Mrs. Irwin complain to you that she was

25   sensitive to both internal lights and also the sun?

1    A.    I didn't ask her specifically.

2    Q.    Okay, so you just learned that she was sensitive to light?

3    A.    That's correct.

4    Q.    Okay.  Now, the next one is frustration over not

5    recovering it, and then the next one which I want to talk about

6    more at length is difficulty with word finding, okay?  Now, did

7    you test Mrs. Irwin to see whether or not she had difficulty

8    with word finding?

9    A.    Yes.

10   Q.    Okay.  And you found out she had some difficulty, right?

11   A.    On examination, she did, yes.

12   Q.    Okay, would you agree with me that the recent records

13   indicate that Mrs. Irwin's problems with word finding have been

14   pretty much eliminated?  Do you know that?

15   A.    You mean with the current treatments that she's having?

16   Q.    No, whether it's the current treatment or whatever, do you

17   know whether or not Mrs. Irwin still has word-finding problems

18   today?

19   A.    I have not examined her again since then.

20   Q.    Okay, but it's your opinion today before this jury that

21   Mrs. Irwin has word-finding problems, right?

22   A.    Yes.

23   Q.    Okay.  Were you here yesterday when Mrs. Irwin testified?

24   A.    I was not here.

25   Q.    Okay, you were in Boston, were you?

1    A.    No.  I arrived here last night.

2    Q.    Okay.  Would you agree with me -- well, first of all, let

3    me represent to you that Mrs. Irwin testified yesterday for

4    about five hours, okay?  Are you aware of that?

5    A.    No.

6    Q.    Okay.  Would you agree with me that the ladies and

7    gentlemen of the jury who observed her testify yesterday would

8    be good judges of whether or not she had word-finding problems?

9    A.    No.

10   Q.    You don't?

11   A.    I don't know the professions of the folks here, but you

12   certainly could have word-finding difficulties that would not

13   be obvious unless tested upon.

14   Q.    So if someone takes the stand and articulates in great

15   detail about their profession and what they did, and how they

16   met doctors and how they knew about renal disease and all that,

17   you don't think the ladies and gentlemen of the jury are

18   capable of judging her ability to do that?

19   A.    I have a famous patient right now who will be on TV on

20   many evenings in New York City, and he can speak and he can do

21   well when you speak with him.  On testing, he clearly has

22   word-finding difficulties when he's in to be examined by me.

23   With that said, I think that it would be my professional

24   opinion that they would not necessarily know if she had

25   word-finding difficulties or not.  You need a medical

1  professional to look at that.

2  Q.    Well, you think the ladies and gentlemen of the jury are

3  capable of evaluating how someone responds to questions,

4  whether they understand the question and give an answer?

5  A.    I -- they may be able to, yes.

6  Q.    They may be able to?  Well, let me ask you this:  If I ask

7  you a question and I say to you, "What is your name?" right,

8  and you answer "Brian Greenwald," don't you think that they're

9  able to evaluate that and to see whether or not you answered it

10  in an appropriate manner other than saying, like, you know,

11  whatever, I mean, right?

12  A.    I think it depends on the complexity of the questions that

13  you're asking versus something simple like someone's name.

14  Q.    Okay, No. 12, deviated nasal septum and recurrent sinus

15  infection, are you aware that Mrs. Irwin suffered from

16  sinusitis prior to August 5, 2012?

17  A.    I am.

18  Q.    Okay, you reviewed the medical records, correct?

19  A.    I did.

20  Q.    One moment, please.  Now, would you agree with me, going

21  back to this list -- and I know I jumped out of order a little

22  bit, and I apologize for that -- feeling of being foggy, would

23  that include not completing one's thoughts?

24  A.    I don't believe that's what she was talking about when she

25  said that she was feeling foggy.

1    Q.    Okay, look at the --

2          MR. LAWLER:  Can you bring up the record of the

3    12/29/11.  I believe it's the exhibit of Dr. Lash.  Could you

4    focus on the middle of the document, please.  Well, first of

5    all, show the title to the doctor, please, so he knows what

6    he's looking at.  Thank you, thank you.

7    Q.    Now, this particular record is -- I think we talked about

8    fatigue -- December 29, 2011, correct?

9    A.    Correct.

10   Q.    Okay.  And if you could go to the center of the document,

11   please.  And you can see it does refer to some sort of illness,

12   but "Returned to work full time in November.  Profound

13   exhaustion is over the past one and a half weeks and hasn't

14   been working during that time," and then right above it --

15   obviously it said "Returned to work full time in November" --

16   "Headache may be slightly better, but fatigue and lower throat

17   discomfort are not."

18         You'd agree with me that she had some profound

19   exhaustion for at least a week and a half that basically

20   precluded her from going to work; is that right?

21   A.    But you don't go down far enough to show the diagnosis was

22   viral infection.

23   Q.    Right.

24         MR. CHARNAS:  Can we see the rest of the document on

25   the screen, your Honor?

1          MR. LAWLER:  You can see as much as you want, Counsel.

2    Give him the whole document, please.

3          MR. CHARNAS:  Thank you.

4          MR. LAWLER:  Now, on July 24, 2012, could you pull

5    that document up, please, as well.  This is Exhibit 25-G, and

6    the date is July 24, 2012, and you can show the whole document

7    first to counsel to look at before I focus.  Then could you

8    focus on "History of present illness."  Could you go down,

9    please.

10   Q.   Okay, so this is a document that essentially says that

11   she's having worsening night vision and not sleeping much

12   because of the three kids.  Do you see that?

13   A.   I see that.

14   Q.   Okay.  Would you agree with me that that's basically

15   fatigue?

16   A.   No.

17   Q.   No?

18   A.   I have a whole book on fatigue I could tell you about, but

19   that's not fatigue.

20   Q.   Okay, let me switch gears for a second here and see if we

21   can talk about some other subject.  I know on direct

22   examination you talked about the fact that you know Mrs. Mary

23   Hibbard, correct?

24   A.   Dr. Hibbard.

25   Q.   I'm sorry, Dr. Mary Hibbard.  I apologize.  It's getting

1  late in the day.  And you and Dr. Hibbard know each other very

2  well, right?

3  A.   I haven't been to her apartment, but we worked together

4  for about five years at Mount Sinai in the same department.  I

5  may have her cell phone number.  That's about the extent of our

6  knowing each other well.

7  Q.   You would agree with me, for instance, when I deposed you,

8  when I was asking you questions about her, you referred to her

9  as Mary, right?

10  A.   Correct.

11  Q.   And you and Dr. Hibbard have worked on some cases together

12  as expert witnesses, right?

13  A.   I believe so.

14  Q.   Okay.  And in fact you got Dr. Hibbard involved in this

15  particular case, right?

16  A.   I was trying to remember.  I don't recall specifically.

17  Q.   Okay.  Well, do you remember giving a deposition in this

18  case?

19  A.   That was like a whole year ago, so I probably remembered

20  better then than I do now.

21  Q.   But fortunately we have the transcript, so we can look at

22  that testimony.

23          MR. LAWLER:  Can I approach, your Honor?

24  A.   I won't waste the jury's time.  I wouldn't be surprised if

25  I did get Dr. Hibbard involved with this case.

1  Q.    Okay.  And in addition there's another expert in this

2  case, Dr. Benson, right?

3  A.    That's correct.

4  Q.    Okay.  And Dr. Benson is going to testify tomorrow.  Do

5  you know that?

6  A.    I'm aware of that.

7  Q.    Okay, have you talked to Dr. Benson lately?

8  A.    No.

9  Q.    But you did refer this particular case to Dr. Benson,

10  right?

11  A.    That I'm sure I didn't do.

12  Q.    You're sure you didn't do that?

13  A.    I'm sure I didn't do that.

14  Q.    Didn't you say that you sent these DTIs to get DTIs from

15  Dr. Benson?

16  A.    In this case specifically?

17  Q.    Yes.

18  A.    I did not.  I did not recommend that Mr. Charnas use

19  Dr. Benson.

20  Q.    Okay.  All right, so I want to get this straight.  So you

21  did not refer Mrs. Irwin directly to Dr. Benson, but you told

22  Attorney Charnas, and at that particular time -- let me step

23  back a little bit.  At that particular time when you were

24  retained as an expert, okay, you were an expert for Megan

25  Irwin, right, Mrs. Irwin, right?

1  A.   Correct.

2  Q.   Okay.  And you told Mr. Charnas about Dr. Benson?

3  A.   I did not.  I recommended that he get an MRI with

4  diffusion tensor imaging, but I did not specifically recommend

5  Dr. Benson.

6  Q.   Are you positive about that?

7  A.   98.2 percent.

8  Q.   But you and Dr. Benson, you know each other because you

9  have spoken together at brain injury conferences, right?

10  A.   I met Dr. Benson before.

11  Q.   Well, isn't it true that, I think just recently, maybe the

12  last year, that you and Dr. Benson spoke together at a brain

13  injury conference in New Orleans before a bunch of lawyers?

14  A.   I know that we were both on the list of people who spoke

15  there.  I wouldn't say that we spoke together.  I think there

16  was a whole panel of people who spoke, and I spoke and he spoke

17  at that same conference, and that was one of the opportunities

18  where I did meet him.

19  Q.   Well, not only did you speak, you also listened to what

20  Dr. Benson had to say, right?

21  A.   I did stay to listen to his lecture.

22  Q.   Have you referred other cases, other legal cases to

23  Dr. Benson?  You're saying you didn't refer this one.  I

24  understand your testimony, but have you referred any other

25  medical legal cases to Dr. Benson?

1  A.    Dr. Benson is in Detroit, which is far from New Jersey.

2  So Dr. Benson is a good clinician, but it wouldn't be a common

3  thing for me to refer people there.  I know I've worked on

4  cases where Dr. Benson has been an expert, but I can't think of

5  even one case where I was the person who referred the person to

6  him.

7  Q.    Okay.  Do you know another expert by the name of

8  Dr. Ziejewski?

9  A.    I do.

10  Q.    Okay, I think I butchered his pronunciation.  How do you

11  pronounce his name?

12  A.    I usually call him Mariusz because I have the same trouble

13  as yourself.

14  Q.    Okay.  So are you aware that he's an expert in this

15  particular case?

16  A.    No, I'm not.

17  Q.    You didn't get him involved in this particular case?

18  A.    As I said, I didn't even know that he was an expert in the

19  case.

20  Q.    Let's talk a little bit about headaches.  Are headaches

21  something that you can -- just a regular headache, is it

22  something that you can somehow locate with an objective test?

23  A.    Can you locate the cause, or actually can you locate if

24  the person is having pain or not?

25  Q.    Well, let me simplify it.  If I come to you and you're my

1  physiatrist, and I say to you, "I have a headache," first of

2  all, do you believe me that I have a headache?

3  A.    Do I believe you that you have a headache?

4  Q.    Right.

5  A.    I guess the physician/patient relationship is generally

6  about people coming in and having their complaints.  It's not

7  necessarily about disbelieving them.

8  Q.    Yes, I understand that, and that's in the typical, you

9  know, patient/doctor relationship.  So if I'm --

10 A.    That's the scenario you gave me.

11 Q.    Okay, and that's what I'm going to build on, the scenario,

12 by the way.

13 A.    Great.

14 Q.    So if it's patient/doctor relationship, and I come in and

15 I say, "I have a headache," you believe me, right?

16 A.    Well, I don't disbelieve you.

17 Q.    Okay.  And then you typically say, "Okay, John Lawler,

18 what's your headache, 0 to 10," right?

19 A.    That would be a common thing to do.

20 Q.    Okay.  And I say I have a headache, it's a 7, it's really

21 pounding and I've got a bad headache, and you believe me,

22 right?

23 A.    I still believe you.

24 Q.    Okay.  Now, change the scenario, and suddenly I'm involved

25 in a lawsuit and it's a medical legal case, and there's more at

1  stake than just a cure, right?

2  A.    Potentially, yes.

3  Q.    Okay.  So, first of all, someone can tell you that they

4  have a headache when they really don't have a headache, right?

5  A.    That could happen.

6  Q.    And someone could tell you that they have a severe

7  headache when they only have a mild headache, right?

8  A.    That could happen.

9  Q.    Okay, so headaches are basically subjective, right?

10  A.    Are headaches subjective?  The impairments from headaches

11  are objective, but the headaches, certainly the intensity of a

12  headache or having a headache or not is subjective.

13  Q.    And when someone has a headache, what you typically do is,

14  you want them to -- or a series of headaches, what you want

15  them to do is complete a headache diary, right?

16  A.    That's one of the things that can be helpful in monitoring

17  the frequency of their headaches.

18  Q.    To figure out what's causing them, how often they exist

19  for, what gets rid of them, whether it's ibuprofen or Bayer

20  Aspirin, right?

21  A.    Yes.

22  Q.    Okay.  And are there also, for instance, like, for

23  instance, as a physiatrist, do you go through, you know,

24  headache regimes to try to get rid of a person who has

25  headaches?

```
 1    A.   Well, the first thing you always do when someone comes in
 2    and has complaints of headache is to take a comprehensive
 3    history and physical examination to look at the type of
 4    headache it is.  Headache is sort of a bigger class of
 5    problems, but there are different types of headaches.  And then
 6    to make a more specific diagnosis on both where the headache is
 7    coming from, the type of headache that it is, and that will
 8    help sort of guide what treatment would be best for that
 9    person.
10    Q.   Okay.  And sometimes, if someone goes through a headache
11    regimen, they can get rid of their headaches, right?
12    A.   Sometimes, yes.
13    Q.   Okay, I want to switch gears here a little bit.  If you
14    could turn to your report --
15              THE COURT:  Mr. Lawler, are you switching to a topic
16    of five minutes or less?
17              MR. LAWLER:  No.  It's probably a ten-minute topic.
18              THE COURT:  All right, why don't we call it a day and
19    continue tomorrow.
20              MR. LAWLER:  That's fine.  I think I have probably
21    half an hour.
22              THE CLERK:  All rise for the jury.
23              THE COURT:  Keep an open mind, no talking, try to be
24    on time tomorrow.
25              (Jury excused.)
```

1          THE COURT:  He has a half an hour with him, let's say

2    fifteen minutes for redirect and recross, something like that.

3    That gets us to quarter of 11:00.  Hibbard comes back on

4    quarter of 11:00?

5          MR. LAWLER:  That gets us to lunch.

6          THE COURT:  That gets us to lunch.

7          MR. CHARNAS:  How long do you have with Hibbard?

8          MR. LAWLER:  Oh, I have easily an hour, I think.

9          THE COURT:  Quarter of 11:00, quarter of 12:00, we'll

10   have a break, so 12:15, maybe a little bit more.  We can break

11   for lunch somewhere in there.  And then?

12         MR. CHARNAS:  Dr. Benson.

13         THE COURT:  How long with Benson?  Benson will be on

14   and off tomorrow?

15         MR. CHARNAS:  Benson will definitely be on and off

16   tomorrow, unless he cross-examines for an hour and a half or

17   so, but, yeah, I'm sure he'll be on and off tomorrow.

18         THE COURT:  Okay.  So anything else we can accomplish

19   today?

20         MR. CHARNAS:  I don't think so, Judge.

21         THE COURT:  Okay, I'll see you at quarter of 10:00

22   tomorrow.

23         MR. LAWLER:  Thank you, your Honor.

24         (Adjourned, 3:58 p.m.)

25

1                    C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Part 2,

9  Pages 1 through 92 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 13-10974-ADB, Megan C. Irwin v. Eclectic Dining,

12  Inc., and thereafter by me reduced to typewriting and is a true

13  and accurate record of the proceedings.

14          Dated this 1st day of June, 2016.

15

16

17

18

19          /s/ Lee A. Marzilli
          _____
20          LEE A. MARZILLI, CRR
          OFFICIAL COURT REPORTER
21

22

23

24

25