```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    MEGAN C. IRWIN and THOMAS L.      )
      IRWIN, INDIVIDUALLY AND AS        )
 4    FATHER AND NEXT FRIEND OF MINOR   )
      CHILDREN M.1, M.2 AND T.1,        )
 5                                      ) CA No. 13-10974-ADB
                   Plaintiffs           ) Pages 1 - 67
 6                                      )
                     -VS-               )
 7                                      )
      ECLECTIC DINING, INC., d/b/a      )
 8    ATLANTICA'S OLDE SALT HOUSE,      )
                                        )
 9                 Defendant            )

10

11            JURY TRIAL - DAY FOUR - PART TWO

12
              BEFORE THE HONORABLE ALLISON D. BURROUGHS
13                 UNITED STATES DISTRICT JUDGE

14

15                           United States District Court
                             1 Courthouse Way, Courtroom 17
16                           Boston, Massachusetts  02210
                             October 1, 2015, 1:48 p.m.
17

18

19

20

21

22                    LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
23            United States District Court
              1 Courthouse Way, Room 7200
24                 Boston, MA  02210
                     (617)345-6787
25
```

1    A P P E A R A N C E S:

2        SCOTT E. CHARNAS, ESQ., Charnas Law Firm, P.C.,
     66 Long Wharf, Boston, Massachusetts, 02110, for the
3    Plaintiffs.

4        JOHN F. X. LAWLER, ESQ. and HEATHER M. GAMACHE, ESQ.,
     Prince Lobel Tye, LLP, 100 Cambridge Street, Boston,
5    Massachusetts, appearing for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 4   MARY HIBBARD

 5        By Mr. Lawler:              4

 6        By Mr. Charnas:                     19

 7   RANDALL BENSON, M.D.

 8        By Mr. Charnas:    26

 9        By Mr. Lawler:              45

10        By Mr. Charnas:                     64

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Resumed, 1:48 p.m.)
 3              (Jury enters the courtroom.)
 4              THE CLERK:  Court is back in session.
 5              THE COURT:  Mr. Lawler.
 6              MR. LAWLER:  Thank you.
 7                        MARY HIBBARD
 8    having been previously duly sworn, was examined and testified
 9    further as follows:
10    CONTINUED CROSS-EXAMINATION BY MR. LAWLER:
11    Q.   I know I said that I was all done with the tests, but I
12    wanted to go over one with you, Doctor, one more on the screen.
13    If you could put up the same exhibit, No. 18, just the top of
14    it please, the top.  I think you talked a little bit, Doctor,
15    yesterday about similarities.  Did you say this involved
16    abstract thinking?
17    A.   Yes, it does.
18    Q.   Okay.  What is abstract thinking?
19    A.   Abstract thinking is higher-order conceptual thinking,
20    being able to tie discrete bits of information into a cohesive
21    whole, being able to see the big picture rather than the
22    details of something.  It is really the kernel of an executive
23    function.
24    Q.   Okay.  And how did Mrs. Irwin do with abstract thinking?
25    A.   Her score was at the 50th percentile.
```

1    Q.    The 50th percentile?

2    A.    Correct.

3    Q.    And you arrived -- do you see the test in front of you,

4    "Similarities"?

5    A.    Correct.

6    Q.    So is that the score that arrives at that 50 percentile

7    number?

8    A.    Correct.

9    Q.    Okay.  So the maximum score I think is what, 36?

10           (Witness examining document.)

11    Q.    I think it's on that page.

12    A.    Yes.  I'm sorry.  I just found it.

13    Q.    And Mrs. Irwin got a score of 25?  Is that 25 or 26?

14    A.    25.

15    Q.    And so I take it, if she gets more points on this

16    particular test, then she would have a higher score for

17    abstract learning; is that right?

18    A.    That's correct.

19    Q.    Okay.  So if you would, please, could you focus in on

20    Question 11.  And before we talk about Question 11, when you do

21    similarities, what do you do for the person who's the

22    test-taker?

23    A.    Exactly the same as I had done with the information

24    subtest, except here I say, "I'm going to present two different

25    words, and your task is to tell me how they are alike, what

1    they have in common, how are they similar."

2    Q.    Okay.  And specifically 11, it says "Music and tides,"

3    right?

4    A.    Correct.

5    Q.    And her answer was, "Both make beautiful sounds," right?

6    A.    That's correct.

7    Q.    Isn't that really, I mean, a terrific abstract thought

8    when you think about the beautiful sound that a tide makes and

9    then also the beautiful sound that music makes?  Isn't that

10   like the highest form of abstract thinking?

11   A.    Not according to the Wechsler Adult Intelligence Scale

12   scoring system, no.  In fact, it is a zero.

13   Q.    But, okay, let's get away from the scoring system and talk

14   you and I here.  Don't you think that music and tides and that

15   they both make beautiful sounds, that that's a really good

16   abstract thought?

17   A.    It's a component of abstract thought, but, again, one of

18   the underlying principles of neuro-psych testing is that you

19   use well-normed data that have standardized approaches to

20   scoring, and whether you agree or not, you're not making the

21   test up; this test is something you follow.

22   Q.    Okay, and you gave her a zero on that?

23   A.    That's correct, that's correct.

24   Q.    Okay.  And "Anchor/fence" on 13, "Fence to keep people in

25   and out, and anchor to keep put."  And you only gave Mrs. Irwin

1    a 1 on that, right?

2    A.    That's correct.

3    Q.    It didn't meet the criteria, the same thing?

4    A.    It didn't meet the full criteria, correct.

5    Q.    Thank you.  That's all for the tests on the screen.  We're

6    going to talk about some other tests briefly.

7        Now, there's a test that's called the TOMM, the T-O-M-M.

8    We talked about that earlier as well, right?

9    A.    Correct.

10   Q.    Okay.  And that's an abbreviation for the Test of Memory

11   and Malingering, right?

12   A.    Correct.

13   Q.    Okay, are you set?

14   A.    Oh, yeah.

15   Q.    I'm sorry.  And this is a test of immediate recall,

16   correct?

17   A.    Yes, immediate visual recall.

18   Q.    Which is basically short-term memory?

19   A.    Uhm, it's short-term visual memory, yes.  It's a component

20   of it.

21   Q.    Okay.  And you would agree with me that people who have a

22   brain injury often struggle with the TOMM, correct?

23   A.    Uhm, that's kind of an over-generalized statement.  It is

24   not uncommon for individuals with significant injuries,

25   particularly in the area of memory, to have difficulty with

1    this and difficulty passing the test itself.

2         MR. LAWLER:  May I approach, your Honor?

3         THE COURT:  Yes.

4    Q.    Dr. Hibbard, I'm handing you your deposition transcript

5    which was taken August 20, 2014.  You remember that I came to

6    New York City and deposed you; is that right?

7    A.    That's correct.

8    Q.    And you testified under oath that day, correct?

9    A.    Correct.

10   Q.    And then you had the opportunity to read the deposition

11   transcript and correct any mistakes that were made, right?

12   A.    Correct.

13   Q.    And everything was basically signed under the pains and

14   penalties of perjury, correct?

15   A.    That's correct.

16   Q.    Okay.  And you have testified at depositions before,

17   right?

18   A.    Yes, I have.

19   Q.    How many depositions do you think you've testified before?

20   A.    Maybe thirty.

21   Q.    Okay, I'm going to walk back to my podium, but I want you

22   to look at Page 95.

23         (Witness examining transcript.)

24         MR. LAWLER:  And, Counsel, I'm going to draw your

25   attention to Lines 11 through 16.

1  Q.    Now, let's back up a little bit.  Do you see that we're

2  talking about the TOMM during this discourse?

3  A.    Correct.

4  Q.    Okay.  And the question on Line 11, when I ask you this, I

5  say, "But isn't it also a test of immediate recall of memory?"

6  I read that correctly, right?

7  A.    Correct.

8  Q.    And we're talking about the TOMM, right?

9  A.    Correct.

10  Q.    And your answer on Page 95, Line 13 through 16 is, "Yes,

11  it is.  It's one of the confines of individuals who have a

12  brain injury.  They often struggle with this; not all do, but

13  some do."  I read that correctly, right?

14  A.    Right.

15  Q.    Now, there is also a test known as the -- is it pronounced

16  the TOPF?

17  A.    T-O-P-F.

18  Q.    T-O-P-F?

19  A.    Test of Premorbid Functioning.

20  Q.    Okay.  And premorbid function is essentially the IQ of the

21  person before the alleged date of the injury, right?

22  A.    It is an estimated IQ based on reliable data.

23  Q.    Okay.  But you give the person the TOPF after the date of

24  the alleged injury to determine what a rough estimate of their

25  IQ was prior to the injury, right?

1    A.    It is one of the measures and considerations for

2    determining premorbid IQ.

3    Q.    Okay.  Now, you administered the TOPF to Mrs. Irwin,

4    right?

5    A.    Correct.

6    Q.    And the score that she received was in the 32 percentile,

7    correct?

8    A.    That's correct.

9    Q.    Okay, so you would agree with me that -- again, is the

10   range for average in the TOPF, is it 25 to 74, just like we

11   talked about before?

12   A.    That range is interpreted as normal, as average behavior.

13   Q.    Okay.  And she's 32 percent at that particular as far as

14   where she falls into the average range, right?

15   A.    What that translates to is, 32 would be 58 percent of

16   people do better than she does, or she does better than

17   31 percent of people in her age group.  You can look at it that

18   way as well.

19   Q.    Right.  So she does better than 31 percent, but 58 percent

20   do better than her?

21   A.    Correct.

22   Q.    Okay.  No, actually it's 68 percent, isn't it?

23   A.    I don't have a piece of paper.  It's been a long day.

24   Q.    Right, 68 percent?

25   A.    68 percent.  Pardon my error.

1   Q.    That's all right.

2   A.    Thank you.

3   Q.    That's all right.  Okay.  But I'm confused because you

4   said that when you were considering her intellectual function,

5   in the report, you put her at average to above average.

6   A.    I did.

7   Q.    Well, how can you be above average if 68 percent of your

8   age group are above you?

9   A.    The TOPF was one of the estimates I used to determine her

10  IQ premorbidly.  It's an estimate.  It's based on demographic

11  factors.  It is, like many other tests, it's a word test that

12  they have to recognize and be able to identify the word and say

13  it correctly.  Her performance on that test put her at the

14  score that we were talking about, and that's a projection.  I

15  also included family history and educational levels.  She's

16  someone who went to college.  Her family at least went to

17  college and further degrees.  There's been some discrepancy

18  about how far.  Her performance in her work performance clearly

19  suggests somebody who was extremely skilled and did extremely

20  well.  That is suggestive that someone may have a little bit

21  higher abilities.  Not everybody -- she's the first one to say,

22  "I really didn't love academics.  I liked sports.  I was never

23  a super one for academics; the rest of my family was."

24  Q.    Okay, thank you very much.  Let's go back to the report.

25  Let's look at Page 16.

1    A.    Are we finished with the TOMM?

2    Q.    We are.

3    A.    And this?

4    Q.    We are, we're finished with the TOMM and the deposition

5    transcript.   Thank you.

6    A.    Okay.

7    Q.    Let's go to Page 16, and it's the second-to-last

8    paragraph, the one that begins with "The current

9    neuropsychological evaluation."

10    A.    Correct.

11    Q.    Halfway down, do you see Mrs. Irwin's self-report?

12    A.    Correct.

13    Q.    Okay, it says, "Mrs. Irwin's self-report of symptoms

14    raised concerns about potential of over-reporting with elevated

15    scores on somatic, neurological, and emotional scales of the

16    measure," right?

17    A.    Correct.

18    Q.    Okay.  So you noted that she was doing over-reporting, and

19    another word for "over-reporting" would be "exaggeration,"

20    right?

21    A.    Not necessarily.

22    Q.    Okay.

23    A.    It could be factual.

24    Q.    It could be factual over --

25    A.    It could be real symptoms that they're reporting.

1  Q.   Yeah, but that would be factual reporting as opposed to
2  over-reporting, right?
3  A.   If someone has significant changes, as the case for
4  individuals many times with a brain injury, they have many
5  symptoms across somatic, some are physical, more physical
6  concerns, emotional concerns.  And what was the third one she
7  had?  And neurological, neurological.  TBI is a neurological
8  injury.
9  Q.   Sometimes over-reporting can be conscious over-reporting,
10  and it can be subconscious over-reporting, correct?
11  A.   Uhm, that's true.
12  Q.   The same thing with effort:  Sometimes effort can be
13  conscious lack of effort, and also there can be a subconscious
14  lack of effort, right?
15  A.   That's correct.
16  Q.   And you certainly look for both conscious and subconscious
17  lack of effort in cases that involve litigation, right?
18  A.   That's correct.
19  Q.   Because there's financial gain to be made, right?
20  A.   That's correct.
21  Q.   So it's safe to say that someone who's involved in a
22  lawsuit, they actually could be involved in subconscious lack
23  of effort and really not even know it, but know it I guess in
24  their subconscious that whatever they're trying to produce will
25  help their lawsuit, right?

1    A.    Correct.  However --

2    Q.    No, there's no "however."  You might get a "however" if

3    Mr. Charnas offers that answer or question again.

4    A.    I'm sure he will.

5    Q.    So we can wait till then.  Are you familiar, Doctor, with

6    a Compendium of Neuropsychological Tests by Spreen and Strauss?

7    A.    Yes.

8    Q.    Do you consider this to be an authority in the field of

9    psychology and neurological testing?

10   A.    Authoritative?  It's one of many, yes.

11   Q.    Okay.  Do you have this in your library?

12   A.    I do not.  Colleagues have it.

13   Q.    Okay.  And it says, "A particular difficult aspect of

14   forensic report is the question of symptom validity:  Was the

15   patient cooperating fully?"  You would agree with me on that,

16   right?

17   A.    Correct.

18   Q.    Okay.  And it says, "Are some or all of the symptoms

19   valid, or are they influenced by a tendency to exaggerate or

20   even to malinger?"  And that's something that you have to

21   determine, right?

22   A.    That's something I have looked at in my assessment.

23   Q.    Okay.  And it says, "However, the problem is complicated

24   by the fact that these tests," which are in your psychological

25   tests, "can at best only indicate the motivational or emotional

1    factors -- e.g.," which means, you know, an example,

2    "depression, anxiety, lack of effort maybe influence test

3    performance," right?

4    A.    That's what it says in the book.

5    Q.    Well, do you agree with that?

6    A.    There's points to be made that's counter to that, yes.

7    Q.    Okay, I'm going to jump around a little bit to get done.

8    Yesterday we talked a little bit about when Mrs. Irwin was

9    speaking on the phone.  Do you remember that?  No, no, was

10   taking the test and she was concerned about the phone, right?

11   A.    Correct.

12   Q.    Okay.  And you indicated heightened anxiety regarding her

13   children, right?

14   A.    That's correct.

15   Q.    Okay.  Now, you would agree with me that she had

16   heightened anxiety regarding her children, or at least one of

17   her children, before the August 5, 2012 incident, right?

18   A.    Yes, she did.

19   Q.    She had a lot of heightened anxiety in regard to Michael,

20   her son who had the heart problem, correct?

21   A.    Correct.

22   Q.    As a matter of fact, you know, for instance, that she

23   complained to Dr. Sontz that she has not been able to trust the

24   hospitals to take care of their son, which is Michael, right?

25   A.    I don't remember that specific part of that review, but

1    that --

2    Q.    Well, let's bring it up and show it to you quickly.  It's

3    41-A, middle of the page, please.

4    A.    I can barely read the writing.

5    Q.    Do you see that where it is?  It begins with "PT."  It's

6    right above Psychiatric History, which is in the middle of the

7    page of what you have highlighted.

8    A.    "... when she had a complete pelvic break," is that what

9    you're talking about?

10    Q.    What's that?

11    A.    What section do you want me to read?

12    Q.    Well, do you see that in dark print, "Psychiatric

13    History"?

14    A.    I see what you're --

15    Q.    Okay.  "Patient has not been able to trust the hospitals

16    to take care of their son."  You would agree with me that

17    that's a form of anxiety, correct?

18    A.    Yes.

19    Q.    Okay, thank you.  Now, at some point during your direct

20    examination you testified that, in your opinion, Mrs. Irwin

21    suffers from post-traumatic stress disorder, correct?

22    A.    That's correct.

23    Q.    And you gave her a diagnosis of 309.81, which is

24    articulated in DSM-V, right?

25    A.    I don't know the PTSD numbers by heart, but I did diagnose

1    her with post-traumatic stress disorder.

2    Q.    Do you want me to show you the text?

3    A.    That would be fine.

4    Q.    Show you?

5         MR. LAWLER:  May I approach, your Honor?

6         THE COURT:  Certainly.

7    Q.    I'll leave this with you.

8    A.    Okay, thank you.

9    Q.    Now, I want you to clarify it in your own words, but you

10   did diagnose Mrs. Irwin as suffering post-traumatic stress

11   disorder from being hit with the umbrella; is that right?

12   A.    That's correct.  That was a precipitating issue.

13   Q.    And did you essentially say that her post-traumatic stress

14   disorder is the same type of stress disorder that the service

15   members who are fighting in Iraq and Afghanistan have?

16   A.    No, I did not.  I said it is a common diagnosis for

17   military individuals once they have finished their service.

18   Many have also experienced traumatic brain injury, but

19   post-traumatic stress disorder is another common diagnosis.  In

20   no way am I equating these two conditions.

21   Q.    Very well.

22   A.    But a post-traumatic stress disorder is a post-traumatic

23   stress disorder, and it has criteria to meet it.

24   Q.    Well, turn to Page 274, please.  They talk about the

25   diagnostic features of post-traumatic stress disorder, right?

1    A.    Yes.  That's the title.

2    Q.    And it also talks about Criterion A, right?

3    A.    I haven't read this, so I would need to read it, but I

4    don't know where you're reading, if you would help identify --

5    Q.    Well, why don't you do this, please, if you would.  On

6    Page 274 there's a feature called "Diagnostic Features"?

7    A.    Correct.

8    Q.    And at the beginning of that it says, "The essential

9    feature of post-traumatic stress disorder (PTSD) is the

10   development of characteristic symptoms following exposure to

11   one or more traumatic events."  Then the next paragraph states,

12   "The directly experienced traumatic events in Criterion A

13   include, but are not limited to, exposure to war as a combatant

14   or civilian, threatened or actual physical assault; examples,

15   physical attack, robbery, mugging, childhood physical abuse."

16   Then "Threatened or actual sexual violence."  Then it gives

17   examples:  "Forced sexual penetration, alcohol/drug-facilitated

18   sexual penetration, abusive sexual contact, noncontact sexual

19   abuse," and then "sexual trafficking."  And then other

20   examples:  "Being kidnapped, being taken hostage, terrorist

21   attack, torture, incarceration as a prisoner of war, natural or

22   human-made disasters, and severe motor vehicle accidents."  I

23   read that correctly, right?

24   A.    That's correct.

25   Q.    Would you agree with me that being struck with the

1    umbrella on August 5, 2012, the three seconds that that event

2    occurred, that that doesn't come close to any of those events

3    that I just mentioned?  Would you agree with that?

4    A.   I would not.

5         MR. LAWLER:  Very well.  And that finishes my

6    cross-examination.  Thank you.

7         THE COURT:  Redirect, Mr. Charnas?

8    REDIRECT EXAMINATION BY MR. CHARNAS:

9    Q.   And why wouldn't you agree with that, Dr. Hibbard?

10   A.   If you look at Page 271, the first criteria is "Exposure

11   to actual or threatened death, serious injury or sexual

12   violence in one of the following:  directly experiencing the

13   trauma, witnessing in person the event as it occurred --"

14   "learning about the event" would be unrelated to her --

15   "experiencing repeated or extreme exposure to aversive details

16   of the event."  That's like nightmares, things like that.

17         In a very brief period of time, Megan Irwin got to

18   experience a life-threatening thing coming at her and her

19   child, and she continued to experience flashbacks of that event

20   when I saw her for initial testing.  She had nightmares.  She

21   had nightmares of the event, recurrent nightmares.  She was

22   avoiding places and things.  She was separating and distancing

23   herself from her friends and her family, including her husband.

24   Those are very traditional criteria.  There are more criteria

25   that go on down here, but she does meet that criteria.  At that

1    point in time, it was the equivalent of something that was

2    going to potentially kill her.  She had no idea.

3    Q.   Thank you.

4         MR. CHARNAS:  May I approach, Judge?

5         THE COURT:  Yes.

6    Q.   The tests that you gave to Mrs. Irwin, are these tests

7    generally accepted in your field as being accurate tests?

8    A.   Yes, they are.

9    Q.   How long have these tests been around?

10   A.   Probably the oldest ones are the Wechsler Adult

11   Intelligence Scale and the Wechsler Memory Scale.  They're now

12   on their fourth revisions or fifth revisions.  I'm not sure if

13   the fifths are coming out.  They go back at least 25 or 30

14   years.  They're extensively normed across all age groups, and

15   their scoring criteria is very definitive, and as a result,

16   they really are -- they are the course gold standard for

17   assessment.

18   Q.   When you say "extensively normed," what does that mean in

19   laymen's terms?

20   A.   The norms require that the testing is administered to

21   individuals without any known injury or anything wrong with

22   them, in different age groups, and these require samples of

23   thousands in order to establish a normal variation of people's

24   performance so that they in many ways respect that normal curve

25   of intellectual abilities.

1  Q.   Let's talk about the IQ test.  Mr. Lawler had gone over

2  that with you in detail.  Is that generally used in business

3  and government and education to assess people?

4  A.   Yes, it is.  It's used extensively --

5  Q.   Tell us about that.

6  A.   It's used extensively in schools for school placements to

7  rule out some sort of an educational pathology.  It is used in

8  personnel departments of businesses to ascertain individuals'

9  creative thinking, overall intellectual stamina.  What was the

10  third area you wanted?

11  Q.   That's enough.

12  A.   Okay.

13  Q.   In regards to the scoring that you did -- Mr. Lawler had

14  gone over some of the scoring -- is that the Mary Hibbard

15  scoring methodology that you used?

16  A.   No, it is not.  It's one of the reasons why this process

17  takes so long.  Each and every response of a person needs to be

18  analyzed and gone through an external document that tells you

19  what to do with that scoring.

20  Q.   Now, you mentioned that you tested her effort, and I'm not

21  going to go back over that, but there was something about that

22  subconsciously, because she was involved in a lawsuit, it could

23  have influenced her performance on the tests, and then you said

24  "however."  Do you remember that?

25  A.   Yes.  I'm trying to think of what it was now.  Let me see.

1    Well, I'm not sure this is the answer at this moment, but,

2    however, that was in relationship -- I know where it is now, it

3    came back.  It was in relationship to the personality test

4    called the Multiphasic Personality Inventory, and the scoring

5    of high somatic neurological and cognitive problems was the

6    issue:  Does that mean that she's over-trying to make a poor

7    presentation of self?  What I wanted to go on and say is that

8    the MMPI manual is very explicit that over-reporting has to be

9    considered in light of other extenuating medical conditions

10   that very well may result in this over-reporting because the

11   person has significant symptoms, and in this case, it was the

12   case.

13   Q.    Speaking of that, Mr. Lawler read to you a sentence on

14   Page 16 of your report.  Do you have your report in front of

15   you?

16   A.    I sure do.  16, okay, ready.

17   Q.    And here's the sentence that Mr. Lawler -- sorry, Doctor.

18   Mr. Lawler read this sentence to you in the second-to-last

19   paragraph:  "On personality assessment, Mrs. Irwin's

20   self-report of symptoms raised concerns about potential of

21   over-reporting, with elevated scores on somatic, neurological,

22   and emotional scales of the measure."

23   A.    Correct.

24   Q.    I was going to say, did I read that right, but I guess I

25   didn't.  But here's the next sentence:  "Over-reporting is

1  commonly noted in individuals with documented medical

2  conditions who report critical symptoms related to their

3  medical condition, MMPI-2-RF Manual."  What did you mean by

4  that?

5  A.    That's the citation directly from the manual that

6  forewarns you that you need to factor in that if there is some

7  extenuating medical condition, the findings have to be in many

8  ways discounted.

9  Q.    Let me read the next sentence he didn't read:

10  "Mrs. Irwin's self-reported symptoms on the personality

11  inventory are congruent with her symptom report in prior

12  medical documentation and documented in current testing.  Thus,

13  the personality assessment findings serve to validate

14  Mrs. Irwin's TBI-related challenges post her accident of

15  8/5/12."  What did you mean by that?

16  A.    I meant there were many -- let me backtrack for a second.

17  On the MMPI, which is the personality measure, there are many

18  factors that could score as elevated.  Someone could -- I'll

19  give you some examples just to kind of freshen it up.  She

20  could have -- well, she could have had a lot of symptoms, but

21  the symptoms could be a thought disorder -- you know, unusual

22  thoughts -- or they could be cynicism she could have had an

23  elevated score on, or it could be ideas of persecution.  There

24  are many different factors that could become elevated.  The

25  point that makes these findings congruent with a diagnosis of

1    TBI is that her scores are elevated solely on somatic items,

2    which are physical manifestations of an illness; neurological,

3    which are reflective of her neurological injury; and emotional,

4    which clearly have been demonstrated by her distress about her

5    accident and her mood and her anxiety disorders.

6    Q.    Doctor, changing gears here for a second, did you do

7    anything to test to see whether any of Megan Irwin's answers on

8    this test were influenced by psychiatric problems?

9    A.    This would be the measure that you would be looking at.

10   This would flag if somebody was schizophrenic, or paranoid, or

11   any other number of observations.

12   Q.    And what did you find?

13   A.    They were not elevated at all.

14   Q.    That ray test where there was talk about who could draw a

15   straight line, who couldn't draw a straight line, was this some

16   sort of artistic competition?

17   A.    No, it is not.

18   Q.    Does someone's ability to draw a straight or difficulty

19   drawing a straight line, does that have anything to do with

20   this test?

21   A.    No, it doesn't.  If the person has a continuous line -- it

22   could be a little angled on the page, the rectangle could be

23   angled on the page -- as long as everything in it is in its

24   right place, it's scored.

25   Q.    You mentioned something earlier, that it was not important

1   to you to know whether Megan Irwin suffered a loss of

2   consciousness on the prior concussions.  Do you remember that?

3   A.    That's correct.

4   Q.    What's the basis of that answer?

5   A.    The prior concussions before I saw her?

6   Q.    Yes.

7   A.    The report from the patient is, she had no loss of

8   consciousness on any of those events, and that her symptoms

9   disappeared -- the important thing is that her symptom report,

10  which was predominantly headaches, disappeared within a very

11  short period of time.  As I noted in my report -- let me see

12  where that was -- I wrote it at the back of it -- it is

13  important to pay attention to prior concussions, but her four

14  prior concussions met the criteria for a mild concussion that

15  resolved.  This is not the case for her current event where she

16  has persistent syndrome.

17  Q.    Is there any evidence that she had persistent long-lasting

18  symptoms of any kind after any of those prior concussions?

19  A.    She did not.  She denied any.  And then I think we have to

20  look at, these happened when she was fourteen, fifteen,

21  sixteen.  Maybe the last one or two might have been a little

22  later.  But she went on to college, finished the college

23  degree, and then immediately started work, and then worked

24  consistently right up until the time of her current injury and

25  excelled in each of the positions she was in.

1          MR. CHARNAS:  Thank you, Doctor.  Those are all the

2     questions I have.

3          THE COURT:  Recross?

4          MR. LAWLER:  Nothing further.

5          THE COURT:  Doctor, you are excused.

6          (Witness excused.)

7          THE COURT:  Mr. Charnas?

8          MR. CHARNAS:  Dr. Randall Benson.

9                    RANDALL BENSON, M.D.

10    having been first duly sworn, was examined and testified as

11    follows:

12          THE CLERK:  Please state your name and spell your last

13    name for the record.

14          THE WITNESS:  Randall Reed Benson, B-e-n-s-o-n.

15          MR. CHARNAS:  May I proceed?

16          THE COURT:  Yes.

17    DIRECT EXAMINATION BY MR. CHARNAS:

18    Q.   Good afternoon, Dr. Benson.  Tell us, what's your address?

19    A.   My address?

20    Q.   Yes.

21    A.   It is 43000 West Nine Mile Road in Novi, Michigan.

22    Q.   What's your occupation, Dr. Benson?

23    A.   I'm a neurologist.

24    Q.   Do you have a specialty within the field of neurology or a

25    subspecialty?

1    A.    Behavioral neurology.

2    Q.    What's behavioral neurology?

3    A.    Behavioral neurology is a subspecialization within

4    neurology that essentially means that you're focused on brain

5    disorders.  As opposed to the spinal cord and the peripheral

6    nervous system, my specialty is brain, and that means

7    behavioral disorders, to some extent psychiatric disorders,

8    specialization in memory and cognition, and over the past ten

9    years a heavy emphasis on brain injury, traumatic brain injury.

10   Q.    Please summarize for us, Doctor, your education, training,

11   and experience in the field of medicine.

12   A.    I went to medical school in St. Louis, or I should say I

13   went to a college in St. Louis at Washington University,

14   majored in biology and psychology, went to medical school at

15   Hahnemann in Philadelphia, did an internship and then residency

16   at a school called Boston University, and then fellowship

17   training at Massachusetts General Hospital, Mass. General;

18   spent six and a half years, including fellowship, using a new

19   imaging technique, a new MRI imaging technique called

20   functional MRI, and was heavily involved in early experiments

21   using functional MRI to map the brain cognitively, again, with

22   an emphasis on language processing; also had some training in a

23   technique called diffusion tensor imaging that set the stage

24   for application of this technique to head trauma beginning in

25   about 2004.  I think I'll stop there.

1    Q.    Tell us about this diffusion tensor imaging.  What is it?

2    A.    Diffusion tensor imaging is an MRI technique.  That is,

3    it's done on a regular MRI scan, no special hardware required.

4    It's a technique that is capable of measuring random motion of

5    water molecules inside biological tissue.  Now, this turns out

6    to be very important because with trauma, or with destruction

7    of white matter, fibers -- the brain, as you may know, is

8    comprised of gray matter and white matter.  The white matter

9    takes the brunt of these traumatic injuries.  Diffusion tensor

10   imaging is able to identify areas of abnormal diffusion caused

11   by destruction or injury to the white matter tissue.

12   Q.    Tell us about your research and experience with diffusion

13   tensor imaging.

14   A.    So beginning in 2004, I, as I mentioned, turned my focus

15   to brain injury, what we call "TBI," traumatic brain injury,

16   and deployed this technique that we call "DTI," because it's

17   kind of hard to say "diffusion tensor imaging" all the time, so

18   DTI is the technique; began by looking at a large number of

19   people with brain injury and comparing them using this

20   technique with normal, healthy controls.  And what we found in

21   2007 and published in 2007 is that this technique was able to

22   differentiate or separate all of the trauma cases from all of

23   the healthy controls, and we published in the Journal of

24   Neurotrauma and showed how we did that, looking exclusively at

25   the white matter of the brain.  Since then -- and I was at

1    Wayne State University in Detroit at the time, where I was for
2    ten years, did extensive research involving veterans of Iraq
3    and Afghanistan, so people with head injuries from war, blast
4    injury and impact injury, in addition to studies involving
5    former professional football players, and actually presented
6    some of that work at the second NFL concussion hearing back in
7    2010.

8        And so what we've done, generally speaking, is, we've
9    looked at their clinical impairments using neuropsychological
10    data, their symptoms.  We also have our subjects complete
11    questionnaires that cover a range of different symptoms, and
12    then we do brain imaging.  We do brain imaging with diffusion
13    tensor imaging and a few other techniques, and what we have
14    learned and published is that there is a real good correlation
15    between what we find on the imaging and the symptoms that
16    patients report, and even neuropsychological performance.

17        And I don't want you to think that it's just my lab that's
18    doing this.  There are a number of groups across the country
19    and really all over the world who are doing this, and what we
20    understand now is that particularly with the milder injuries,
21    conventional MRI or CAT scan doesn't show the injuries.  We
22    need something more.  Diffusion tensor imaging seems to be the
23    most sensitive.  That is to say, it seems to detect injuries
24    when they exist, and it doesn't detect injuries when they don't
25    exist.

1      Now, I'm not going to tell you that we can date these

2  injuries because with this technique, we can't tell you whether

3  it was an injury that occurred a month ago or ten years ago.

4  But we can see the injuries, and we can relate the location of

5  the injuries to the cognitive problems, the symptoms that

6  people are having, and I think -- I think I'll stop there.

7  Q.   Doctor, would it be fair to call you a pioneer in this

8  field?

9  A.   Hmm.  Well, I would say that I'm probably one of the first

10  people, one of the first scientists to use DTI for head trauma.

11  DTI was used originally to study multiple sclerosis, which is

12  another disorder involving damage to white matter, but I was

13  one of the first to deploy this technique in head trauma.

14  Q.   I think earlier you said, "we" published a paper.  When

15  you said "we," did you mean you amongst some others?

16  A.   Yes.  You know, obviously you don't do this work by

17  yourself, so I had a team and continue to have a team, and I

18  collaborate with other researchers at Wayne State University in

19  Detroit, so I don't do any of this by myself.

20  Q.   Tell us briefly, after you completed your training as a

21  physician, where did you work since then?

22  A.   Where did I work?

23  Q.   Yes.

24  A.   I've worked -- initially I took a job as an academic, as

25  an attending neurologist on the faculty at University of

1    Connecticut in Farmington, Connecticut, and stayed there for

2    five years, and after that -- well, I around that time got

3    married and moved to my wife's hometown of Detroit, Michigan,

4    so I was on the faculty again at Wayne State University for ten

5    years, and after that, left to open up a nonprofit dedicated to

6    head trauma.

7    Q.    Tell us about that nonprofit.  What's the name of it,

8    Doctor?

9    A.    The name of the nonprofit is The Center For Neurological

10   Studies.

11   Q.    What's the mission of The Center for Neurological Studies?

12   A.    The mission of CNS is to push the needle on the diagnosis

13   and treatment of traumatic brain injury.

14   Q.    Have you been involved in research involving football

15   players with head injury?

16   A.    I have.

17   Q.    Tell us about that.

18   A.    Well, one of the first studies that I was involved with,

19   when I was at Wayne State, our imaging group was contracted by

20   the NFL to do the imaging portion of an outcome study that they

21   were pursuing on retired football players.  So we worked

22   collaboratively, I guess you would say, with the NFL, and

23   prescribed the imaging that we wanted done, including diffusion

24   tensor imaging, and did the analysis of the imaging, and would

25   send them reports.  We were part of or coauthored an article

1    that came out last year on that data, and, as I mentioned, I've

2    done -- I continue to see former NFL players.  I've seen over a

3    hundred in the past year and a half to two years as part of the

4    class action suit evaluations, and every single one of those

5    players or former players that I see signs a research consent

6    form, so we have their data, and we're currently working on a

7    publication involving that group of over a hundred players.

8    Q.    Is there any part of that study, any important findings

9    you can share with us?

10   A.    Well, certainly one important finding is that most of the

11   players, most of the former players that we've seen do have

12   evidence of brain injury, which is not too surprising, given

13   the repetitive impacts that they sustain.  I can also tell you

14   that almost every one of those former players has pituitary

15   insufficiency, again, caused by trauma, so some of their

16   symptoms are related to hormone insufficiencies.

17   Q.    Have you ever testified before Congress about brain

18   injury?

19   A.    I did.

20   Q.    Tell us a little bit about that, if you would, Doctor.

21   A.    Well, I alluded to it earlier.  Back in 2010, at the

22   second NFL concussion hearing, I testified as both a treater of

23   head-injured persons as well as a researcher, so I testified

24   for about 20 minutes and talked about what at the time was not

25   terribly well appreciated.  This is 2010, and what a difference

1    five years makes because people weren't talking so much about

2    concussions in football.  They certainly weren't talking about

3    the chronic degenerative problems that we now understand, the

4    public now understands players deal with.  So I talked about

5    what we called the "silent epidemic," concussions and the

6    persistent effects, and, as I mentioned, showed some imaging

7    results, and made or tried to argue that the NFL should use the

8    type of imaging that I presented on a regular basis.  I felt

9    that it's important to monitor their employees because they're

10   employees.  One way to monitor them over time was to do

11   imaging.  As you know, that is not something that has been

12   invoked or employed by them, and I continue to think that it's

13   a mistake.

14   Q.   Is diffusion tensor imaging generally accepted in the

15   medical community as a method of diagnosing traumatic brain

16   injury?

17   A.   I think that -- I mean, when you say "generally accepted,"

18   I think it's generally accepted that the technique offers a

19   lot, that it offers the potential to be standard of care.  It's

20   not standard of care yet.  In the same way that functional MRI,

21   it took ten years before it became the standard of care for

22   mapping language areas in surgical patients before surgeries,

23   so I think even those radiologists who aren't terribly familiar

24   with it have read the literature.  And certainly there are over

25   8,000 articles published, peer-review articles on the subject,

1    and probably 1,000 or so where DTI has been applied to head

2    trauma.  Most people would say that it's only a matter of time

3    before it becomes something that is used routinely all over the

4    country.

5    Q.    Doctor, at some point did I send Megan Irwin to you?

6    A.    Yes.

7    Q.    And did you arrange to have some brain imaging done on

8    her?

9    A.    I did.

10   Q.    What type of imaging did you perform or have performed in

11   regard to Megan Irwin?

12   A.    Well, we did an MRI scan.  The MRI scan lasts about an

13   hour, and in that hour there are a number of sequences, a

14   number of different types of MRI scans that are done.  So you

15   might think of it as a battery of MRI tests, not one test,

16   because MRI uniquely has the capability of looking at many

17   different aspects of biological tissue.  And so historically

18   what I like to do is to put as much in that battery as I can,

19   understanding that the consequences of trauma are not singular.

20   That is to say, it's not a true statement that the only finding

21   when you look at the tissue after trauma is bleeding.  I mean,

22   there's more than that.  There are a number of different kinds

23   of pathology.

24          So we used standard conventional structural imaging.

25   In addition, we used two sequences that are the most sensitive

1    sequences for looking at bleeding.  We used the diffusion

2    tensor sequence that I've talked about, and we did an

3    additional research sequence that we haven't even looked at the

4    results.  We just -- we bank that data and we look at it later

5    in time.

6              MR. LAWLER:  Your Honor, can we have a sidebar?

7    SIDEBAR CONFERENCE:

8              THE COURT:  How long will you be?

9              MR. LAWLER:  I don't think it's going to be that long

10   as long as it stays within the confines of the -- although I

11   think -- can I make my argument first?

12             THE COURT:  Yes.

13             MR. LAWLER:  Your Honor, I think that we should stop

14   right now with this witness.  He basically said that this

15   particular technique is not generally accepted in the field;

16   it's not the standard of care.  Now everything that he says

17   beyond that becomes prejudicial.  He should be knocked down the

18   blocks right at this moment.

19             MR. CHARNAS:  Dr. Greenwald testified that he used it

20   in his practice, and I think what he's saying is that not every

21   neurologist or physician uses it yet, but that's not the same

22   as not being accepted as an accurate technique.  I can clear

23   that up.

24             THE COURT:  I think he said that it was an accurate

25   technique, but he did say it wasn't the standard of care, but I

1    think he said it's increasingly being used.  So see if you can

2    clear it up about its reliability.

3              MR. LAWLER:  Oh, I think it has to go, you know,

4    without a leading fashion.  It has to be generally accepted in

5    the field.  I mean, I think it should there should be an

6    open-ended question:  Is DTI analysis, is it generally accepted

7    in the field?  And then if he says "yes," and then what's the

8    reason for that, then I'm fine with it.  If he says "no," I

9    think his testimony should be stricken.

10             MR. CHARNAS:  I think he's already made it clear that

11   it's generally accepted as an accurate methodology.

12             THE COURT:  I think that's what he said too.  If you

13   can clear it up, okay.

14             MR. LAWLER:  Thank you.

15             (End of sidebar conference.)

16   BY MR. CHARNAS:

17   Q.   Just to clear one thing up, is DTI generally accepted as

18   being an accurate methodology for viewing damage to the brain

19   or visualizing damage to the brain?

20   A.   Yes, I would agree with you.

21   Q.   Now, Doctor, you mentioned DTI.  What other imaging was

22   performed on Megan, if that's the right terminology I'm using?

23   It was FLAIR and some other things but --

24   A.   Yes, more specifically, we did a T1-weighted sequence, a

25   T2-weighted sequence, a so-called FLAIR.  We did a gradient

1    echo sequence, a susceptibility weighted sequence.  The latter

2    two are blood-sensitive techniques looking for hemorrhage, and

3    then the DTI sequence.

4    Q.    And, Doctor, have you reviewed the results of the MRI

5    scans and these other scans you're talking about?

6    A.    Yes, I have.

7    Q.    Now, diffusion tensor imaging, does there have to be some

8    sort of post-processing of the scans?  Can you explain that to

9    us.

10    A.    Yes.  Diffusion tensor imaging is a technique, as I

11    mentioned, that's looking at microscopic changes in the tissue.

12    It's not something you can see with the naked eye except in

13    very, very extreme, severe trauma cases.  So what we do in

14    order to bring out the abnormalities is to compare a patient's

15    brain images, DTI images, to a number of healthy control brain

16    images.  So there are, as Mr. Charnas alluded to, there are

17    some steps that we call "post-processing" that then allow us to

18    create a statistical map, and that statistical map is going to

19    show us areas of the brain that are highly likely to be injured

20    because they're showing up on the DTI as being very, very

21    different relative to the healthy control group.

22    Q.    Now, Doctor, hopefully this is going to show up on your

23    screen in a moment.  What are we looking at here?

24    A.    Well, what we're looking at --

25              MR. CHARNAS:  By the way, for the record, this is

1    Exhibit 49, your Honor.  Sorry.

2    A.    Okay, what we're looking at here are two ways of looking

3    at the same brain slice.  Now, this is one of those sequences.

4    It's called a FLAIR sequence.

5    Q.    By the way, this is Megan Irwin, right?

6    A.    Yes, this is Megan Irwin's -- this is one slice of Megan

7    Irwin's FLAIR image.  Now, we acquire a three-dimensional set,

8    so, in other words, we image the entire brain; but for Megan,

9    there were a couple of slices that showed some scars, and you

10   should see a couple of red squares, and inside those red

11   squares are high signal areas, hyperintensities.  Those

12   hyperintensities are scars.

13        Now, the second image with the bright background is

14   simply the light/dark reversed version, what we call "inverted

15   contrast," so it's showing you the same information, just two

16   different ways.

17   Q.    What's the significance of the scars that you mentioned?

18   A.    Well, we don't know for sure, but in somebody who has no

19   other brain disorder, it's likely that scars like this in the

20   white matter represent what we call "axonal injury" from

21   trauma.  Axons are these cable or wire-like processes inside

22   the white matter, and axonal injury is the pathology that

23   results most commonly with what we call "closed-head injury."

24   Q.    Let's look at the next one, Doctor.  What are we looking

25   at here?

1    A.    So we're looking at the same thing.  That is to say, we're

2    looking at axonal injury again.  And what you see is a very

3    sort of rounded, well-differentiated area of hyperintensity;

4    and I think in particular, with this area or this lesion, it's

5    located close to the gray matter, which is that ribbon-like

6    structure that is out at the periphery of the brain.  And when

7    we see hyperintensities shaped like this, sized like this that

8    are out of the periphery that occur kind of in isolation, that

9    is most typical of trauma as a cause.

10   Q.    Now, you mentioned that you had done a battery of these.

11   Which one is this?  Is this FLAIR we're looking at?

12   A.    This is the FLAIR.

13   Q.    And the one before that?

14   A.    That was also FLAIR, so these are structural sequences.

15   Q.    What are we looking at here?

16   A.    Now we're looking at a statistical map of the DTI image.

17   So you should see color.  You should see blue and maybe even

18   some green.  Now, the way that we structure this is that

19   anything that shows up in color exceeds a statistical

20   threshold, which means that it's very, very reduced relative to

21   the normals, and that is essentially an indication of breakage

22   or damage to the axons in these blue areas.

23   Q.    Just so it's clear, Megan Irwin doesn't have these blue

24   dots in her head, obviously?

25   A.    Right.

1   Q.   So how are these created?  What causes this to happen?

2   A.   So the short answer to that is that we obtain a

3   statistical map, a three-dimensional map with obviously

4   thousands or hundreds of thousands of pixels.  And what we do

5   is, we impose a statistical threshold, and that statistical

6   threshold might be two standard deviations.  And we say, we

7   essentially tell the software that anything, any voxel that

8   exceeds that threshold gets put in color, and everything else

9   ends up as black and white or gray.  And so I hope that

10  explains it.

11  Q.   So would it be a -- I guess it would be an

12  oversimplification, but basically do these dots indicate areas

13  where the water is not traveling through the axons the way they

14  should?

15  A.   Yes, I would say that's a good general way to say it.

16  Wherever you see color is an indication that in that tissue, in

17  that volume of brain, there is an abnormality in terms of the

18  water flow there, and it's indicative of injury.

19  Q.   Let's look at what I think is the last slide.  No, next to

20  last.  What's this?

21  A.   This is essentially the same kind of image as the last

22  image, but the only difference is that Megan Irwin was compared

23  to a whole different control group here.  And the point is

24  really to illustrate that the results are really not about the

25  control group; it's really about the patient.  And that's

1    important because if the results depended on the control group

2    to a large degree, we'd have to be exceedingly, exceedingly

3    specific about who we included in the control group, all right?

4    Now, the good news is that we don't have to do that because the

5    findings -- let's put it a different way.  The difference

6    between Megan's water flow and the average person who has not

7    had a brain injury is very large, so that gives it a certain

8    robustness.  And we could use any number of different control

9    groups, and we would still get the same results.

10   Q.   The last one, Doctor, what are we looking at here?

11   A.   What we're looking at here is essentially the same data,

12   the same results, but we've kind of presented it differently

13   for you so that you can see where in the head, where in the

14   brain some of these abnormalities live.  So this is actually a

15   three-dimensional reconstruction of Megan Irwin's FLAIR image,

16   which allows you nicely to see the surface features, and it

17   basically just gives you a good orientation to where some of

18   these injuries reside.

19   Q.   Doctor, what does the term "diffuse axonal injury" mean?

20   A.   "Diffuse axonal injury" is a description of what you see

21   if you were to cut open the brain and you were to go to the

22   areas that were damaged and you were to use a particular stain,

23   you would identify and you would locate in the tissue axons

24   that are no longer, meaning that they've been removed because

25   they've been damaged.  You would also see areas in the tissue

1   where the axons are swollen beyond anything resembling an axon,

2   what are called "retraction balls," and you would see scars.

3   So axonal injury we know from about a hundred years' worth of

4   research is appropriately named "diffuse," meaning it's all

5   over the brain.

6           Now, what I'm going to tell you is that no matter

7   where the impact comes from or no matter where the impact site

8   is to the head, the brain is soft, and it's kind of a

9   gelatinous consistency.  When there's impact and when there's

10  acceleration or deceleration of the brain, the brain deforms.

11  It literally gets stretched or it compacts or it twists all

12  over the brain, and so when we look at the tissue, we see

13  little pockets of axonal injury all over the brain, regardless

14  of where the impact was.

15  Q.   Do these axons carry information for the brain?  What

16  function do they perform?

17  A.   Think of these axons as being the cables of a computer

18  network, right?  So these axons are very long, and they connect

19  neurons to each other in the same way that wires or cables do

20  in an electrical network.  So if some of those axons are

21  damaged and not working, the network isn't going to work

22  properly.  And I think we all have experience with networks

23  that aren't working properly, where things are slow, errors are

24  made, the system goes down, all right?  Well, that's exactly

25  what a damaged brain does:  It works slowly, inefficiently.  It

1    fatigues, it goes down, and it's under much less control than

2    it was before.  The system isn't working properly.

3    Q.    Doctor, based on your knowledge, education, training and

4    experience that you told us about, and based on your review of

5    these scans that we've been looking at, do you have an opinion

6    as to whether Megan Irwin suffered at some point diffuse axonal

7    injury?

8    A.    There's no doubt in my mind.

9           MR. LAWLER:  Objection, your Honor.  Request a sidebar

10   at this point.

11          THE COURT:  Okay, come on up.

12   SIDEBAR CONFERENCE:

13          MR. LAWLER:  I know that was not Mr. Charnas' fault,

14   but the proper way is to say, is his opinion, yes or no, and

15   then what is the basis of that opinion, and then I can

16   articulate my objection.  So I was unable to do that, but I

17   want to state for the record that I'm objecting to this

18   particular expert opinion, and the reasons which were stated

19   earlier to include those in the motions in limine.  But also,

20   in regard to this, it's my understanding that he's not going to

21   testify specifically that diffuse axonal injury is attributed

22   to the August 5, 2012 incident.  Is that correct?

23          MR. CHARNAS:  Yes.

24          MR. LAWLER:  Okay.  But here we have a situation where

25   we have an opinion that she has this diffuse axonal injury, and

1    it's out in left field.  There's no causal connection

2    whatsoever.  No expert has articulated that; just to the

3    contrary.  So its probative value is minimal, but its

4    prejudicial value is extensive, and it should be a situation

5    where the testimony should be stricken.  It hasn't been met.

6    No one has been able to say.  Just as I said before, to the

7    contrary, there's been no -- you have to have a causal

8    connection.  You can't just have this injury out in left field.

9    So that's my objection.

10         MR. CHARNAS:  I would make several points.  One is,

11   this has already been ruled on.  Secondly, there is no imaging

12   technique, X ray, nothing, CAT scan, MRI, nothing, that shows

13   the etiology of what's shown on the image.  And the idea is

14   that others have testified based on clinical analysis that she

15   has brain damage, and this scan is consistent with that.

16         Now, he's free to cross-examine on the causal

17   connection.  No one has said that that we can show that it's

18   caused by this particular incident, so there's no issue on

19   that.

20         MR. LAWLER:  But it's different from the objective

21   X ray.  The objective X ray shows, for instance, a broken arm,

22   and then a doctor says, "I have an opinion that that's a broken

23   arm and that it's attributable to this particular incident,

24   this particular motor vehicle accident, this particular

25   whatever."  In this situation, there's none.  It's out in left

1    field.

2           THE COURT:  I understand the objection.  I think it

3    goes to the weight, and you should cover that in

4    cross-examination.

5           MR. LAWLER:  Okay, thank you.

6           (End of sidebar conference.)

7    BY MR. CHARNAS:

8    Q.   Let me ask it again slightly differently.  Based on your

9    knowledge, training, and experience that you've laid out for us

10   already, based on your review of these scans, yes or no, do you

11   have an opinion as to whether Megan Irwin has suffered diffuse

12   axonal injury?

13   A.   I do have an opinion.

14   Q.   Do you hold that opinion to a reasonable degree of medical

15   certainty?

16   A.   I do.

17   Q.   And what is that opinion, Doctor?

18   A.   That she did suffer diffuse axonal injury.

19           MR. CHARNAS:  Thank you.  That's all I have.

20   CROSS-EXAMINATION BY MR. LAWLER:

21   Q.   Good afternoon, Doctor.

22   A.   Good afternoon.

23   Q.   I think we met over a video conference this summer at a

24   deposition.  My name is John Lawler, and I represent Eclectic

25   Dining, the defendant in the case.  First of all, I have a few

1    questions regarding your background.  Sir, how many times have

2    you been retained as an expert in a case in litigation

3    involving DTI analysis?

4    A.   Well, generally speaking, I'm retained as an expert, as a

5    head injury expert, with additional admission as a neuroimaging

6    expert.  So how many times?  You're talking deposition and

7    trial or just trial?

8    Q.   Well, let's just start with trial.  For instance, how many

9    times have you testified at trial as an expert?

10   A.   I would say probably about twenty to twenty-five times.

11   Q.   Okay.  And how many times have you testified as an expert

12   at depositions?

13   A.   Uhm, oh, maybe a hundred or so.

14   Q.   Okay.  And that's in the past ten years or shorter than

15   that?

16   A.   The past six years, let's say.

17   Q.   Okay.  So you testified as an expert at trial in the last

18   six years approximately what, twenty-five times?

19   A.   Twenty to twenty-five, I guess.

20   Q.   And then another hundred times in depositions?

21   A.   Correct.

22   Q.   And working as an expert, that's a large percentage of

23   your practice; is that right?

24   A.   Working as an expert, I evaluate on the average of two new

25   patients a week.  I see about eight patients in my private

1   practice a week.

2   Q.   So you see two patients a week in regard to litigation

3   matters?

4   A.   Right.

5   Q.   So that's a little bit over a hundred patients a year in

6   litigation matters; is that right?

7   A.   That's about right.

8   Q.   Okay.  So over the course of a given year, you're retained

9   about a hundred times by lawyers who work on behalf of

10   plaintiffs; is that correct?

11   A.   That's correct.

12   Q.   And it's safe to say that you derive a very large

13   percentage of your income from working as an expert for

14   plaintiff attorneys, correct?

15   A.   Well, as I mentioned, I have a nonprofit, and the bulk of

16   the revenue that funnels into the nonprofit is through medical/

17   legal plaintiff-referred cases, each of which is a research

18   subject.  So our major mission, as I mentioned, is research and

19   treatment, so this fuels it, but that is correct.  My salary is

20   a flat salary.  I don't have -- my salary does not go up or

21   down week to week depending on how many cases I see.

22   Q.   Okay.  Now, you're obviously charging Attorney Charnas for

23   your time here testifying in Boston, correct?

24   A.   Correct.

25   Q.   How much are you charging to come to Boston and testify in

1    this particular case?

2    A.   I'm not sure exactly because I don't handle the billing

3    and the fee structure, but it's probably on the order of

4    $5,000.

5    Q.   You don't know a figure, though?

6    A.   No, I don't.

7    Q.   Well, it's safe to say that when you were originally

8    retained by Attorney Charnas, you insisted on being paid $7,000

9    up front, right?

10   A.   Well, I didn't insist.  I have other people that do the

11   billing.

12   Q.   Okay.  Now, although you were retained by

13   Attorney Charnas, Mrs. Megan Irwin was referred to you by

14   another physician; is that right?

15   A.   I don't -- I don't recall offhand.

16   Q.   Okay.  If I was to suggest to you that you were referred

17   this case by a doctor in New Jersey by the name of Brian

18   Greenwald, would that refresh your recollection?

19   A.   Yes, I know Brian, and I wasn't sure if he referred or if

20   the referral came directly from Mr. Charnas, but it was one or

21   the other.

22   Q.   Okay.  Well --

23        MR. LAWLER:  May I approach, your Honor?

24        THE COURT:  Sure.

25   Q.   Sir, what I'm going to do is, I'm going to show you your

1  deposition transcript and have you identify it, and then I'm

2  going to go back to the podium and ask you some questions.

3  Fair enough?

4  A.    Yes.

5  Q.    If you look at this, this is deposition testimony, a video

6  conference deposition that was provided on August 14, 2014, in

7  the case of *Irwin v. Eclectic Dining*.  Do you see that?

8  A.    I do.

9  Q.    Okay, and you remember giving testimony in that particular

10 case?

11 A.    Hmm, vaguely.

12 Q.    Well, that's because you give a lot of testimony at

13 depositions, so it's sometimes tough to remember, right?

14 A.    Well, that, and it's been a while.

15 Q.    Okay.  Well, would you agree with me that when you give

16 deposition testimony, you raise your right hand and you swear

17 to tell the truth and all that, right?

18 A.    Correct.

19 Q.    So help you God, right?

20 A.    Correct.

21 Q.    And that's what you did today as well, right?

22 A.    Right.

23 Q.    Now, I'm going to give you that deposition transcript, and

24 I'm going to go back to the podium and I'm going to have some

25 questions for you.  Now, could you please --

```
 1              MR. LAWLER:  Counsel, it's Page 8.
 2     A.   Okay.
 3     Q.   And actually I think the question begins on Page 7, so if
 4     you can turn to Page 7, the question on Line 25, "And were you
 5     retained by her attorney, Scott Charnas?"  I read that
 6     correctly, right?
 7     A.   Yes.
 8     Q.   And on Page 8, if you could turn to your answer on Line 1,
 9     it says, "My understanding is that I was referred by another
10     physician, but that I was retained by Mr. Charnas."
11              I read that correctly, right?
12     A.   Yes.
13     Q.   And then I asked you the question on Line 3, "Okay, and
14     who was the other physician that referred you?"
15              I read that correctly, right?
16     A.   Yes.
17     Q.   And the answer on Line 5 is "Brian Greenwald," correct?
18     A.   Correct.
19     Q.   So I would assume that that refreshes your recollection so
20     that you now know that Dr. Brian Greenwald referred you this
21     particular case, correct?
22     A.   Uhm, yes.  I'm not sure that even at that time I was a
23     hundred percent certain, but apparently a year ago, or more
24     than a year ago, my memory was a little clearer about this, and
25     I did say Brian Greenwald, yeah.
```

1    Q.    Okay.  And actually you've come across Dr. Greenwald at

2    conferences where you both lecture about brain injury, correct?

3    A.    That's true, probably about four or five times over the

4    years.

5    Q.    Okay, so you basically teach at conferences that are run

6    by lawyers who are plaintiff attorneys, correct?

7    A.    That's true, in addition to medical conferences, but that

8    particular one is legal affairs, that's true.

9    Q.    Okay.  But you do teach at seminars in which lawyers

10   attend who are interested in litigating brain injury cases,

11   right?

12   A.    True, true.

13   Q.    And you also see Dr. Brian Greenwald in those situations

14   as well, right?

15   A.    As I mentioned, I've seen Brian probably about four or

16   five times in my life, right.

17   Q.    Okay.  Now, let's talk briefly about some of the testimony

18   regarding work that you've done in the past, and you talked

19   about work that you've done in regard to professional football

20   players, right?

21   A.    Correct.

22   Q.    And would you agree with me that in the realm of brain

23   injury, that football players are members of a unique set of

24   the population, right?

25   A.    How do you mean?  I'm not sure what you're referring to.

1  Q.   Well, you realize that, for instance, there's been a lot
2  of talk in the media about professional football players and
3  brain injuries due to concussions, right?
4  A.   Yes.
5  Q.   Okay.  So you would agree with me that someone, let's say,
6  for instance, someone who's played professional football for
7  five years, that by definition they have had numerous head
8  impacts during the course of their career, right?
9  A.   I agree.
10 Q.   Okay.  So, for instance, someone who played professional
11 football may have played Pop Warner football, right?
12 A.   Correct.
13 Q.   Okay.  And Pop Warner football is football for the younger
14 kids, right?
15 A.   Right.
16 Q.   Okay.  And someone who played professional football most
17 likely played in high school, right?
18 A.   Correct.
19 Q.   And because professional football players are the best of
20 the bunch, they probably played both ways, right?  Do you
21 understand what that means?
22 A.   I do, but that's not necessarily true.
23 Q.   Okay.  And when I say a football player plays both ways,
24 that means he plays both on offense and on defense, right?
25 A.   And special teams.

1    Q.    And special teams, right, okay.  Now, in addition, a

2    professional football player typically plays four years of

3    college football, right?

4    A.    Uhm, plus or minus, but, yes.

5    Q.    Okay, some may leave earlier for the draft, but for the

6    most part, they played four years in a college, right?

7    A.    Right.

8    Q.    Okay.  And, also, the level that they play football at in

9    the college level is at a very high level, right?

10   A.    Correct.

11   Q.    Typically like, for instance, Division 1, Notre Dame,

12   Northwestern, you know, University of Miami, colleges like

13   that, right?

14   A.    Uhm, yeah.

15   Q.    Okay.  So before they even reach the pro level, these

16   football players have played for years and years, right?

17   A.    Right.

18   Q.    And they have for the most part suffered numerous impacts

19   on Saturdays and Sundays when they play, right?

20   A.    Right.

21   Q.    Numerous impacts to the brain, right?

22   A.    Uhm, well, impacts to the body, which ultimately result in

23   movement of the brain, and oftentimes symptoms suggesting

24   concussion, but oftentimes no symptoms.

25   Q.    Okay.  But also, for instance, not only do they suffer

1    impacts when they play on Saturday and Sundays or high school

2    Friday nights, but they also play or practice during the week,

3    right?

4    A.    Right.

5    Q.    And they hit all the time, right?

6    A.    Well, not all the time but --

7    Q.    Quite a bit?

8    A.    Quite a bit, yes.

9    Q.    Okay.  So some of these professional football players,

10   and, again, when they're playing professional football, whether

11   they're trying out for a team or they're playing on Sundays,

12   they're also involved in a lot of hitting, right?

13   A.    It's a violent game.

14   Q.    Right.  And so this set of professional football players,

15   I mean, some of them have had, you know, 50 to 75 occasions of

16   basic head injuries, right?

17   A.    Well, it depends on what you mean by a basic head injury.

18   I'm not sure I know what you're referring to.

19   Q.    Well, for instance, you know, like, for instance, there's

20   a term when you play football when you get your bell rung,

21   right?

22   A.    Right.

23   Q.    And we know that, you know, football players get their

24   bell rung, and they go back out on the field, right?

25   A.    Absolutely, right.

1   Q.    You know, I mean, whether it's someone like Wes Welker --
2   do you know who Wes Welker is?
3   A.    Sure.
4   Q.    Okay, someone who's played professional football for a
5   number of years and has had a multitude of concussions, right?
6   A.    Absolutely.
7   Q.    And probably a number of multiple undiagnosed concussions,
8   right?
9   A.    Absolutely.
10  Q.    So it's a very different population than, you know,
11  someone, like, who just goes to work in an office from 9:00 to
12  5:00, right?
13  A.    Somebody whose job it is to suffer head impacts versus
14  somebody who works in an office, which is, I think, a
15  noncontact sport, yeah, that's pretty different.
16  Q.    Okay.  So, for instance, if a football player, let's say
17  at age thirty years old who's played, you know, eight years in
18  the NFL, if you do DTI scans on that individual and there's a
19  lot of disturbances to the white matter, it's safe to say that
20  you cannot tell what caused the changes to the white matter
21  during the course of that player's career, right?
22  A.    That's correct.
23  Q.    So the damage could have occurred when that player played
24  in Pop Warner, right?
25  A.    Could have, yeah.

1    Q.    It could have occurred when that player played in high

2    school, right?

3    A.    True.

4    Q.    It could have occurred any year when that player played in

5    college, right?

6    A.    Absolutely.

7    Q.    And the same thing, anytime during that particular

8    person's career in the NFL, right?

9    A.    Yes.

10   Q.    You just don't know, right?

11   A.    That's right.

12   Q.    And in reference to Mrs. Irwin's DTI sequences, you don't

13   know when the alleged axonal damage that you see in those DTIs

14   occurred, right?

15   A.    I cannot be certain, that's true.

16   Q.    Okay.  Now, let's talk briefly about the report that you

17   completed.  Do you have a copy of that report, Doctor?

18   A.    I do.

19   Q.    Now, the report is dated, or the date of the service,

20   which means the MRIs were taken on April 5, 2014; is that

21   right?

22   A.    Correct.

23   Q.    Okay.  And, first of all, when those MRIs were taken, they

24   were taken in Detroit, Michigan, right?

25   A.    Correct.

1  Q.   And the name of the hospital where they were taken, is it
2  Harper Hospital?
3  A.   It is.
4  Q.   And are you affiliated with Harper Hospital?
5  A.   Not now, but I was.
6  Q.   Okay, so were you affiliated with Harper Hospital when
7  these MRIs were taken?
8  A.   No, but my protocol is still used, and that's what I
9  request.
10  Q.   Okay.  You are not a radiologist, right?
11  A.   Correct.
12  Q.   Okay.  You can read some MRIs but not all MRIs; is that
13  right?
14  A.   I can read all MRIs.  My focus is in brain MRIs, and
15  particularly the sequences that I ordered for Megan, the trauma
16  sequences, but there are a number of other types of MRIs that
17  I've read for many years.
18  Q.   Okay.  So getting back to Mrs. Irwin, she goes to Harper
19  Hospital and she's put through a regular MRI scan, right?
20  A.   Right.
21  Q.   Okay.  And you are not there, correct?
22  A.   That's correct.
23  Q.   It's done by what, a radiologist technician?
24  A.   No.  An MRI technologist.
25  Q.   Okay.  And then a CD is produced, is that right?  Is it a

1    CD?

2    A.    Yes.

3    Q.    Okay, so a CD is produced that has the various sequences

4    on it, right?

5    A.    Right.

6    Q.    And then one of your technicians comes and retrieves the

7    CD, right?

8    A.    That's right.

9    Q.    And then that technician then processes the MRI; is that

10   right?

11   A.    Right.

12   Q.    And there's quite a bit of processing that's done to the

13   DTIs, right?

14   A.    Right.

15   Q.    And is it done on a computer scan?

16   A.    It's done on a computer, right.

17   Q.    Okay, it's done on a computer?

18   A.    Right.

19   Q.    All right.  And essentially what you're doing is, you're

20   essentially comparing the sequence of Mrs. Irwin to a certain

21   number of people that you think are normal; is that right?

22   A.    Well, to the best of our ability without -- without

23   getting medical records on these people, that's true.

24   Q.    Okay.  So it's a comparison to a sample?  Would you call

25   it a normative sample?

1    A.   Well, a reference group, a normal reference group, control

2    group; just like, you know, if you had a chemistry lab, they

3    would reference the results against a normal reference group.

4    Q.   And the reference group that you use is 87 subjects; is

5    that right?

6    A.   No.  We have a number of different control groups.  In

7    fact, the images that I showed were done on two different

8    control groups.

9    Q.   And how many numbers in those control groups?

10   A.   Thirty-seven and twenty-five.

11   Q.   Oh, so it's less than -- so you're comparing that, that

12   particular sequence, to 25 people?

13   A.   Comparing Megan's images to a group of 25 and a group of

14   37, that's correct.  We don't need more than that.

15   Q.   Okay.  Now, you took a number of sequences, T1, T2, FLAIR,

16   SWI, DTI, and gradient echo, correct?

17   A.   Correct.

18   Q.   Okay.  Now, in reference to the T1 sequence, that revealed

19   no abnormalities with Mrs. Irwin; is that correct?

20   A.   That's correct.

21   Q.   And in reference to the T2, did that also reveal no

22   abnormalities?

23   A.   No.  There were abnormalities on the T2.

24   Q.   Abnormalities?  I'm sorry.  Is that the FLAIR T2?

25   A.   Well, that's FLAIR and T2.  Those are two different

1    sequences.

2    Q.    Okay.  They revealed subcortical hyperintensities; is that

3    correct?

4    A.    That's correct.

5    Q.    And what does that word mean, "subcortical"?

6    A.    It means under the cortex.

7    Q.    Okay.  Would you agree with me that white matter changes

8    under the cortex normally don't occur in brain injury patients?

9    A.    No, I would not agree with that.

10   Q.    Now, the subcortical hyperintensities, is that damage to

11   the axons?

12   A.    Yes.

13   Q.    And are there other brain disorders that also reveal

14   damage to the subcortical area of the brain, not trauma but

15   other brain disorders?

16   A.    Is that a question?  I didn't get the question.  I'm

17   sorry.

18   Q.    Okay, I'm sorry.  Are there brain disorders which produce

19   subcortical hyperintensities?  That's the question.

20   A.    There are a few.

21   Q.    And can you name them?

22   A.    Vasculitis can do it.  Metastases from distal primary

23   cancers can do it.  Certain infections can do it.  Those are

24   the most common.

25   Q.    How about MS?

1    A.    MS tends not to be subcortical.  It tends to be deep.  It

2    tends to involve the corpus callosum.  It's less likely to be

3    at the gray-white junction or subcortical.

4    Q.    Now, there are obviously certain symptoms -- I'm not

5    talking about Mrs. Irwin; I'm just talking in general -- but

6    there are obviously certain symptoms of brain injury or

7    brain-injured patients, correct?

8    A.    Correct.

9    Q.    Okay.  Is it true that the images that show up to white

10   matter on DTIs cannot translate into specific symptoms that a

11   particular person has?

12   A.    Yes and no.  Certainly we have some understanding about

13   what parts of the brain are responsible for different

14   functions, and we certainly expect, for instance, that a

15   cluster of white matter lesions along the sylvian fisher in the

16   left hemisphere will result in language problems.  So, yeah, we

17   do have some general understanding about those things, but we

18   can't say exactly what a patient is going to look like given

19   their imaging, that is true.

20          MR. LAWLER:  One moment, your Honor.  I may be done.

21   Let me check with my colleague.  I have a couple questions, but

22   I'm pretty close to being done.

23          (Discussion off the record between defense counsel.)

24   Q.    Now, Doctor, as was said before, the DTI cannot pinpoint

25   what, if any, injury occurred to a particular patient at a

1    specific point in time, right?

2    A.    I'm not sure I understand your question.

3    Q.    Okay.  Well, again, if a particular person -- well, first

4    of all, we all have white matter, right?

5    A.    Right.

6    Q.    Okay.  And some people are born with a congenital

7    condition that brings about white matter changes.  Do you agree

8    with that?

9    A.    I'm not sure what congenital condition you're talking

10   about.

11   Q.    Okay.  Well, we learned about that through Dr. Greenwald

12   earlier, so I guess I'll have to defer to him.  So there's no

13   congenital condition that you know that brings about early

14   white matter changes to someone's brain.  Is that an accurate

15   statement?

16   A.    No.  There are leukoencephalopathies that occur that are

17   genetically predetermined.  So, yeah, I mean, those are rare,

18   but they do occur.

19   Q.    Okay.  And also, as people age, they also, for instance,

20   go through white matter changes, right?

21   A.    Uhm, as we age, we lose white matter and we lose gray

22   matter in a linear fashion throughout our life span, that's

23   true.

24   Q.    Starting when?

25   A.    In our twenties.

1    Q.    Okay.  And does that progression, that linear progression,

2    does that show up on your DTIs?

3    A.    Uhm, well, we're not doing a volumetric analysis, so the

4    loss of tissue is not going that DTI looks at.  There is a

5    reduction in, as we talked about, FA, or fractional anisotropy

6    with age, and that is something that we do take into account

7    and eliminate the effect of.

8    Q.    Now, if someone has had a series of concussions throughout

9    their lifetime, one that occurred, for instance, in teenage

10   years, one that occurred in college years, and then one that

11   occurred in the middle twenties or late twenties, so let's say

12   you have three concussions, again, if you take a DTI analysis,

13   a sequence, you can't tell where the white matter changes

14   belong to, right?

15   A.    Well, to the extent that one of those injuries might be

16   much more severe than another, and the symptoms are relatively

17   well localized, let's say, to one hemisphere versus the other,

18   we might indeed be able to associate a specific injury to the

19   brain imaging findings.

20   Q.    Okay, but you certainly haven't done that in Ms. Irwin's

21   case, right?

22   A.    I was not asked to do that, so that's true.

23   Q.    Okay, fair enough.  Now, in the situation you said earlier

24   where if someone suffers a more severe impact, then you might

25   be able to dictate where that is, is that right, on the DTI

1    sequence?

2    A.    Uhm, right.

3    Q.    So when we're talking about severity, do you agree that --

4    let's say there's four events where someone has a concussion

5    under the criteria of concussion, and one of those events

6    results in loss of consciousness for a period of two minutes,

7    and the other ones have loss of consciousness for only a couple

8    seconds, do you expect the DTI analysis to show that the white

9    matter changes belong to the loss-of-consciousness event versus

10   the other events?

11   A.    A brief loss of consciousness does not equate with

12   severity.  In fact, there's some data suggesting that there's a

13   better prognosis in sports concussion when there is a loss of

14   consciousness compared with an absence of loss of

15   consciousness.

16   Q.    So loss of consciousness really doesn't have any play in

17   the situation?

18   A.    Not a brief loss of consciousness.  If it's, you know,

19   24 hours or longer, that's highly significant.

20        MR. LAWLER:  That's all I have.  Thank you very much,

21   Doctor.

22        MR. CHARNAS:  Just a very few questions, Judge.

23        THE COURT:  Yes.

24   REDIRECT EXAMINATION BY MR. CHARNAS:

25   Q.    Following up on Mr. Lawler's questions, if a persons has

1    had significant postconcussion syndrome symptoms clustered

2    around one event and not another, would you be able to

3    determine which event caused the diffuse axonal injury?

4    A.    That's a good question.  I'm not sure I know the answer to

5    that question yet.

6    Q.    Doctor, you had mentioned earlier that you felt -- forgive

7    me if I get the numbers wrong -- that 25 to 37 people in your

8    normative or control group were sufficient?

9    A.    Yes.

10   Q.    What's the basis of your answer?

11   A.    We've done statistical modeling, and given the variance in

12   the results in the control group, we only need about 10 to

13   begin to see statistical significance for a given patient.

14   Q.    Doctor, Mr. Lawler asked you about whether you lectured to

15   plaintiffs' attorneys.  Do you remember that?

16   A.    I do.

17   Q.    Have you ever been invited by defense attorneys to attend

18   a lecture of yours or to have you come to lecture to them about

19   imaging techniques that accurately depict brain injury?

20   A.    No, but I would love to.

21   Q.    They don't seem to be interested?

22   A.    For some reason, they don't seem to be interested, that's

23   true.

24          MR. CHARNAS:  Thank you.

25          MR. LAWLER:  I have nothing further.  Thank you, your

1  Honor.

2          THE COURT:  Doctor, you are excused.

3          (Witness excused.)

4          THE COURT:  All right, jurors, you are also to be

5  excused today.  We only have two minutes left, so we'll recess

6  for the day.  Tomorrow we'll start at 9:00, so you will have to

7  be in rush hour traffic, but we'll have you out of here before

8  lunch.  And my same standing instructions, so don't talk to

9  each other, don't talk to anybody else, keep an open mind about

10  what you've heard until the close of the evidence, and have a

11  good night.

12          THE CLERK:  All rise for the jury.

13          (Jury excused.)

14          THE COURT:  Who's on deck for tomorrow, Mr. Charnas?

15          MR. CHARNAS:  I'm sorry?

16          THE COURT:  Who are we seeing tomorrow?

17          MR. CHARNAS:  It's going to be the restaurant lineup,

18  your Honor.  It's going to be Caitlin Hildreth, it's going to

19  be Meghan O'Neil, and it's going to be Joseph Campbell, and if

20  we finish those three, it will be Mrs. Connolly, Megan Irwin's

21  mother.

22          THE COURT:  Anything else?

23          MR. CHARNAS:  I don't think we'll get beyond that,

24  but --

25          THE COURT:  No, anything else we can do this

1    afternoon?

2            MR. CHARNAS:  Oh, no, I don't believe so, Judge.

3            THE COURT:  Okay, see you tomorrow.

4            MR. CHARNAS:  Thank you, your Honor.

5            MR. LAWLER:  Thank you, your Honor.

6            (Adjourned, 3:45 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

  UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS    ) ss.
  CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Part 2,

9  Pages 1 through 67 inclusive, was recorded by me

10 stenographically at the time and place aforesaid in Civil

11 Action No. 13-10974-ADB, Megan C. Irwin v. Eclectic Dining,

12 Inc., and thereafter by me reduced to typewriting and is a true

13 and accurate record of the proceedings.

14          Dated this 2nd day of June, 2016.

15

16

17

18

19          /s/ Lee A. Marzilli
            _____
20          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25